# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NOVA HOLDING CLINTON COUNTY, LLC, | : | Case No. 09-11081 (KG) |
| *et al.*,[1] | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

**Objection Deadline: June 19, 2009 at 4:00 p.m.**
**Hearing Date: June 24, 2009 at 4:00 p.m.**

**MOTION OF NOVA HOLDING CLINTON COUNTY, LLC AND AFFILIATED DEBTORS FOR A FINAL ORDER: (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING DEBTORS TO UTILIZE CASH COLLATERAL, AND (III) GRANTING ADEQUATE PROTECTION TO WESTLB AG PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363 AND 364 AND BANKRUPTCY RULES 2002, 4001, AND 9014**

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or

"Nova") hereby move for entry of a final order (the "Final DIP Order"), under sections 105, 361, 362,

363, and 364 of title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (the "Bankruptcy Code"),

Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the

"Local Rules"):  (i) authorizing the Debtors to obtain postpetition financing; (ii) authorizing the Debtors

to utilize cash collateral; (iii) granting adequate protection to the Prepetition Lenders (as defined below);

and (iv) scheduling a final hearing on this motion (the "Motion").  In support of the Motion, the Debtors,

by and through their undersigned counsel, respectfully represent:

---

[1]  The Debtors and the last four digits of their respective tax identification numbers are:  Nova Holding Clinton County, LLC ("Holding Clinton"), a Delaware limited liability company (9944); Nova Biofuels Clinton County, LLC ("Clinton"), a Delaware limited liability company (9809); Nova Holding Seneca, LLC ("Holding Seneca"), a Delaware limited liability company (9237); Nova Seneca, LLC ("Seneca"), a Delaware limited liability company (9222); Nova Holding Trade Group, LLC ("Holding Trade"), a Delaware limited liability company (9278); Nova Biofuels Trade Group, LLC ("Biofuels Trade"), a Delaware limited liability company (9269); NBF Operations, LLC ("NBF"), a Delaware limited liability company (8450); Nova Biosource Technologies, LLC ("Technologies"), a Texas limited liability company (4403); Biosource America, Inc. ("Biosource America"), a Texas corporation (7542); and Nova Biosource Fuels, Inc. ("Biosource Fuels"), a Nevada corporation (8450).

**INTRODUCTION**

**Debtors' Liquidity Constraints**

Since the commencement of these cases, the Debtors have worked to analyze their funding needs and have since determined that they need debtor-in-possession financing in order to properly explore value-maximizing strategic alternatives for all of their stakeholders. At present, the Debtors are working diligently to create an appropriate strategic transaction and to create this transaction Nova must run a related strategic diligence/auction/asset disposition process through at least the middle of September of this year.

**Debtors' Efforts To Secured DIP Financing**

Since the Debtors are not operating and since internal sources of cash are insufficient to fund a suitable timetable for a strategic transaction, the Debtors have worked diligently to secure postpetition financing with terms as favorable as they could obtain in the current severely constrained credit markets. To that end, the Debtors have actively pursued multiple sources of a so-called "DIP" Financing, working with their primary prepetition secured working capital lender, WestLB AG (New York Branch) ("WestLB") and The Bank of New York Mellon Trust Co., N.A. as indenture trustee (the "Indenture Trustee") for those certain 55,000,000 parent convertible secured notes (the "Parent Convertible Notes'), as well as other third party lenders.

The Debtors have concluded that the best, indeed only presently feasible financing option they have is embodied in a term sheet provided to the company by WestLB. WestLB has liens on the Debtors' most valuable asset, its bio-diesel refinery in Seneca, Illinois and related assets and cash. Financing alternatives to the WestLB facility were all premised on subordinating WestLB's position on these key assets.

The proposed DIP facility enables the company to access $3.2 million in DIP and other funding and supports the runway the company needs to get a value-maximizing result in these Chapter 11 cases.

The specific terms of the proposed DIP financing and uses of cash collateral are described more fully below, including the forms of adequate protection that the Debtors are proposing to provide to

2

WestLB as the Prepetition Lender. The Debtors will be prepared to present evidence at the hearing scheduled for 4:00 p.m. on June 24, 2009 (the "Final Hearing") that the financing for which the Debtors seek approval is critical to maintain uninterrupted ordinary course operations, is fair and reasonable under the circumstances, and is in the best interests of the Debtors' estates. The Debtors will also be prepared to present evidence at the Final Hearing that the proposed forms of adequate protection, described below, adequately protect the interests of WestLB as the sole Prepetition Lender.

## BACKGROUND

**A.     The Chapter 11 Filing**

1.      On March 30, 2009 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' Chapter 11 cases (the "Chapter 11 Cases") are being jointly administered.

2.      An Official Committee (the "Committee") of Unsecured Creditors of the Debtors  was appointed in these Chapter 11 Cases by the United States Trustee on April 15, 2009.  [Dkt. No. 44].  Its members are:  (i) Highbridge International LLC; (ii) DePue Mechanical, Inc.; (iii) The Bank of New York Mellon Trust Company, N.A., (iv) Lipid Logistics, LLC, and (v) Veolia Environmental Services, Industrial Service ("Veolia").  Veolia has since resigned from the Committee.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.      The predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363 and 364 and Bankruptcy Rules 2002, 4001 and 9014.

**B.     The Debtors**

5.     Biosource Fuels is a publicly held Nevada corporation with its corporate headquarters located at 614 Shipyard Road, Seneca, IL 61360. Biosource Fuels is the ultimate corporate parent of all of the other Debtors. The Debtors are United States-based entities within the Biosource Fuels corporate organization.

**Overview of the Debtors' Businesses**

6.     Nova is an energy company that refines and markets ASTM D6751 quality biodiesel and related co-products from a variety of feedstocks through the deployment of its proprietary patented process technology, which enables the use of a broader range of lower cost feedstocks. Biodiesel is a clean burning, biodegradable and renewable fuel made from a variety of feedstocks, such as animal-derived fats, oils and greases and vegetable-based oils. Biodiesel is typically blended with petroleum diesel to create a biodiesel blend that is nearly indistinguishable from, and in some respects superior to, 100% petroleum diesel.

7.     The proprietary, patented process technology (the "Process Technology") utilized by Nova in the production of biodiesel is owned by Technologies. The Process Technology allows Nova to process over 25 different animal-derived fats, oils and greases and vegetable-based oils with free fatty acid levels in excess of 20% to produce their two primary marketable products: ASTM D6751 quality biodiesel and technical grade glycerin. Because feedstock represents 70 to 80% of biodiesel production costs, the ability to use a variety of potentially cheaper sources, animal fats in particular, dramatically increases Nova's potential profitability. Nova's ability to process a wide range of feedstocks, including single feedstock or blends of feedstocks, such as animal-derived feedstocks with higher free fatty acid content, without modification to the process equipment, gives Nova a significant cost advantage because many of these feedstocks are residual by-products that have limited alternative uses. Many of Nova's competitors are limited to a more narrow range of feedstocks and, in many instances, their feedstock options are limited to vegetable-based oils, and they have little or no ability to economically process meaningful amounts of lower cost animal-based feedstocks.

8.      The Process Technology produces biodiesel that consistently exceeds current ASTM D6751 specifications and EN 14214 (an international standard adopted in Europe that describes the minimum requirements for biodiesel). The quality of biodiesel produced by the Process Technology also meets the more stringent quality requirements anticipated for monoglyceride content. In addition, Nova's process does not generate significant amounts of toxic or hazardous byproducts that are often found in alternative processes. The principal byproduct generated in Nova's production process is technical grade glycerin with additional byproducts consisting of crude glycerin, a biodiesel "bottoms," which can be used as a burner fuel, and a "sweetwater" product, which can be used as fertilizer in some applications. Each of the co-products can be sold to reduce Nova's net biodiesel processing costs. Based upon Nova's experiences to date, the minimal environmental impact of Nova's facilities has resulted in faster facility permitting.

9.      The Nova process is a completely closed loop system, allowing for the recovery and treatment of vapors and condensable products to provide for odor control and limits on emissions to comply with air quality standards and permit limits. By eliminating the "water wash" step used in traditional processes, the Nova process substantially reduces the amount of waste water and the related water disposal challenges. For example, for a 20,000,000 gallons per year refinery, the traditional process would generate approximately 8,000,000 gallons of waste water. In contrast, the Nova process generates only approximately 140,000 gallons of waste water: a 98.25% reduction in waste water discharge.

10.      Prior to the Petition Date, the Debtors had three main operating entities: Seneca, Clinton, and Biosource America. Holding Seneca holds 100% of the member interests of Seneca. Holding Clinton holds 100% of the member interests of Clinton. NBF holds 100% of the member interests of Biosource America.

11.      Seneca owns the Seneca, Illinois refinery, the Debtors' flagship refinery. The Seneca refinery is designed to have production capacity of 60,000,000 gallons per year. It began startup operations in March 2008, and has the most up-to-date technology created by the Debtors. The Seneca refinery consists of three independent production systems or trains, each capable of producing and

5

refining 2,400 gallons per hour or 20 million gallons per year of biodiesel (which would require approximately 3.5 million pounds of feedstock per week per train). The Seneca refinery is not in active operation, but is available for operation with possible tolling/joint venture counter-parties.

12.     Clinton owns and operates the Clinton County, Iowa refinery. The Clinton refinery is designed to have a production capacity of 10,000,000 gallons per year. It began start-up operations in May 2006, and the Debtors purchased the Clinton refinery in September 2007. The Clinton refinery suffered a property casualty in late September 2008. Although repairs have been completed, the Clinton refinery has not resumed operations.

13.     Prior to the Petition Date, Biosource America provided engineering, procurement and construction (EPC) services to third parties, as well as to Clinton and Seneca when appropriate and necessary.

## C.     Debt Structure

### Biosource Fuels 10% Convertible Notes

14.     On September 28, 2007, Biosource Fuels issued the Parent Convertible Notes pursuant to an Indenture dated as of September 28, 2007 (the "BoNY Indenture") by and among Biosource Fuels, Holding Clinton and Clinton as guarantors, with Holding Seneca as a limited counter-party for the purpose of joining in certain limited covenants, and the Indenture Trustee. The Indenture Trustee also serves as the collateral agent under the BoNY Indenture and the related collateral and security documents.

15.     The $55,000,000 of principal owing under the Parent Convertible Notes is scheduled to be paid in one installment due on the maturity date, September 30, 2012, subject to earlier acceleration upon the occurrence of any specified event of default.

16.     Pursuant to the BoNY Indenture, prior to the maturity date of September 30, 2012, interest was to accrue on the outstanding principal balance of the Parent Convertible Notes at a rate of ten percent (10%) per annum and is payable in arrears in semi-annual payments due each March 31 and September 30. As of the Petition Date and at present, Biosource Fuels was and is not in default of any payment due (interest or otherwise) under the Parent Convertible Notes.

17.     Pursuant to collateral and security documents executed in connection with the BoNY Indenture, the Parent Convertible Notes appear to be accommodated and/or secured by:  (i) the unlimited guarantee of Holding Clinton and Clinton; (ii) a pledge by Biosource Fuels of all of its equity in Holding Clinton and Seneca; (iii) liens and security interests granted by Holding Clinton and Clinton on all of their personal property (including all of the equity in Clinton owned by Holding Clinton); and (iv) a mortgage granted by Clinton on the plant and real estate making up Clinton's biodiesel refinery located in Clinton County, Iowa to Jeffries Funding LLC as collateral agent (the recording cover sheet attached to this mortgage lists the Indenture Trustee as mortgagee) (this collateral includes the principal non-payroll bank accounts of Holding Clinton and Clinton maintained at Sterling Bank and such accounts appear to be subject to tri-party control agreements among the Indenture Trustee, Sterling Bank and Holding Clinton and Biofuels Bank giving the Indenture Trustee "control" of those Clinton Accounts) (collectively, the "Clinton Collateral").  As of the Petition Date, the outstanding principal amount owing under the Parent Convertible Notes was $55,000,000, with accrued and unpaid interest from October 1, 2008 through the Petition Date of approximately $2.678 million.

**Seneca Secured Credit Facility**

18.     On December 26, 2007, Seneca obtained a credit facility providing for a $36,000,000 construction loan/term loan facility and a $5,000,000 working capital loan facility (the "Seneca Credit Facility") pursuant to a Credit Agreement dated as of December 26, 2007 (as amended, the "Seneca Credit Agreement") by and among Seneca as the Borrower, WestLB in its capacities as administrative agent and collateral agent (in such capacities, the "Prepetition Agent") and as sole Lender thereunder (in such capacity, the "Prepetition Lender") (and also in other capacities), and Sterling Bank as "Accounts Bank".

19.     The Seneca Credit Facility was intended to:  (i) finance the ownership, development, engineering, construction, testing and operation of the Seneca biodiesel refinery and all auxiliary and other facilities constructed or to be constructed by or on behalf of Seneca, together with all fixtures and improvements thereto, all real property owned by Seneca and all other real property, easements and

rights-of-way held by or on behalf of Seneca and all rights to use easements and rights-of-way of others, and all personal property, contracts and permits related thereto (collectively, the "Seneca Plant"); (ii) fund certain reserves and accounts; and (iii) pay interest, fees and other expenses associated with the credit facility.

20.     The Seneca Credit Agreement contemplated: (i) an initial period, during which the Seneca Plant would be acquired, completed and taken through its initial start-up and testing to the point where the Seneca Plant would be ready to commence regular operations at a capacity contemplated by the parties, and (ii) a period thereafter of continued and permanent operation of the Seneca Plant in accordance with yearly "Operating Budgets" to be agreed upon by Seneca and WestLB.

21.     The initial construction and start-up period was contemplated to come to an end following the occurrence of: (i) the Commercial Operations Date, and (ii) the Conversion Date (each term as defined under the Seneca Credit Agreement).  The Seneca Credit Agreement originally required that the Conversion Date occur prior to September 30, 2008 but this "Conversion Date Certain" was later extended several times pursuant to the mutual agreement of Seneca and WestLB, with the last such extension providing for a Conversion Date Certain of March 31, 2009.

22.     As of the Petition Date, construction of the Seneca Plant has been completed, all costs of the initial construction have been paid, all mechanics liens relating to initial construction had been discharged, and most other substantive steps relating to the commencement of commercial operations, including obtaining required insurance coverage, have been satisfied.  Since March, 2008 and through February, 2009, Seneca had been conducting successful operations at the Seneca Plant – producing biodiesel and marketable by-products of biodiesel production (collectively, the "Products") that meet or exceed applicable industry quality standards and successfully selling such Products, at production levels that the Debtors felt were economically prudent.  Notwithstanding that most substantive steps related to commercial operations have occurred, neither the Commercial Operations Date nor the Conversion Date have occurred, and neither are expected to occur during Seneca's Chapter 11 case.

131655.01602/21792568v.3

23.     Under the Seneca Credit Agreement, WestLB agreed to provide up to $36,000,000 in "Construction Loans" to be used to fund the "Project Costs" incurred by Seneca relating to the acquisition, construction, and start-up of the Seneca Plant. The Seneca Credit Agreement further provides that upon the Conversion Date, the Construction Loans would be repaid through the proceeds of "Term Loans" to be made on that date in the amount of the outstanding Construction Loans. As of the Petition Date, the full $36,000,000 committed amount of Construction Loans had been funded, and due to the fact that the Commercial Operations Date and Conversion Date have not yet occurred, no Term Loans have yet been funded to repay and refinance the Construction Loans.

24.     Also under the Seneca Credit Agreement, WestLB agreed to provide up to $5,000,000 in revolving credit "Working Capital Loans" to be used: (i) prior to the Conversion Date, for payment of certain Project Costs in accordance with a "Construction Budget", and (ii) after the Conversion Date, for payment of "Operating and Maintenance Expenses" for the Seneca Plant, all in accordance with an Operating Budget to be agreed upon by Seneca and WestLB at the time of the Conversion Date (subject to yearly updates as agreed by the parties). As of the Petition Date, the full $5,000,000 committed amount of the Working Capital Loans had been funded and all such Working Capital Loans remain outstanding.

25.     The loans and other indebtedness, obligations and liabilities (collectively, the "Seneca Prepetition Obligations" or the "Seneca Obligations") under the Seneca Credit Agreement and related loan documents (collectively (as amended), the "Seneca Credit Documents") are secured by liens and security interests in "Seneca Prepetition Collateral." Seneca Prepetition Collateral is comprised of: (i) all Seneca personal property, including the Project Accounts and the Sponsor Support Account (as such terms are defined below); (ii) a mortgage granted by Seneca on the plant and real estate making up the Seneca Plant; (iii) a pledge by Holding Seneca of all of the equity in Seneca; and (iv) a pledge by Holding Seneca of an unsecured intercompany loan receivable in the amount of $35,000,000 owing to Holding Seneca from Seneca.

131655.01602/21792568v.3

26.     Biosource Fuels also executed a limited and unsecured Completion Guaranty Agreement in favor of WestLB and dated as of February 22, 2008 (the "Guaranty").  In the Guaranty, Biosource Fuels has agreed to pay or cause to be paid all Project Costs (as defined in the Guaranty) if and to the extent that there are insufficient funds available to Seneca to cover any Project Completion Deficiency (as defined in the Guaranty) not to exceed $41,000,000.

27.     The Seneca Credit Agreement required Seneca to establish certain specified cash management accounts, operating accounts and reserve and collateral accounts, (the "Project Accounts").  These Project Accounts, each established in the name of Seneca and maintained with the Accounts Bank, include:  (i) deposit account #021030167 FCC 1381 entitled "Nova Seneca, LLC Construction Account" (the "Construction Account"); (ii) deposit account #021030167 FCC 1382 entitled "Nova Seneca, LLC Revenue Account" (the "Revenue Account"); (iii) deposit account #021030167 FCC 1383 entitled "Nova Seneca, LLC Operating Account" (the "Operating Account"); and (iv) the Sponsor Support Account described below.  Pursuant to the Seneca Credit Agreement, Seneca created a security interest and lien in its right, title and interest in the Project Accounts in favor of WestLB.  Under the Seneca Credit Agreement, Seneca has the right, in the absence of a default, to give instructions to the Accounts Bank directing the Seneca Account Bank to withdraw and disburse funds from the various Project Accounts (and/or to transfer funds between the Project Accounts) for the purposes and in the amounts/within the parameters provided for in the Seneca Credit Agreement.

28.     As required in the Seneca Credit Agreement and provided for in the Guaranty, Biosource Fuels funded a certain blocked deposit account #021030167 FCC 1391 (the "Sponsor Support Account") for the benefit of and established in the name of Seneca and maintained with the Accounts Bank in a certain minimum amount (originally $5,000,000 but later reduced to below $2,000,000).  The Sponsor Support Account is an asset of Seneca intended to support its obligations to construct the Seneca Plant and thereafter satisfy certain warranty obligations.  Pursuant to the Seneca Credit Agreement, Seneca created a security interest and lien for the benefit of WestLB in Seneca's right, title and interest in the

Sponsor Support Account, which security interest is acknowledged by Seneca and the Subject Debtors in the Interim Cash Collateral Orders (as that term is defined hereafter.)

29.     All cash flow, revenues, and customer payments and collections on accounts receivable from the operations of the Seneca Plant and the sale of Products produced at the Seneca Plant are required to be and currently are deposited into the Revenue Account. Disbursements from the Revenue Account are controlled by the Accounts Bank. Since the entry of the First Interim Cash Collateral Order (as that term is defined hereafter), funds in the Project Accounts (including the Revenue Account) other than the Sponsor Support Account have been made available to the Debtors pursuant to the terms and provisions of the Interim Cash Collateral Orders.

30.     The Seneca Credit Agreement also contemplated the establishment of "Local Accounts", which would be local bank accounts of Seneca that would be under the direct control of Seneca. Seneca has established such a Local Account #101051042 in its name with Sterling Bank (the "Local Operating Account"). Pursuant to the Seneca Credit Agreement and a separate Blocked Account Agreement between Seneca and Sterling Bank, Seneca created a security interest and lien in favor of the Seneca Agent for the benefit of WestLB in its right, title and interest in the Local Operating Account. Funds in the Local Operating Account have likewise been used by the Debtors pursuant to the Interim Cash Collateral Orders.

31.     All cash in the Revenue Account, the Operating Account, the Construction Account, the Sponsor Support Account, and the Local Operating Account is Seneca Cash Collateral.

**D.      Cash Collateral Usage, Financing Needs, and The DIP Term Sheet**

32.     On April 1, 2009, the Court entered the Interim Order (the "First Interim Cash Collateral Order") (i) Authorizing the Use of Cash Collateral by Nova Biofuels Seneca, LLC, Nova Biosource Fuels, Inc., Biosource America, Inc., Nova Biosource Technologies, LLC, and Nova Biofuels Trade Group, LLC pursuant to 11 U.S.C. § 363, (ii) Granting Adequate Protection to WestLB AG Pursuant to 11 U.S.C. §§ 361 and 363 and (iii) Scheduling a Final Hearing. [Dkt. No. 17]. The First Interim Cash Collateral Order authorized a bifurcated use of cash collateral between Seneca and certain non-Seneca

131655.01602/21792568v.3

Debtors and, among other things, granted WestLB as Prepetition Agent and Prepetition Lender an additional adequate protection lien on the proceeds of the avoidance actions from the estates of Seneca and the non-Seneca Debtors. The First Interim Cash Collateral Order did not implement surcharge or similar waivers for the benefit of WestLB, but did implement covenants that required Seneca Prepetition Collateral to be sold by September 18, 2009, consistent with a strategic time-line acceptable to the Debtors. This interim cash collateral regime did not permit usage of the Sponsor Support Account funds and did not place adequate protection liens on non-Seneca Debtor assets (other than the proceeds of those entities' avoidance actions).

33.     On April 30, 2009, the Court entered the Second Interim Order (the "Second Interim Cash Collateral Order") (i) Authorizing the Use of Cash Collateral by Nova Biofuels Seneca, LLC, Nova Biosource Fuels, Inc., Biosource America, Inc., Nova Biosource Technologies, LLC, and Nova Biofuels Trade Group, LLC pursuant to 11 U.S.C. § 363, (ii) Granting Adequate Protection to WestLB AG Pursuant to 11 U.S.C. §§ 361 and 363 and (iii) Scheduling a Final Hearing, which incorporated the terms of the First Interim Cash Collateral Order, except where otherwise expressly amending the First Interim Cash Collateral Order. [Dkt. No. 64]. On May 22, 2009, the Court entered the Third Interim Order (the "Third Interim Cash Collateral Order") (i) Authorizing the Use of Cash Collateral by Nova Biofuels Seneca, LLC, Nova Biosource Fuels, Inc., Biosource America, Inc., Nova Biosource Technologies, LLC, and Nova Biofuels Trade Group, LLC pursuant to 11 U.S.C. § 363, (ii) Granting Adequate Protection to WestLB AG Pursuant to 11 U.S.C. §§ 361 and 363 and (iii) Scheduling a Final Hearing, which incorporated the terms of the First Interim Cash Collateral Order and the Second Interim Cash Collateral Order. [Dkt No. 94]. The First Interim Cash Collateral Order, the Second Interim Cash Collateral Order, and the Third Interim Cash Collateral Order are collectively referred to hereafter as the "Interim Cash Collateral Orders."

34.     During the interim period of cash usage authorized by these Orders, the Debtors confirmed that they required postpetition financing. Primarily through the company's financial advisor, the Debtors then contacted seven (7) possible third party sources of DIP financing, the Indenture Trustee,

and WestLB regarding the provision of necessary financing. Based upon this diligence, the Debtors determined that there was no unsecured financing, subordinated financing, parity financing, or Clinton/Technologies only financing available to the company. The Debtors' only financing options either required: (i) the subordination of WestLB liens and claims at Seneca and/or Indenture Trustee liens and claims at Clinton by third party priming under Bankruptcy Code section 364(d), or (ii) a consensual postpetition financing arrangement with WestLB, whereby WestLB would prime the Seneca Prepetition Obligations and the Indenture Trustee would agree to subordinate the liens and security interests on the Clinton Collateral for the benefit of a WestLB DIP, but subject to a limit on such subordination reflective of the benefit to the Clinton Collateral from WestLB DIP financing. The Indenture Trustee has indicated a willingness to consent to a West LB DIP Facility, subject to a reasonable limit of the Parent Convertible Notes' subordination. The Debtors, therefore, ultimately determined that a consensual arrangement with WestLB (and the Indenture Trustee) was more feasible than other financing options and better preserved the value of the estates' assets than any third party priming financing, which would inevitably subject Nova's Chapter 11 cases to the costs, risks, and distracting arising from a contest with WestLB and likely with the Indenture Trustee as well (WestLB will not consent to have its liens and claims subordinated to a third party lender).

35. During this diligence process, the Debtors engaged in lengthy, arms-length negotiations with WestLB over the terms of financing and each of the Debtors and WestLB, in its capacity as Prepetition Agent, Prepetition Lender, DIP Agent and DIP Lender entered into the "<u>Term Sheet</u>" attached hereto as Exhibit "A." This Term Sheet will serve as the basis for definitive documentation, the DIP Loan Documents. [2] The DIP Loan Documents will be filed with the Court no later than June 19, 2009 and

---

[2] For the purposes of this Motion, initially capitalized terms, which are otherwise undefined in the Motion, henceforward shall have the meaning set forth in the Term Sheet. The summary and description of the terms and conditions of the DIP Facility and Final DIP Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Credit Agreement, the other DIP Loan Documents and Final DIP Order. In the event there is a conflict between this Motion, the DIP Credit Agreement, the other DIP Loan Documents, or Final DIP Order, the DIP Credit Agreement, the relevant DIP Loan Document, or Final DIP Order, as applicable, shall control in all respects.

served upon the Office of the United States Trustee, counsel for the Indenture Trustee and counsel for the Committee.

## RELIEF REQUESTED

36.     The financing, use of Cash Collateral, grant of adequate protection and other related relief will be implemented on a final basis pursuant to the terms of the proposed Final DIP Order, which is attached hereto as Exhibit "B," and the DIP Credit Agreement.

37.     Material provisions of the DIP Facility are summarized here:

(a)     **Borrowers**.     Seneca, Biosource Fuels, Biosource America, Technologies, Clinton, Biofuels Trade.

(b)     **Guarantors**.  Holding Seneca, NBF, Holding Trade and Holding Clinton.

(c)     **DIP Lender**.  WestLB.

(d)     **DIP Facility**.   The DIP Facility shall consist of loan to Borrowers in the aggregate maximum amount of $2,030,000.  The loan advances under the DIP Facility shall be available to Borrowers after exhaustion of all available Cash Collateral, including Cash Collateral in the Sponsor Support Account, which is to be made available to Borrowers pursuant to the terms of the Final DIP Order and the DIP Loan Documents.  (Term Sheet, sections I at 2 and 4; Final DIP Order, ¶¶ 1, 6(b)).

(e)     **DIP Agent**.  WestLB, in such capacity as DIP Agent.

(f)     **Seneca Budget and Non-Seneca Budget**.  The DIP Facility shall be subject to a Seneca Budget and a Non-Seneca Budget which are attached as Exhibits to the Term Sheet, on a rolling 13-week cash flow basis, commencing as of the Closing Date, that shall fund Clinton, and Non-Seneca Debtors other than Clinton, from Cash Collateral usage and DIP Loan proceeds, estimating that Seneca should be responsible for eighty-five percent (85%) of the Debtors' general corporate overhead and general administrative expenses, subject to the approval of the DIP Agent and the DIP Lender.  Upon consent of DIP Agent and the DIP Lender of the DIP Budget, any subsequent changes to the DIP Budget may be made by the Debtors.  The Borrowers will be allowed ten percent (10%) variances on the aggregate amounts set forth in the Seneca Budget and Non-Seneca Budget consistent with the Interim Cash Collateral Orders and as set forth in the Final DIP Order.  The Seneca Budget shall include monthly reimbursement of the reasonable fees and expenses of the professionals of DIP Agent and DIP Lender up to the amounts contemplated therein.  (Term Sheet, section I at 3-4, Final DIP Order at ¶¶ 7-11).

(g)     **Interest Rate**.  Interest shall be payable monthly in arrears in cash on the outstanding amount of the DIP Facility on the first business day of each month at a rate equal to LIBOR + 10% per annum.  LIBOR shall be defined as a rate per

14

annum set on a rolling 30 day basis (beginning on the date the proceeds of the DIP Facility are lent to the Borrowers) equal to the greater of: (i) 4% per annum; and (ii) the offered rate on the applicable page of the Telerate screen (or any successor thereto) that displays an average British Bankers Association Interest Rate Settlement Rate for deposits in U.S. Dollars with a term of 30 days as of 11:00 AM on the third business day prior to each applicable rolling 30 day period, and shall contain appropriate protections to ensure that such rate is not less than the DIP Lender's cost of funds.  (Term Sheet, section I at 6).

(h)     **Default Rate**.  Upon the occurrence and during the continuance of any event of default under the DIP Facility and at the election of the DIP Lender, interest to be payable on all outstanding DIP Facility at 2% above the then applicable interest rate.  (Id.).

(i)     **Maturity**.  The Borrowers shall repay any outstanding portion of the DIP Facility in full, to the DIP Agent in immediately available funds on the earliest to occur of: (i) September 18, 2009 if the Sale Order relating to the Seneca Collateral is entered by the Court on August 31, 2009 or August 31, 2009 if no Sale Order has been entered by that date; (ii) the date of the acceleration of all or any portion of the obligations under the DIP Facility; (iii) the first business day on which the Final DIP Order expires by its terms or is terminated; (iv) conversion of any of the Debtors' Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Agent and the DIP Lender; (v) dismissal of any of the Chapter 11 Cases unless otherwise consented to in writing by the DIP Agent and the DIP Lender; and (vi) the effective date of any Borrower/Guarantor plan of reorganization.  (Term Sheet, section I at 5).

(j)     **DIP Collateral, Carve-Out, Related Issues**.  To secure all obligations of the Borrowers under and with respect to the DIP Facility (the "<u>DIP Obligations</u>"), DIP Agent, for the benefit of the DIP Lender, shall receive, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the Final DIP Order and the DIP Loan Documents, valid, enforceable, and fully perfected security interests in and liens upon all prepetition and postpetition assets of the Borrowers and Guarantors, whether now existing or hereafter acquired or arising, including a pledge of all equity interests in each Borrower (other than Biosource Fuels) and Guarantor, all inter-company notes or inter-company receivables due to each Borrower or Guarantor and all other instruments of each Borrower or Guarantor (collectively, the "<u>DIP Collateral</u>"), which liens shall have the priority set forth below. Subject to the entry of the Final DIP Order, DIP Collateral shall include all proceeds of the rights, claims and other causes of action of each Borrower's and each Guarantor's estate and any other avoidance actions under Chapter 5 of the Bankruptcy Code (collectively, "<u>Avoidance Actions Proceeds</u>").

For the avoidance of doubt, the DIP Collateral shall include, without limitation, those assets of Clinton and Holding Clinton, and the equity interests in Holding Clinton and Holding Seneca held by Biosource Fuels, which are subject to liens that have been granted by Clinton, Holding Clinton and Biosource Fuels to the Indenture Trustee to secure the Parent Convertible Notes issued by Biosource Fuels pursuant to the BoNY Indenture to secure such Notes (such liens securing the Parent Convertible Notes, being the "<u>Clinton Liens</u>".  The definition of

"Clinton Liens" shall specifically exclude any purported liens securing the Convertible Notes Indenture on the equity of any entities other than Clinton, Holding Clinton or Holding Seneca, and any purported liens on the assets of any entities other than the assets of Clinton and Holding Clinton. Furthermore, any equity in or assets of any entities directly or indirectly owned or controlled by Biosource Fuels other than Clinton and Holding Clinton shall be excluded from the definition of Clinton Collateral.

"Senior Permitted Liens" shall be defined under the DIP Loan Documents similarly to the definition of "Permitted Liens" under the Seneca Credit Agreement; however, Senior Permitted Liens, unlike the term Permitted Liens in the Seneca Credit Agreement shall not include liens that, as of the Petition Date, are junior to the Prepetition Liens. The term Senior Permitted Liens shall include the Clinton Liens, provided that, such Clinton Liens shall be subordinated and primed pursuant to section 364(d)(1) of the Bankruptcy Code to: (i) the security interest and liens in favor of DIP Agent and other claims of the DIP Agent and the DIP Lender on the DIP Collateral, and (ii) the security interest and liens in favor of the Prepetition Agent and other claims of the Prepetition Agent and the Prepetition Lender on the DIP Collateral related to the Senior Cash Collateral Claims, to the extent of all of the Clinton Priming Expenditures as that term is defined below (which definitional concept is derived from the share of the expenditures under the Non-Seneca Budget that should be allocated to the Clinton Collateral, as agreed by the Debtors and WestLB, and that the Debtors expect will be consented to by the Indenture Trustee).

For the avoidance of doubt, the Clinton Liens on the Clinton Collateral, if any, shall be Senior Permitted Liens, with priority over the security interest and liens provided for in clauses (i) and (ii) of the preceding Paragraph to the extent the value of any Clinton Liens on the Clinton Collateral exceed the amount of the Clinton Priming Expenditures incurred from time to time. Furthermore, no provision of the Term Sheet, the Final DIP Order and the DIP Loan Documents, other than the provisions related to the liens securing the Senior Cash Collateral Claims is intended to require the grant of security interests or liens in favor of the Prepetition Agent or the Prepetition Lender in any of the Clinton Collateral to secure any of the Prepetition Obligations.

"DIP Collateral" shall also include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Lender or the DIP Agent in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits.

The liens and security interests securing the DIP Facility shall attach and be valid, binding, enforceable and fully perfected first priority (subject only to the Senior Permitted Liens) liens and security interests upon entry of the Final DIP Order without the requirement of any further action by the DIP Agent or the DIP Lender.

The Borrowers and Guarantors shall execute and deliver to the DIP Agent and the Prepetition Agent a credit agreement, guaranties, financing statements, security agreements, vehicle lien applications, mortgages or other documents

reasonably necessary or desirable to document the DIP Facility and further evidence the perfection of the liens on the DIP Collateral.

The DIP Obligations shall enjoy super-priority administrative expense status under section 364(c)(1) with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject to the Carve-Out.

Liens and security interests with respect to DIP Collateral (the "<u>DIP Liens</u>") shall not be subject to challenge and shall attach and become valid and perfected upon entry of the Interim Order without the requirement of any further action by DIP Agent or DIP Lender. DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens in existence as of the petition date, if any, and any Senior Permitted Liens.

<u>"Carve Out"</u>  As used in the DIP Credit Agreement, the term "<u>Carve-Out</u>" shall mean the sum, after application of unencumbered cash, of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; (ii) the aggregate amount of any budgeted, accrued but unpaid, professional fees and expenses existing as of the Carve-Out Date (as defined below) of the Borrowers and of the Committee, which fees and expenses are then or later allowed by the Bankruptcy Court; and (iii) after application of unencumbered cash, those professional fees and expenses of the Borrowers and the Committee incurred after the Carve-Out Date and subsequently allowed by the Bankruptcy Court in an amount not to exceed $210,000 in the aggregate (to be allocated as follows; $160,000 for the Debtors' professionals and $50,000 for the Committee's professionals) (the amounts provided for in clause (iii) shall not be reduced by any amounts paid to the Debtors' professionals or the Committee's professionals prior to the occurrence of the Carve-Out Date).  Prior to the Carve-Out Date, subject to entry of an appropriate order of the Bankruptcy Court (in form and substance acceptable to the DIP Agent and the DIP Lenders), the Borrowers shall be permitted to use proceeds of the DIP Facility to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code in accordance with the Seneca/Non-Seneca Budgets; provided, further, that following the Carve-Out Date, any amounts paid to professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis; and provided, further, that nothing in the DIP Credit Agreement shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation sought by the professionals retained by the Borrowers or any statutory committee in the Chapter 11 Cases.

<u>"Carve-Out Date</u>" means the date that is the earlier of any Borrower's receipt of a notice of default under the DIP Facility or the Maturity Date.

Neither DIP Facility proceeds, DIP Collateral, Seneca Prepetition Collateral, Cash Collateral nor the Carve-Out may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to the DIP Facility or the Seneca Credit Agreement, or the security interests and liens securing the DIP Obligations or the Seneca Prepetition

Obligations with respect thereto or otherwise to litigate against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders; provided, however, the foregoing shall not apply to any DIP Facility proceeds, DIP Collateral, Seneca Collateral, Cash Collateral, Carve-Out proceeds that are used for purposes of seeking a Section 506(a) Determination. Notwithstanding the foregoing, the Committee may spend up to an aggregate maximum of $30,000 in professional fees and expenses, which may be paid from Cash Collateral use or the proceeds of loan advances under the DIP Facility to investigate potential claims arising out of, or in connection with, the Seneca Credit Agreement or the security interests and liens securing the Seneca Prepetition Obligations.

The security interests in and liens upon the DIP Collateral shall be senior to all other liens and encumbrances other than the Senior Permitted Liens.

(Term Sheet, sections I, II at 5, 10-12) (Final DIP Order, §§ III and VIII).

(k)    **Application of Proceeds of DIP Collateral**.  Except as provided for below with respect to proceeds related to Clinton, the net cash proceeds from any use, sale, lease, license or other disposition of any portion of the DIP Collateral outside of the ordinary course of business shall be distributed to the DIP Agent or, if the DIP Facility has been satisfied in full, then to the Debtors or the Prepetition Agent and shall be applied in the following order of priority (collectively, the "General Waterfall"):

(i)    First, to pay any fees, expenses and accrued interest under the DIP Loan;

(ii)    Second, to prepay all amounts outstanding under the DIP Facility;

(iii)    Third, to (x) pay any and all allowed administrative expenses, in respect of the Carve-Out, provided for in the Seneca and Non-Seneca Budgets, and/or (y) to make appropriate reserves for anticipated allowed administrative expenses, in an amount which shall not exceed, in the aggregate, the Carve-Out;

(iv)    Fourth, to prepay the Prepetition Agent an amount equal to the amount of Cash Collateral used by any of the Debtors from and after May 22, 2009 through to the date of the calculation (the "Senior Cash Collateral Claims") (which prepayment shall reduce the outstanding obligations under the Prepetition Credit Agreement by a corresponding amount consistent with applicable bankruptcy law);

(v)    Fifth, to the extent that there are net cash proceeds remaining after payment of the items above that are allocated exclusively to DIP Collateral that is not also Seneca Prepetition Collateral, then such amounts shall be retained by the applicable Debtors to be used in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court;

(vi)    Sixth, to pay (or reserve for if the secured claim has not yet been allowed) any allowed secured claim under the Seneca Credit Agreement pursuant to the Mandatory Prepayment Provisions in section 3.10(e) of the Seneca Credit Agreement (the allowance of the secured claim, except to the extent of a timely challenge pursuant to paragraph 30 of the First Interim Cash Collateral Order,

shall be limited to a determination of the value of the Prepetition Collateral used, sold, leased, license or disposed of in a relevant transaction and, without limitation, the Debtors are and remain bound by the various acknowledgements of the extent and validity of the Seneca Prepetition Obligations and the liens and security interests in the Seneca Prepetition Collateral contained in the Interim Cash Collateral Orders and the Final DIP Order); and

(vii)     Seventh, all excess net cash proceeds remaining after the distributions or reservations provided for in clauses (i) through (vi) shall be returned to the applicable Debtors to be used in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court.

Notwithstanding the foregoing, to the extent the net cash proceeds from any use, sale, lease, license or other disposition of any portion of the DIP Collateral, outside of the ordinary course of business is allocated exclusively to the Clinton Collateral, such proceeds shall be distributed and applied in the following order of priority (collectively, the "Clinton Waterfall"):

(i)     First, to the DIP Agent in repayment of the DIP Facility as provided for in clauses (i) and (ii) of the General Waterfall, in an amount not to exceed the aggregate sum of:

> (a)   the amount expended by the Borrowers from May 22, 2009 through the date of such disposition for expenses specifically related to Clinton, including expenses that are designated under the Non-Seneca Budget (as modified from time to time) as Clinton expenses; plus

> (b)   15% of the amount expended by the Borrowers from May 22, 2009 through the date of such disposition for all expenses under the Non-Seneca Budget (as modified from time to time) that are not designated as Clinton expenses;

> (c)   the sum of the amounts under clauses (a) and (b) at any applicable time shall be referred to collectively as the "Clinton Priming Expenditures"; provided that, notwithstanding anything to the contrary contained in the Final DIP Order or the DIP Credit Agreement, in the event that there is more than one sale, license or other disposition of any portion of the DIP Collateral outside of the ordinary course of business after May 22, 2009 but prior to the repayment in full of the DIP Facility and the Senior Cash Collateral Claims, the amount payable to the DIP Agent and/or the Prepetition Agent in repayment of the DIP Facility and the Senior Cash Collateral Claims in respect of any Clinton Priming Expenditures shall be calculated taking into effect all prior such payments to the DIP Agent and/or the Prepetition Agent in respect of the Clinton Priming Expenditures (whether pursuant to the General Waterfall and/or the Clinton Waterfall) made in connection with all previous such sale(s), lease(s), license(s) or other disposition(s) outside the ordinary course of business.

(ii)    Second, to the Borrowers to make the payments and fund the reserves specified in subpart (iii) of the General Waterfall; and

(iii)    Third, to the Prepetition Agent in repayment of the Senior Cash Collateral Claims (which prepayment shall reduce the outstanding obligations under the Prepetition Credit Agreement by a corresponding amount) in an amount not to exceed the Clinton Priming Expenditures less any distributions to the DIP Agent pursuant to clause (i) of the Clinton Waterfall;

(iv)    Fourth, to pay or reserve for any allowed secured claim of the Indenture Trustee under the Parent Convertible Notes; and

(v)    Fifth, all excess net cash proceeds remaining after the distributions or reservations provided for in clauses (i) through (iv) shall be returned to the applicable Debtors to be used in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court.

Distributions pursuant to either the General Waterfall or the Clinton Waterfall shall be made on a serial basis such that distributions provided in subsequent clause(s) of each waterfall shall only be made with excess proceeds after the satisfaction in full of the distribution requirements of the preceding clause(s). If there are net cash proceeds available for distribution under both the General Waterfall and the Clinton Waterfall on a reasonably contemporaneous basis, then the net cash proceeds distributed pursuant to the Clinton Waterfall shall be distributed first. If there are net cash proceeds available for distribution under the General Waterfall from the proceeds of DIP Collateral that is not also Seneca Prepetition Collateral, then the proceeds of such DIP Collateral shall be distributed first.

Mandatory prepayments under the General Waterfall shall also be required under the circumstances provided for in sections 3.10(a)(i) and 3.10(a)(ii) of the Seneca Credit Agreement related to casualty or condemnation events.

Unless otherwise agreed to by the DIP Lender, prepayments of the principal outstanding under the DIP Facility shall permanently reduce the DIP Facility. (Term Sheet, section II at 7-10); (Final DIP Order, § IV(D-E)).

(l)    **Adequate Protection**. As adequate protection to the Prepetition Lender for the diminution, if any, in the value of its interests in each Borrower's or Guarantor's property resulting from: (x) the priming liens granted to secure the DIP Obligations pursuant to section 364(d)(1) of the Bankruptcy Code; (y) the use, sale, lease, license or other disposition of the Prepetition Collateral (including the Cash Collateral) pursuant to section 363(c) of the Bankruptcy Code; and (z) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the Prepetition Agent, for the benefit of the Seneca Prepetition Lender, pursuant to section 105(a) and 363(e) of the Bankruptcy Code, shall:

(i)    Receive valid, enforceable, fully perfected security interests in and liens upon the DIP Collateral to secure the repayment of the Senior Cash Collateral Claims, which liens shall only be junior and subordinate to (1) the liens securing the DIP Obligations, (2) the Senior Permitted Liens, and (3) the Carve-Out;

(ii)     Maintain, subject to the terms of the Final DIP Order, all of its Prepetition Liens (as defined in the Interim Cash Collateral Order), which liens shall only be junior and subordinate to (1) the liens securing the DIP Obligations, (2) the liens securing the repayment of the Senior Cash Collateral Claims, (3) the Senior Permitted Liens, and (4) the Carve-Out;

(iii)     Receive and maintain, subject to the terms of the Final DIP Order, all of the Adequate Protection Liens granted in paragraph 9 of the First Interim Cash Collateral Order; however, such Adequate Protection Liens shall be modified such that they are only junior to (1) the liens securing the DIP Obligations, (2) the liens securing the repayment of the Senior Cash Collateral Claims, (3) the Senior Permitted Liens, and (4) the Carve-Out;

(iv)     Receive and maintain, subject to the terms of the Final DIP Order, its Adequate Protection Priority Claims granted in paragraph 9 of the First Interim Cash Collateral Order, which claims shall include the repayment of the Senior Cash Collateral Claims, subject only to (1) the super-priority claims granted to the DIP Agent and the DIP Lender under the DIP Facility and the Final DIP Order, as the case may be, and (2) the Carve-Out;

(v)     Receive and maintain, subject to the terms of the Final DIP Order, the adequate protection provisions in paragraphs 12 (as may be amended by the Final DIP Order as to cash management), 13, and 20 as well as the sale process in paragraphs 16-19 of the First Interim Cash Collateral Order (which terms shall be included in the Final DIP Order); and

(vi)     Receive and maintain, subject to the terms of the Final DIP Order, the adequate protection rights provided for in paragraph 11 of the First Interim Cash Collateral Order; provided, however, that in accordance with the Seneca Budget, the Seneca Prepetition Lender will not receive (and has not received) the adequate protection payments provided for in paragraph 11(i) of the First Interim Cash Collateral Order.

The Adequate Protection Liens shall be perfected in accordance with paragraph 14 of the First Interim Cash Collateral Order.  Paragraph 28 of the First Interim Cash Collateral Order shall also be incorporated into the Final DIP Order.  (Term Sheet, section II at 13-14, Final DIP Order, §V(F-G).

(m)     **Events of Default**.  The DIP Facility includes Events of Default customary for DIP loan transactions and investments of a similar size and nature, including, but not limited to:

- The use of proceeds of the DIP Facility and/or the Cash Collateral in a manner inconsistent with the Seneca Budget and the Non-Seneca Budget;

- The payment of claims existing prior to the Petition Date other than as set forth in the Seneca Budget or the Non-Seneca Budget or if payment is approved by the DIP Agent and authorized by an Order of the Bankruptcy Court;

- Dismissal or conversion to Chapter 7 of any of the Borrower's or Guarantor's Chapter 11 Cases;

- The appointment of a trustee or examiner in any of the Borrower's or Guarantor's Chapter 11 Cases;

- The entry of an order that in any way modifies, stays, reverses, or vacates the Final DIP Order in a manner adverse to the DIP Agent, the DIP Lender, the Prepetition Agent or the Prepetition Lender without their respective written consent which may be withheld in their sole discretion, or if the Final DIP Order ceases to be in full force and effect;

- The entry of the Final DIP Order shall not have occurred prior to or concurrently with the expiration of the authority to use Cash Collateral under the Interim Cash Collateral Orders;

- Any Borrower or Guarantor moves the Bankruptcy Court to obtain additional financing pari passu or senior to DIP Facility;

- The entry of an order granting any other super-priority claim or lien equal or superior to that granted to the DIP Agent or the DIP Lender on the assets of the Borrowers and Guarantors;

- The entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any material assets of the Borrowers and Guarantors, provided that, as a safe harbor, it shall be agreed that such relief as to assets having a fair market value, in the aggregate as to any one or more such orders, not exceeding $250,000 shall not be deemed material;

- The entry of any order of the Bankruptcy Court confirming any plan of reorganization that does not contain a provision for termination of the DIP Facility and repayment in full in cash of all of the DIP Obligations under the DIP Facility and the Adequate Protection Priority Claims on or before the effective date of such plan;

- Any Borrower or Guarantor violates or breaches the Final DIP Order or files any pleadings seeking, joining in, or otherwise consenting to any alteration, violation or breach of the Final DIP Order, in each case in a manner adverse to the DIP Agent, the DIP Lender, the Prepetition Agent or the Prepetition Lender, in the sole determination of such party;

- Any party in interest files any pleadings seeking to alter, violate or breach the Final DIP Order, in each case in a manner adverse to the DIP Agent, the DIP Lender, the Prepetition Agent or the Prepetition Lender, in the sole determination of such party;

- Any Debtor or its affiliate fails to comply with the provisions of Paragraph 20 of the First Interim Cash Collateral Order as incorporated into the Final DIP Order;

131655.01602/21792568v.3

- (i) Any Borrower or Guarantor engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the Seneca Prepetition Obligations or the liens on or security interests in the assets of the Borrowers or Guarantors securing the DIP Facility or the Seneca Prepetition Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the DIP Facility or the Seneca Prepetition Obligations, or (ii) any Borrower or Guarantor engages in or supports any investigation or assertion of any claims or causes of action (or supporting the assertion of the same) against the DIP Agent, the DIP Lender, the Prepetition Agent or the Prepetition Lender; provided, however, it shall not constitute an Event of Default if the Borrowers and Guarantors provide written information with respect to the Seneca Prepetition Obligations to a party in interest or are compelled to provide information by an Order of the Court and provides prior written notice to the DIP Agent and the DIP Lender of the intention or requirement to do so; furthermore, it shall not constitute an Event of Default if the Borrowers and Guarantors engage in oral communication to neutrally assist a party in interest in understanding the Prepetition Loan Documents or other publicly available information with respect to the Seneca Prepetition Obligations;

- Any person shall seek a determination under section 506(a) of the Bankruptcy Code with respect to the Seneca Obligations that is unacceptable to the Prepetition Agent and the Prepetition Lender; provided, however, it shall not constitute an Event of Default if the Section 506(a) Determination is sought either: (i) pursuant to the challenge period provided for in paragraph 30 of the First Interim Cash Collateral Order; or (ii) to determine the value of the Prepetition Agent's and the Prepetition Lender's interest in the estate's interest in the Prepetition Collateral to the extent such valuation is related to the use, sale, lease, license or disposition of DIP Collateral and does not involve a determination of the validity, intent, perfection, priority or enforceability of such interest;

- The allowance of any claim or claims under sections 506(c), 552(b) or 726 of the Bankruptcy Code against the DIP Agent, the DIP Lender, the Prepetition Agent or the Prepetition Lender with respect to any of the DIP Collateral or the Prepetition Collateral;

- The use of Cash Collateral or other assets of the Borrowers other than as expressly contemplated by the Final DIP Order and the Seneca Budget or the Non-Seneca Budget prior to the indefeasible payment in full of the DIP Obligations and the Adequate Protection Priority Claims as well as the termination of the DIP Facility and the Borrowers' ability to use Cash Collateral;

- The consummation of the sale of any material portion of any Borrower's or Guarantor's assets unless consented to by the DIP Agent and the DIP Lender, which consent may be withheld in their sole discretion, and authorized by the Bankruptcy Court pursuant to an order, which is in

form and substance reasonably acceptable to the Borrowers, Guarantors, DIP Agent and DIP Lender; and

- Breach of any covenants or representations and warranties in the DIP Loan Documents or the Final DIP Order, including without limitation, failure to distribute the proceeds of the DIP Collateral as required in the Seneca Waterfall and the Clinton Waterfall.

Waiver of any of the foregoing requires the written consent of the DIP Agent and the DIP Lender, and as applicable the Prepetition Agent and the Prepetition Lender. (Term Sheet, sections II at 15-19); (Final DIP Order, §§ VII and IX).

(n) **DIP Facility Fees; Expenses**. The Borrowers will pay a commitment fee of $160,000 on account of the DIP Facility on the Closing Date. Further, all reasonable out-of-pocket fees, costs and expenses of the DIP Agent (including, without limitation, reasonable fees and disbursements of counsel to the DIP Agent and the fees and expenses of the financial advisors advising the DIP Agent) shall be payable by the Borrowers and Guarantors under the DIP Facility pursuant to reasonably detailed invoices, which may be redacted in part to preserve attorney-client privilege, whether or not the transactions contemplated hereby are consummated. (Term Sheet, sections I and II at 6, 21).

38.     The provisions described in Bankruptcy Rule 4001(b)(l)(B)(i)-(iv) are set forth at the following sections of the Final DIP Order:

(a)     **Name of Each Entity with Interest in Cash Collateral**. (Final DIP Order, § 1 of Recitals).

(b)     **Purposes of Use of Cash Collateral**. (Final DIP Order, ¶¶ 6-9).

(c)     **Material Terms, Including Duration, of Use of Cash Collateral**. (Final DIP Order, ¶¶ G-I, § V).

(d)     **Liens, Cash Payments, or Other Adequate Protection to Be Provided to Each Entity with Interest in Cash Collateral**. (Final DIP Order, § V(F-G)).

39.     In addition, the provisions described in Bankruptcy Rule 4001(c)(l)(B)(i)-(xi) are set out at the following sections of the Term Sheet and the Final DIP Order:

(a)     **Grant of Priority or a Lien on Property of the Estate**. (Term Sheet, section II, 10-14); (Final DIP Order, §§ III and IV).

(b)     **Adequate Protection or Priority for a Claim that Arose Before the Commencement of the Case**. (Term Sheet, section II at 13-14); (Final DIP Order, § V).

(c)     **Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose Before the Commencement of the Case**. (Final DIP Order, ¶¶ F-I).

24

(d)  **Waiver or Modification of the Automatic Stay**. (Term Sheet, section II at 18-19); (Final DIP Order, ¶¶ 17-18, 54, 59 and § VII).

(e)  **Waiver or Modification of Authority to Request Use of Cash Collateral, or Request Authority to Obtain Credit**. (Term Sheet, section II at 15-18): (Final DIP Order, § IX).

(f)  **Establishment of Deadlines for Filing a Plan for Approval of a Disclosure Statement, for a Hearing on Confirmation, or for Entry of a Confirmation Order**. N/A.

(g)  **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien**. (Term Sheet, section II at 18-19); (Final DIP Order, ¶¶17-18, 54, 59).

(h)  **Release, Waiver, or Limitation on any Claim or Cause of Action Belonging to the Estate**. (Term Sheet, section II at 15-18); (Final DIP Order, ¶¶ 42, 43 and § IX).

(i)  **Indemnification of Any Entity**. (Term Sheet, section II at 22-23); (Final DIP Order, ¶ 4).

(j)  **Release, Waiver or Limitation on Rights under Section 506(c)**. (Term Sheet, section of II at 15); (Final DIP Order, ¶ 45).

(k)  **Liens Granted on Proceeds Claims Arising Under Chapter 5**. (Term Sheet, section II at 10, 13-14); (Final DIP Order, §§ III and V).

## DEBTORS' PROPOSED POSTPETITION FINANCING

40.     To provide the Debtors with the funding necessary to fulfill their administrative and operational obligations throughout the duration of their Chapter 11 Cases, the Debtors require a postpetition lending facility. Thus, as noted, prior to the Petition Date, the Debtors surveyed various sources of postpetition financing, including WestLB, the Indenture Trustee, and various other third parties.

41.     Again as noted, in exploring their options, the Debtors recognized that the Seneca and Clinton Collateral are subject to senior claims and liens and that therefore in order to finance Seneca and the non-Seneca Debtors effectively through a third party: (i) WestLB's liens and the Indenture Trustee's liens in such assets would have to be subordinated to obtain postpetition financing; or (ii) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to or *pari passu* with

25

WestLB and the Indenture Trustee; or (iii) postpetition financing would have to be extended on an unsecured basis.

42.     In the current economic environment, postpetition financing is limited and unsecured, junior or parity financing is not available. In fact, all but one of the potential lenders surveyed by the Debtors advised that they either had no interest in providing financing in the bio-diesel or similar industries, or no interest in providing financing that would require a priming fight with WestLB or the Indenture Trustee. One potential lender did discuss financing the Debtors in some detail, but only if such financing was secured by liens priming those of WestLB.  While the Indenture Trustee *has* signaled its limited willingness to suffer "collared" subordination to support a strategic process that could lead to optimal disposition of the Clinton Collateral, WestLB advised the Debtors that they would not consent under any circumstances to be primed by another lender group.  Therefore, since borrowing from this third party lender required security senior to that of WestLB, in turn this would have required the Debtors to prime WestLB (and the Indenture Trustee for that matter) in an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied – the outcome of which would be uncertain.  Now, WestLB *was* willing to extend postpetition financing, prime their own prepetition security interests, and to limit their DIP Liens in Clinton Collateral to a "collared" portion of the DIP Facility at Clinton.  Accordingly, the Debtors concluded that the DIP Facility proposed by the DIP Lender is desirable because, among other things, the DIP Facility permits the Debtors to secure financing required for their strategic optimization of the value of their assets without having to engage in an extended, expensive, contested, uncertain 364(d) hearing and process to subordinate the Seneca Credit Facility and the Parent Convertible Notes on a non-consensual basis.

43.     Given limited options and the market and pricing identified in other biofuels cases, as well as the pricing contained in the only written alternative proposal received for financing by the Debtors (this proposal was two hundred basis points more expensive in terms of interest and contained higher pricing generally), the DIP Lenders' proposal offers the most attractive combination of pricing, fees, covenant flexibility, and structure.

44.     Importantly, because the DIP Lender has a substantial base of knowledge with respect to the Debtors' business and assets, WestLB's proposal contains no diligence contingency and the DIP Lender will be able to close the proposed DIP Facility within days of the entry of the Final DIP Order by this Court. Thus, for all the foregoing reasons, the Debtors determined that WestLB's proposed DIP Facility is the best financing option available under the circumstances.

45.     The Debtors and WestLB engaged in vigorous and extensive arms'-length negotiations with respect to the terms and conditions of the Term Sheet and DIP Facility over the course of a month. The Debtors believes that the Indenture Trustee will consent to the limited subordination of the Parent Convertible Note position proposed hereby.

## USE OF THE DIP FACILITY

46.     The Debtors may use the proceeds of the DIP Facility to pay the transaction costs related to its closing and, thereafter, to finance these Chapter 11 Cases and for other general corporate purposes pursuant to the Seneca/Non-Seneca Budgets.

47.     The proposed use of the DIP Facility confers a direct benefit upon the Debtors and their estates. Among other things, the DIP Facility allows the Debtors to make payroll, and satisfy other working capital and operational needs, while enabling a case critical strategic process that maximizes stakeholder value.

## PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2

48.     The Debtors believe the following provisions of the Term Sheet and Final DIP Order must be highlighted pursuant to Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):

(a)     **Binding the Estates to Validity, Perfection, or Amount of Secured Creditor's Prepetition Lien**. (Term Sheet, section II at 7-14); (Final DIP Order, ¶¶ F-J, 42-43).

(b)     **Waiver of Rights of Estate Under Section 506(c) as to the Final Order**. (Term Sheet, section II at 15); (Final DIP Order, ¶45).

131655.01602/21792568v.3

(c) **Granting Liens on Proceeds of Debtors' Section 544, 545, 546, 547, 548, and 549 Claims and Causes of Action**. (Term Sheet, section II at 7-14); (Final DIP Order, §§ III and IV).

(d) **Provisions that Provide Disproportionate Treatment for Committee Professionals Regarding a Carve-Out**. (Term Sheet, section II at 12-13); (Final DIP Order, § VIII).

## PROPOSED ADEQUATE PROTECTION AND USE OF CASH COLLATERAL

49.     In order to address their working capital needs and fund their strategic efforts, the Debtors also require the use of WestLB Cash Collateral, including, without limitation, Cash Collateral contained in the blocked Sponsor Support Account. Coupled with the proceeds of the DIP Facility, the use of Cash Collateral will provide the Debtors with necessary additional working capital to operate their businesses, pay their employees, maximize value, and successfully use chapter 11's collective remedy.

50.     WestLB has consented to the Debtors' use of Cash Collateral in the ordinary course of business, subject to the Adequate Protection Liens and the other terms and conditions set forth in the Final DIP Order. **Pursuant to the Final DIP Order, WestLB will require non-Seneca Debtors to subject *all of their assets* (which in the case of the Clinton assets is subject to a "collar") to Adequate Protection Claims and Liens for Cash Collateral usage under the Seneca and Non-Seneca Budgets from May 22, 2009 going forward in light of the increased risk to its position at Seneca created by the DIP Facility and use of the blocked Sponsor Support Account pursuant to the Final DIP Order.** Thus, among other things, Technologies' intellectual property, including the Process Technology, will be subject to WestLB Adequate Protection Claims (as allowed) and Liens relating to Cash Collateral usage under the Seneca and Non-Seneca Budgets from May 22, 2009 forward (in addition to DIP Liens and Claims). The Debtors will demonstrate at the Final Hearing that the proposed adequate protection discussed here and below satisfies the requirements of sections 363(e) and 364(d)(1)(B) of the Bankruptcy Code.

51.     WestLB is entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection. As adequate protection, WestLB must be granted Adequate Protection Liens to secure its Adequate Protection Claim for any diminution of the value in the Seneca Prepetition Collateral

or their interests in the Seneca Prepetition Collateral under the Seneca Credit Agreement, to the extent that there is a diminution in the value of their interests in the Prepetition Collateral from and after the Petition Date resulting from: (i) the use of such Collateral and cash constituting proceeds of such Collateral; (ii) the priming imposition of the DIP Liens; and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code.

52.     The Adequate Protection Liens here include:  (x) liens under the Interim Cash Collateral Orders relating to Cash Collateral usage under the Seneca and Non-Seneca Budgets through and including May 22, 2009, which are limited in scope as to non-Seneca Debtors, attaching only to Avoidance Action Proceeds, which Liens shall continue as Adequate Protection Liens under the Final DIP Order, and (y) the broader liens effective as of May 22, 2009 supporting the Senior Cash Collateral Claims.  The Adequate Protection Liens are: (i) subject and subordinate only to: (i) the DIP Liens; (ii) the Senior Permitted Liens; and (iii) the Carve-Out. The Adequate Protection Liens are and shall be valid, perfected, allowed, enforceable, unavoidable and not subject to challenge, dispute or subordination by the Debtors, at the time and date of the entry of the Interim Cash Collateral Orders as modified and extended in part by the Final DIP Order.  Without any further consent of any party, the Debtors are authorized and directed to take, execute and deliver such instruments to enable WestLB as Prepetition Agent, to further validate, perfect, preserve and enforce the Adequate Protection Liens, and to provide additional evidence of perfection.

53.     In addition to the Adequate Protection Liens, the Borrowers propose to grant and/or pay the Seneca Lender the following as adequate protection: (i) a super-priority section 507(b) Claim, and (ii) such additional adequate protection, as set forth in the Term Sheet, the Interim Cash Collateral Orders, the DIP Loan Documents, and in the Final DIP Order.

54.     The foregoing claims are to be granted to WestLB because, among other things, the Debtors, which are not operating presently, will continue to use the Cash Collateral in the Debtors' ongoing strategic and administrative process and in respect of facilities and assets after the entry of the Final DIP Order and throughout the proposed strategic process funded by the DIP Facility and Cash Collateral usage, including the use of funds contained in the blocked Sponsor Support Account. It should

29

be noted that as an accommodation to the Debtors, WestLB has waived adequate protection payments under the Interim Cash Collateral Orders per the Term Sheet, the DIP Loan Documents, and the Final DIP Order.

<b>THE DIP FACILITY SHOULD BE AUTHORIZED</b>

55.     Approval of the DIP Facility will provide the Debtors with access to borrowing availability to pay the Debtors' current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs. Unless these expenditures are made, the Debtors would be forced to accelerate their sales and plan processes, which would result in irreparable harm to their assets and value and would jeopardize the Debtors' ability to formulate a plan. Accordingly, the Debtors need the DIP Facility and the proposed Cash Collateral funding in order to, among other things, maximize recoveries for the Debtors' stakeholders. Accordingly, approval of the relief requested herein is imperative.

56.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Bankruptcy Court may authorize a debtor to obtain credit or incur debt: (i) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. *11 U.S.C. § 364*. Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that:   (x) the debtor is unable to obtain such credit otherwise, and (y) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. *11 U.S.C. § 364(d)*. It should be noted that DIP Lender Liens and claims are "collared" at Clinton assets at a level reflecting the fair benefit of the DIP Facility to the Parent Convertible Notes and the value of the Clinton Collateral.

57.     The Debtors' liquidity needs can be satisfied only if the Borrowers are authorized to obtain postpetition funding consisting of: (a) $2,030,000 of postpetition financing, and (b) the use of $1,169,230 in the blocked Sponsor Support Account. The Debtors have been unable to: (A) procure

30

sufficient financing: (i) in the form of unsecured credit allowable under Bankruptcy Code section 503(b)(1); (ii) as an administrative expense under section 364(a) or (b) of the Bankruptcy Code; (iii) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1); (iv) without granting priming liens pursuant to section 364(d); and (B) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein. Therefore, the Debtors propose to obtain the financing set forth in the Term Sheet by providing, *inter alia*, super-priority claims, security interests, and liens pursuant to Bankruptcy Code sections 364(c)(l), (2), (3) and (d) and additional Adequate Protection Liens on all non-Seneca Debtor assets in respect of Cash Collateral usage after May 22, 2009 pursuant to sections 105(a), 361, and 363(e) of the Bankruptcy Code.

58.     Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Facility with WestLB at arms'-length. Now, provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, bankruptcy courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g., Bray v. Shenandoah Fed. Say. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."). *See also In re Funding Sys. Asset Mgmt. Corp.,* 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985).

59.     Furthermore, section 364(d) of the Bankruptcy Code does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co.,* 789 F.2d 1085, 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful

31

contact with other financial institutions in the geographic area); *In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); *In re Aqua Assocs.,* 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming loan was necessary if debtor were to obtain funding).

60.    The Debtors' most significant tangible assets are encumbered by WestLB and the Indenture Trustee and, despite the diligent efforts of the Debtors, the Debtors have been unable to procure required funding absent granting the proposed super-priority claims and priming liens to WestLB. The Debtors have negotiated the best terms available to obtain the funding they need to maintain sufficient liquidity to preserve their assets over the course of these Chapter 11 Cases.  The Debtors have successfully limited proposed DIP Lender liens on Clinton Collateral consistent with parameters understood to be acceptable to the Indenture Trustee.  The Debtors submit that the circumstances of these cases require the Debtors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Facility reflects the exercise of their sound business judgment.

61.    There is ample legal support for the type of funding here. *See, In re SmurfitStone Container Corp.,* Case No. 09-10235 (Bankr. D. Del. Jan. 27, 2009) (Shannon, J.) [Dkt. No. 58]; *In re Nortel Networks Inc.,* Case No. 09-10138 (Bankr. D. Del. Jan. 15,2009) (Gross, J.) [Dkt. No. 54]; *In re VeraSun Energy Corp.,* Case No. 08-12606 (Bankr. D. Del. Nov. 4, 2008) (Shannon, J.) [Dkt. No. 39]; *In re Boscov's Inc.,* Case No. 08-11637 (Bankr. D. Del. Aug. 5,2008) (Gross, J.) [Dkt. No. 54]; *In re Goody's Family Clothing, Inc.,* Case No. 08-11133 (Bankr. D. DeL June 10,2008) (Sontchi. J) [Dkt. No. 61]; *In re Sharper Image Corp.,* Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008) (Gross, J.) [Dkt. No. 44]; *In re Hancock Fabrics, Inc.,* Case No. 07-10353 (Bankr. D. Del. Mar. 22, 2007) (Shannon, J.) [Dkt. No. 56]; *In re Aventine Renewable Energy Holdings, Inc.,* Case No. 09-11214 (Bankr. D. Del. May 6, 2009) (Gross, J.) [Dkt. No. 141]; *In re Pacific Ethanol Holding Co., LLC,* Case No. 09-11713 (Bankr. D. Del. June 3, 2009) (Gross, J.) [Dkt. No. 78].

## THE USE OF CASH COLLATERAL SHOULD BE APPROVED

62.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral

unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice

and a hearing, authorizes such use in accordance with the provisions of this section." *11 U.S.C. §*

*363(c)(2)*. The Debtors require the use of the Cash Collateral to fund their day-to-day operations. Indeed,

absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging

consequences for the Debtors and their estates and creditors. The interests of WestLB in the Cash

Collateral will be protected by the adequate protection set forth above. The Seneca Prepetition Lender has

consented to the use of the Cash Collateral on the terms set forth herein and in the Final DIP Order.

Accordingly, the Debtors' request to use Cash Collateral in the operation of their businesses and

administration of the Chapter 11 Cases should be approved.

## THE PROPOSED ADEQUATE PROTECTION SHOULD BE AUTHORIZED

63.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an

interest in property used ... or proposed to be used by a debtor in possession, the court ... shall prohibit or

condition such use ... as is necessary to provide adequate protection of such interest." *11 U.S.C. § 363(e)*.

Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic

cash payments, additional liens, replacement liens and other forms of relief. *11 U.S.C. § 361*. What

constitutes adequate protection must be decided on a case-by-case basis. *See  Dallas, N.A. v. O'Conner*

*(In re O'Connor),* 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re*

*Shaw Indus., Inc.,* 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to protect a

secured creditor from diminution in the value of its interest in the particular collateral during the period of

use. *See In re Swedeland Dev. Group, Inc.,* 16 F.3d 552, 554 (3d Cir. 1994) ("The whole purpose of

adequate protection for a creditor is to insure that the creditor receives the value for which he bargained

prebankruptcy.") (internal citations omitted).

64.     WestLB has agreed to the Debtors' use of Cash Collateral and to the DIP Facility in

consideration for the adequate protection provided to them under the Term Sheet, the DIP Loan

Documents, and the Final DIP Order. Moreover, the liens and other protections offered to WestLB will, taken together, sufficiently protect its interest in any collateral taken as security under the Prepetition Credit Agreement. Accordingly, the adequate protection proposed here is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

## THE AUTOMATIC STAY SHOULD BE MODIFIED ON A LIMITED BASIS

65.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to: (i) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lender to exercise, upon the occurrence and during the continuance of an event of default and after five (5) business days' notice thereof, all rights and remedies under the DIP Credit Agreement; and (iii) implement the terms of the proposed Final DIP Order.

66.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

67.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

68.     Notice of this Motion will be given to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Indenture Trustee; (iii) counsel to WestLB; (iv) counsel to the Committee; (v) counsel for Sterling Bank; and (vi) all parties that have requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

**NO PRIOR REQUEST**

69.     No previous request for the relief sought herein has been made to this Court or any other

court.

WHEREFORE, the Debtors respectfully request that the Court enter the proposed Final DIP Order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:  June 9, 2009     **BLANK ROME LLP**

         */s/ David W. Carickhoff*
         David W. Carickhoff (DE No. 3715)
         1201 Market Street, Suite 800
         Wilmington, DE  19801
         Telephone:  (302) 425-6400
         Facsimile:  (302) 425-6464

           and

         Michael B. Schaedle
         Erin O'Brien Harkiewicz
         One Logan Square
         Philadelphia, PA  19103
         Telephone:  (215) 569-5500
         Facsimile:  (215) 569-5555

         Counsel for Debtors and Debtors in Possession

131655.01602/21792568v.3