**EXHIBIT A**

**FOR DISCUSSION PURPOSES ONLY**
**NOT A COMMITMENT TO LEND**

_____

**TERM SHEET**

**Nova Biosource Fuels, Inc., and its debtor subsidiaries**

**Debtor-in-Possession Credit Facility**

*The terms and conditions summarized below are intended as a summary outline of a financing commitment which is conditioned in all respects upon completion of certain due diligence, negotiation of definitive documentation and final credit approval and do not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation. The DIP Lender (as defined herein) is not under any obligation to make a loan or make any commitment to lend and any such commitment would be subject to, among other conditions, obtaining any necessary authorizations and approvals and negotiation and execution of definitive documentation in form and substance satisfactory to the DIP Lender.*

*For the purposes of this Term Sheet only, capitalized terms not defined herein or in the First Interim Cash Collateral Order (as that term is defined herein) shall have the meaning ascribed to such terms in the Credit Agreement dated as of December 26, 2007 (as amended, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement"), among Nova Biofuels Seneca, LLC, WestLB AG, New York Branch ("WestLB"), as administrative agent and collateral agent (collectively, the "Prepetition Agent"), WestLB, as issuing bank with respect to Letters of Credit, Sterling Bank, as accounts bank ("Accounts Bank"), and WestLB as the Lender referred to therein (the "Prepetition Lender").*

*As a general matter the form and content of the Prepetition Credit Agreement and the related loan documents shall be used as an indicative template for the form and content that certain DIP Credit Agreement by and among the DIP Lender and the DIP Agent (as those terms are defined herein), each Borrower and Guarantor (as those terms are defined herein) (the "DIP Credit Agreement") and the documents, agreements and instruments evidencing and securing the DIP Facility (as that term is defined herein) (including the DIP Credit Agreement, the "DIP Loan Documents") provided that, to the extent that any such provisions of the Prepetition Credit Agreement and related loan documents are inconsistent with the terms of this Term Sheet, the DIP Loan Documents shall instead reflect such terms hereof. The terms and conditions of the the Prepetition Credit Agreement and the related loan documents shall continue to govern and control the Prepetition Obligations (as defined herein), but the terms and conditions of the final DIP Loan Documents (as approved by the Bankruptcy Court (as defined herein) and executed by Debtor, DIP Lender and DIP Agent) and of the Final DIP Order (as defined herein) shall govern and control the DIP financing proposed by this Term Sheet. This Term Sheet is not a binding commitment to lend nor is it a binding commitment to borrow; therefore, upon execution of the DIP Loan Documents by all necessary parties and the entry of the Final DIP Order (as defined below), the terms of the DIP Loan Documents shall supersede the terms thereof in their entirety.*

## I.    **General Terms**

| | |
|---|---|
| **Borrowers:** | (i) Nova Biofuels Seneca, LLC ("Seneca") and (ii) Nova Biosource Fuels, Inc. ("Biosource Fuels"), Biosource America, Inc. ("Biosource America"), Nova Biosource Technologies, LLC ("Technologies") Nova Biofuels Clinton County, LLC ("Clinton") and Nova Biofuels Trade Group, LLC ("Biofuels Trade") (Biosource Fuels, Biosource America, Technologies, Clinton and Biofuels Trade are collectively referred to as the "Subject Debtors", Seneca and the Subject Debtors are collectively referred to as the "Borrowers"), who each are debtors and debtors-in-possession under chapter 11 ("Chapter 11") of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and jointly administered under case no. 09-11081 (KG).  The obligations of the Borrowers under the DIP Facility shall be joint and several. |
| **Guarantors:** | Nova Holding Seneca, LLC, NBF Operations, LLC, Nova Holding Trade Group, LLC, and Nova Holding Clinton County, LLC (collectively, "Guarantors"), each of which is a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and jointly administered under case no. 09-11081 (KG).  The obligations of the Guarantors under the DIP Facility shall be joint and several. |
| **DIP Lender:** | WestLB, together with any person who shall become a lender under the DIP Facility (collectively with WestLB, the "DIP Lender"). |
| **DIP Agent:** | WestLB, in such capacity as DIP Agent. |
| **DIP Facility:** | The senior secured first priority debtor in possession facility (the "DIP Facility") shall consist of a loan to the Borrowers in the aggregate maximum principal amount of $2,030,000. |
| **DIP Order:** | The proceeds of the DIP Facility shall be disbursed to, and used by, the Borrowers pursuant to the DIP Loan Documents after entry of the final order by the Bankruptcy Court approving the DIP Facility in a form acceptable to the DIP Agent, the DIP Lender, the Prepetition Agent, the Prepetition Lender, Borrowers and Guarantors (the "Final DIP Order"). Upon entry of the Final DIP Order the terms of the Final DIP Order shall supersede and replace, the terms of: (x) the Interim Order (i) Authorizing the Use of Cash Collateral by Seneca and the Subject Debtors Pursuant to 11 U.S.C. § 363, (ii) Granting Adequate Protection to WestLB Pursuant to 11 U.S.C. §§ 361 and 363, and (iii) Scheduling a Final Hearing [Docket No. 17] (the "First Interim Cash Collateral Order"), and (y) Orders of the Bankruptcy Court amending the First Interim Cash Collateral Order from time to time |

| | |
|---|---|
| | [Docket Nos. 64 and 94] (collectively, the "<u>Interim Cash Collateral Orders</u>") to the extent set forth in the Final DIP Order and the DIP Loan Documents. |
| **Use of Cash Collateral in Sponsor Support Account:** | The Final DIP Order, in addition to approving and authorizing the incurrence of the obligations related to the DIP Facility, shall also authorize the Borrowers' to use the "Cash Collateral" (as that term is defined in the First Interim Cash Collateral Order and as modified herein), including those funds held in the Sponsor Support Account located at Sterling Bank (Account No. 021030167 FCC 1391) (the "<u>Sponsor Support Account</u>") in the approximate amount of $1,170,052. |
| | Concurrently with the entry of the approved Final DIP Order the Prepetition Agent and the Prepetition Lender shall consent to the Borrowers' use of the funds in the Sponsor Support Account and the continued use of their other Cash Collateral on the terms set forth herein.  For purposes of both this Term Sheet and the Final DIP Order the term Cash Collateral shall include the funds in the Sponsor Support Account. |
| **Use of DIP Proceeds and Cash Collateral:** | The DIP Facility and the Cash Collateral shall be used to fund (i) with respect to Seneca, its general corporate and working capital requirements and capital expenditures (including, without limitation, Seneca's ongoing administrative expenses in its Chapter 11 case), in each case in accordance with the budget for Seneca (the "<u>Seneca Budget</u>") for the period from June 24, 2009 to September 18, 2009 (the "<u>Budget Period</u>") (the proposed Seneca Budget is attached hereto as <u>Exhibit 1</u>); and (ii) with respect to the Subject Debtors, their respective general corporate and working capital requirements and capital expenditures (including, without limitation, each Subject Debtors' ongoing administrative expenses in its respective chapter 11 case), in each case in accordance with the budget for the Subject Debtors (the "<u>Non-Seneca Budget</u>") for the Budget Period (the proposed Non-Seneca Budget is attached hereto as <u>Exhibit 2</u>).[1] |
| | The Borrowers shall not be authorized to use the proceeds of the DIP Facility until they have exhausted the Cash Collateral. |
| | Upon the entry of the Final DIP Order, the Seneca Budget and the Non-Seneca Budget attached thereto shall supersede and replace any prior Seneca Budget(s) and Non-Seneca Budget(s) filed with |

---

[1]  The funding of Clinton through the DIP Facility as opposed to the prior cash collateral scheme requires revisions to the Non-Seneca Budget to reflect the proposed funding of expenses specifically related to Clinton in addition to continuing to reflect the Debtors' expenses that are not specifically related to either Clinton or Seneca.

|  | the Bankruptcy Court. |
|---|---|
|  | No portion of the DIP Facility, the DIP Collateral (as defined below), the Cash Collateral (as defined below), or the Carve-Out (as defined below) is to be used by any person or their counsel (i) to challenge the validity, extent, amount, perfection, priority, or enforceability of, or assert any defense, counterclaim or offset to the DIP Facility, the obligations under the Prepetition Credit Agreement (the "Prepetition Obligations"), or the security interests and liens securing the DIP Obligations (as defined below) or the Prepetition Obligations or otherwise litigate against the DIP Agent, the DIP Lender, the Prepetition Agent of the Prepetition Lender, or (ii) as otherwise prohibited in Paragraph 22 of the First Interim Cash Collateral Order; provided, however, that no more than $30,000 of the DIP Facility may be used by the Committee to investigate the Prepetition Liens and the Prepetition Obligations; provided further, that nothing herein shall be deemed to limit the use of DIP Facility proceeds or Cash Collateral in respect of any determination under section 506(a) of the Bankruptcy Code to determine the value of the Prepetition Agent's and the Prepetition Lender's interest in the estate's interest in the collateral securing the Prepetition Obligations (the "Prepetition Collateral") to the extent such valuation is related to the use, sale, lease, license or disposition of DIP Collateral, and does not involve a determination of the validity, extent, perfection, priority, or enforceability of such interest. |
| **Seneca Budget and Non-Seneca Budget:** | The DIP Facility and the Seneca Budget and the Non-Seneca Budget shall be subject to the provisions of Paragraphs 4, 5, 6, and 8 of the First Interim Cash Collateral Order, as subsequently amended and as otherwise applicable.  The chief restructuring officer for the Borrowers shall have the authority to propose amendments to the Seneca Budgets and Non-Seneca Budgets from time to time.  Paragraph 17 of the First Interim Cash Collateral Order shall be included in the Final DIP Order. |
|  | Until the obligations of the Borrowers in connection with (i) the DIP Facility and (ii) Adequate Protection Priority Claims (as defined in the First Interim Cash Collateral Order and ultimately the Final DIP Order) shall have been indefeasibly paid in full, all ordinary course sales proceeds, revenues, reimbursements and receipts of any of the Borrowers, of any kind and from time to time, shall be held in the Borrowers' accounts and disbursed pursuant to the Seneca Budget and the Non-Seneca Budget.  All sales proceeds, revenues, reimbursements and receipts outside of the ordinary course shall be dealt with as set forth under the caption "Application of Proceeds of DIP Collateral" below. |
|  | Subject to the agreement of the DIP Agent, the Prepetition Agent |

4

*Nova DIP Credit Facility*
*Term Sheet*

|  | and the Debtors regarding possible simplification of the Debtors' cash management accounts, the cash management provisions regarding use of Cash Collateral contained in the Final DIP Order will generally be consistent with the corresponding provisions of the Interim Cash Collateral Orders, including provisions which provide for the weekly release by the Prepetition Agent of Cash Collateral to the Debtors in the amounts budgeted for that week's expenditures under the Seneca Budget and Non-Seneca Budget.<br><br>Notwithstanding anything to the contrary contained herein, the Final DIP Order and the DIP Loan Documents (including any applicable financial covenants under the DIP Loan Documents relating to the Seneca Budget and Non-Seneca Budget and/or expenditures by Borrowers) shall contain appropriate provisions permitting limited line-item variances by the Borrowers with respect to the Seneca Budget and Non-Seneca Budget that are acceptable to the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders and Debtors.  It is anticipated that the line-item variances agreed to between the parties will be consistent with the variances provided for in Paragraphs 4 and 8 of the First Interim Cash Collateral Order. |
|---|---|
| **Maturity:** | The Borrowers shall repay any outstanding portion of the DIP Facility, in full, to the DIP Agent in immediately available funds, on the Maturity Date, to be defined as the earliest of (i) either (x) September 18, 2009 if the Sale Order as defined in the Interim Cash Collateral Order is entered by August 31, 2009, or (y) August 31, 2009 if the Sale Order as defined in the Interim Cash Collateral Order is not entered by August 31, 2009; (ii) the date of acceleration of any outstanding portion of the DIP Facility; (iii) the first business day on which the Final DIP Order expires by its terms or is terminated; (iv) conversion of any Borrower's or Guarantor's Chapter 11 case to a case under chapter 7 of the Bankruptcy Code ("Chapter 7") unless otherwise consented to in writing by the DIP Agent and the DIP Lender; (v) dismissal of any Borrower's or Guarantor's Chapter 11 case unless otherwise consented to in writing by the DIP Agent and the DIP Lender; and (vi) the effective date of any Borrower's or Guarantor's plan of reorganization.<br><br>Closing on the sale of the Seneca Plant and other assets of any Borrower or Guarantor pursuant to the Sale Order shall not accelerate the Maturity Date. |
| **Interest:** | Interest shall be payable monthly in arrears in cash on the outstanding amount of the DIP Facility on the first business day of each month at a rate equal to LIBOR + 10% per annum.  LIBOR shall be defined as a rate per annum set on a rolling 30 day basis (beginning on the date the proceeds of the DIP Facility are lent to |

*Nova DIP Credit Facility*
*Term Sheet*

| | |
|---|---|
| | the Borrowers) equal the greater of (i) 4% per annum and (ii) the offered rate on the applicable page of the Telerate screen (or any successor thereto) that displays an average British Bankers Association Interest Rate Settlement Rate for deposits in U.S. Dollars with a term of 30 days as of 11:00 AM on the third business day prior to each applicable rolling 30 day period, and shall contain appropriate protections to ensure that such rate is not less than a DIP Lender's cost of funds |
| **Default Interest:** | Upon the occurrence and during the continuance of any event of default under the DIP Facility and at the election of the DIP Lender, interest to be payable on all outstanding DIP Facility at 2% above the then applicable interest rate. |
| **Closing Date:** | A date on or after the entry of the Final DIP Order and upon which all Conditions Precedent have been satisfied (the "<u>Closing Date</u>"). The Closing Date shall occur by July 1, 2009, unless otherwise consented to in writing by the DIP Agent, the DIP Lender and Debtors. |
| **DIP Facility Fee:** | A fee of $160,000 payable to the DIP Lender on the Closing Date. |

## II.    Additional Terms

| | |
|---|---|
| **Sale of DIP Collateral:** | Material portions of the DIP Collateral may not be sold, leased, licensed or otherwise disposed of outside the ordinary course of business without a Bankruptcy Court order which is in form and substance acceptable to the affected Borrowers and Guarantors and the DIP Agent, the DIP Lender, the Prepetition Agent and the Prepetition Lender and without the prior written consent of the DIP Agent, the DIP Lender, the Prepetition Agent, and the Prepetition Lender, which consent may be withheld by each of them in its sole discretion. |
| | The sale related provisions of the Interim Cash Collateral Orders, including Paragraphs 16-20 of the First Interim Cash Collateral Order, as amended, shall be included in the Final DIP Order.  These provisions are requirements under both the DIP Facility and as adequate protection for the Prepetition Liens and Prepetition Obligations. |
| | None of the provisions of this Term Sheet, the DIP Loan Documents or the Final DIP Order shall be construed under any circumstances to (i) limit the rights or ability of the Debtors under the Bankruptcy Code to seek approval by the Bankruptcy Court for the sale, lease, license or other disposition of the DIP Collateral or the Prepetition Collateral, to otherwise make determinations regarding the conduct of the auction and in respect of bids and bidding, to make any determinations in connection with any related matters, and to otherwise exercise its fiduciary duties to all parties in interest in connection therewith; or (ii) to limit the rights or |

6

| | |
|---|---|
| | ability of any of the DIP Agent, the DIP Lender, the Prepetition Agent or the Prepetition Lender to object to any such sale, lease, license or other disposition of the DIP Collateral or the Prepetition Collateral or related matters on any grounds available to them, whether or not arising under the Final DIP Order or the DIP Loan Documents or otherwise applicable law, and to take other actions as they deem appropriate such as declaring an Event of Default under the DIP Loan Documents or the Final DIP Order. |
| **Application of Proceeds of DIP Collateral:** | Except as provided for below with respect to proceeds related to Clinton, the net cash proceeds from any use, sale, lease, license or other disposition of any portion of the DIP Collateral outside of the ordinary course of business shall be distributed to the DIP Agent or, if the DIP Facility has been satisfied in full, then to the Prepetition Agent and shall be applied in the following order of priority (collectively, the "<u>General Waterfall</u>"): |

    (i)    First, to pay any fees, expenses and accrued interest under the DIP Loan;

    (ii)    Second, to prepay all amounts outstanding under the DIP Facility;

    (iii)    Third, to (x) pay any and all allowed administrative expenses, in respect of the Carve-Out (as defined below), provided for in the Seneca and Non-Seneca Budgets, and/or (y) to make appropriate reserves for anticipated allowed administrative expenses, in an amount which shall not exceed, in the aggregate, the Carve-Out;

    (iv)    Fourth, to prepay the Prepetition Agent an amount equal to the amount of Cash Collateral used by any of the Debtors from and after May 22, 2009 through to the date of the calculation (the "<u>Senior Cash Collateral Claims</u>") (which prepayment shall reduce the outstanding obligations under the Prepetition Credit Agreement by a corresponding amount);

    (v)    Fifth, to the extent that there are net cash proceeds remaining after payment of the items above that are allocated exclusively to DIP Collateral that is not also Prepetition Collateral, then such amounts shall be retained by the applicable Debtors to be used in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court;

    (vi)    Sixth, to pay (or reserve for if the secured claim has not yet been allowed) any allowed secured claim under the Prepetition Credit Agreement pursuant to the Mandatory Prepayment Provisions in section 3.10(e) of the Prepetition Credit Agreement (the allowance of the secured claim,

except to the extent of a timely challenge pursuant to Paragraph 30 of the First Interim Cash Collateral Order, shall be limited to a determination of the value of the Prepetition Collateral used, sold, leased, license or disposed of in the relevant transaction); and

(vii)    Seventh, all excess net cash proceeds remaining after the distributions or reservations provided for in clauses (i) through (vi) shall be returned to the applicable Debtors to be used in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court.

Notwithstanding the foregoing, to the extent the net cash proceeds from any use, sale, lease, license or other disposition of any portion of the DIP Collateral outside of the ordinary course of business is allocated exclusively to the Clinton Collateral (as defined below) such proceeds shall be distributed and applied in the following order of priority (collectively, the "Clinton Waterfall"):

(i)    First, to the DIP Agent in repayment of the DIP Facility (as provided for in clauses (i) and (ii) of the General Waterfall), in an amount not to exceed the aggregate sum of:

a.    the amount expended by the Borrowers from May 22, 2009 through the date of such disposition for expenses specifically related to Clinton, including expenses that are designated under the Non-Seneca Budget (as modified from time to time) as Clinton expenses; *plus*

b.    15% of the amount expended by the Borrowers from May 22, 2009 through the date of such disposition for all expenses under the Non-Seneca Budget (as modified from time to time) that are not designated as Clinton expenses;

c.    the sum of the amounts under clauses (a) and (b) at any applicable time shall be referred to collectively as the "Clinton Priming Expenditures", provided that, notwithstanding anything to the contrary contained herein, in the event that there is more than one sale, lease, license or other disposition of any portion of the DIP Collateral outside of the ordinary course of business after May 22, 2009 but prior to the repayment in full of the DIP Facility and the Senior Cash Collateral Claims, the amount payable to the DIP Agent and/or the Prepetition Agent in repayment of the DIP Facility and the Senior Cash Collateral Claims in respect of any Clinton Priming Expenditures shall be

*Nova DIP Credit Facility*
*Term Sheet*

calculated taking into effect all prior such payments to the DIP Agent and/or the Prepetition Agent in respect of the Clinton Priming Expenditures (whether pursuant to the General Waterfall and/or the Clinton Waterfall) made in connection with all previous such sale(s), lease(s), license(s) or other disposition(s) outside the ordinary course of business

(ii)   Second, to the Borrowers to make the payments and fund the reserves specified in subpart (iii) of the General Waterfall;

(iii)   Third, to the Prepetition Agent in repayment of the Senior Cash Collateral Claims (which prepayment shall reduce the outstanding obligations under the Prepetition Credit Agreement by a corresponding amount) in an amount not to exceed the Clinton Priming Expenditures less any distributions to the DIP Agent pursuant to clause (i) of the Clinton Waterfall;

(iv)   Fourth, to pay or reserve for any allowed secured claim of the Indenture Trustee (as defined below) under the Convertible Notes (as defined below); and

(v)   Fifth, all excess net cash proceeds remaining after the distributions or reservations provided for in clauses (i) through (iv) shall be returned to the applicable Debtors to be used in accordance with the Bankruptcy Code and the orders of the Bankruptcy Court.

Distributions pursuant to either the General Waterfall or the Clinton Waterfall shall be made on a serial basis such that distributions provided in subsequent clause(s) of each  waterfall shall only be made with excess proceeds after the satisfaction in full of the distribution requirements of the preceding clause(s).  If there are net cash proceeds available for distribution under both the General Waterfall and the Clinton Waterfall on a reasonably contemporaneous basis, then the net cash proceeds distributed pursuant to the Clinton Waterfall shall be distributed first.  If there are net cash proceeds available for distribution under the General Waterfall from the proceeds of DIP Collateral that is not also Prepetition Collateral, then the proceeds of such DIP Collateral shall be distributed first.

Mandatory prepayments under the General Waterfall shall also be required under the circumstances provided for in Sections 3.10(a)(i) and 3.10(a)(ii) of the Prepetition Credit Agreement related to casualty or condemnation events.

Unless otherwise agreed to by the DIP Lender, prepayments of the

*Nova DIP Credit Facility*
*Term Sheet*

| | principal outstanding under the DIP Facility shall permanently reduce the DIP Facility. |
|---|---|
| **Security for DIP Facility:** | To secure all obligations of the Borrowers and Guarantors under and with respect to the DIP Facility (the "<u>DIP Obligations</u>") the DIP Agent, for the benefit of the DIP Lender, shall receive with respect to the DIP Obligations, pursuant to Sections 364(c)(1), (2), and (3) and 364(d)(1) of the Bankruptcy Code, valid, enforceable, fully perfected security interests in and liens upon all prepetition and postpetition assets of the Borrowers and Guarantors, whether now existing or hereafter acquired or arising, including a pledge of all equity interests in each Borrower (other than Biosource Fuels) and Guarantor, all inter-company notes or inter-company receivables due to each Borrower or Guarantor and all other instruments of each Borrower or Guarantor, and subject to entry of the Final DIP Order and the terms thereof, the proceeds of avoidance actions under sections 544, 547, 548 or 550 of the Bankruptcy Code in each Borrower's and Guarantor's Chapter 11 case (the "<u>Avoidance Actions</u>") (collectively, the "<u>DIP Collateral</u>").<br><br>For the avoidance of doubt, the DIP Collateral shall include, without limitation, those assets of Clinton and Nova Holding Clinton County, LLC ("<u>Clinton Holding</u>"), and the equity interests in Nova Holding Clinton County LLC and Nova Holding Seneca, LLC held by Biosource Fuels, which are subject to liens that have been granted by Clinton, Clinton Holding and Biosource Fuels to the Bank of New York Mellon Trust Company as indenture trustee (the "<u>Indenture Trustee</u>") for a certain $55,000,000 secured convertible notes (the "<u>Convertible Notes</u>") issued by Biosource Fuels pursuant to that certain Indenture dated September 28, 2007 among Biosource Fuels, Clinton, Clinton Holding and Nova Holding Seneca LLC and Indenture Trustee (the "<u>Convertible Notes Indenture</u>") to secure such Notes (such liens securing the Convertible Notes, the "<u>Clinton Liens</u>" and such assets of Clinton, Clinton Holding and Biosource Fuels subject to such Clinton Liens, the "<u>Clinton Collateral</u>"). The definition of "Clinton Liens" shall specifically exclude any purported liens securing the Convertible Notes Indenture on the equity of any entities other than Clinton, Clinton Holding or Nova Holding Seneca, LLC, and any purported liens on the assets of any entities other than Clinton and Clinton Holding. Furthermore, any equity in or assets of any entities directly or indirectly owned or controlled by Biosource Fuels other than Clinton and Clinton Holding shall be excluded from the definition of "Clinton Collateral."<br><br>The security interests in and liens upon the DIP Collateral shall be senior to all other liens and encumbrances other than the Senior |

10

LA1 1516535v.11
PHL02 21792203v.3

Permitted Liens.

"Senior Permitted Liens" shall be defined under the DIP Loan Documents similarly to the definition of "Permitted Liens" under the Prepetition Credit Agreement; however, Senior Permitted Liens, unlike the term Permitted Liens in the Prepetition Credit Agreement shall not include liens that, as of the Petition Date, are junior to the Prepetition Liens. The term Senior Permitted Liens shall include the Clinton Liens, provided that, such Clinton Liens shall be subordinated and primed pursuant to section 364(d)(1) of the Bankruptcy Code to (i) the security interest and liens in favor of DIP Agent and other claims of the DIP Agent and the DIP Lender on the DIP Collateral, and (ii) the security interest and liens in favor of the Prepetition Agent and other claims of the Prepetition Agent and the Prepetition Lender on the DIP Collateral related to the Senior Cash Collateral Claims, to the extent of all of the Clinton Priming Expenditures.

For the avoidance of doubt, the Clinton Liens on the Clinton Collateral, if any, shall be Senior Permitted Liens, with priority over the security interest and liens provided for in clauses (i) and (ii) of the preceding Paragraph to the extent the value of any Clinton Liens on the Clinton Collateral exceed the amount of the Clinton Priming Expenditures incurred from time to time. Furthermore, no provision of this Term Sheet other than the provisions related to the liens securing the Senior Cash Collateral Claims is intended to require the grant of security interests or liens in favor of the Prepetition Agent or the Prepetition Lender in any of the Clinton Collateral to secure any of the Prepetition Obligations.

"DIP Collateral" shall also include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Lender or the DIP Agent in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits.

The liens and security interests securing the DIP Facility shall attach and be valid, binding, enforceable and fully perfected first priority (subject only to the Senior Permitted Liens) liens and security interests upon entry of the Final DIP Order without the requirement of any further action by the DIP Agent or the DIP Lender.

The Borrowers and Guarantors shall execute and deliver to the DIP Agent and the Prepetition Agent a credit agreement, guaranties, financing statements, security agreements, vehicle lien applications, mortgages or other documents reasonably necessary or desirable to document the DIP Facility and further evidence the perfection of the

| | |
|---|---|
| | liens on the DIP Collateral. |
| | The DIP Obligations shall enjoy superpriority administrative expense status under Section 364(c)(1) with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject to the Carve-Out. |
| **Carve-Out:** | As used in this Term Sheet, the term "Carve-Out" shall mean the sum, after application of any unencumbered cash, of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, (ii) the aggregate amount of any budgeted, accrued but unpaid, professional fees and expenses existing as of the Carve-Out Date (as defined below) of the Debtors and the Official Committee of Unsecured Creditors of the Debtors (the "Committee"), to the extent such fees are allowed by order of the Bankruptcy Court, and (iii) those fees, costs and expenses incurred by (x) the Debtors' professionals after the Carve-Out Date and subsequently allowed by order of the Bankruptcy Court in an amount not to exceed $160,000 and (y) the Committee's professionals after the Carve-Out Date and subsequently allowed by order of the Bankruptcy Court in an amount not to exceed $50,000 (the amounts provided for in clause (iii) shall not be reduced by any amounts paid to the Debtors' professionals or the Committee's professionals prior to the occurrence of the Carve-Out Date). |
| | Prior to the Carve-Out Date, subject to entry of an appropriate order of the Bankruptcy Court (in form and substance acceptable to the DIP Agent and the DIP Lender), the Borrowers and Guarantors shall be permitted to use proceeds of the DIP Facility to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code in accordance with the Seneca Budget and the Non-Seneca Budget, as applicable, to the extent allowed by order of the Bankruptcy Court. |
| | Following the Carve-Out Date any amounts paid under (i), (ii) or (iii) above, by any means, will reduce the Carve-Out on a dollar-for-dollar basis. |
| | Nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation sought by the professionals retained by any Debtor or the Committee. |
| | "Carve-Out Date" means the date that is the earlier of (i) the delivery of a notice of default under the DIP Facility to counsel to the Borrowers and Guarantors, counsel to the Committee, and the |

*Nova DIP Credit Facility*
*Term Sheet*

| | |
|---|---|
| | Office of the U.S. Trustee, or (ii) the Maturity Date. |
| **Adequate Protection:** | As adequate protection to the Prepetition Lender for the diminution, if any, in the value of their interests in each Borrower's or Guarantor's property resulting from (i) the priming liens granted to secure the DIP Obligations pursuant to section 364(d)(1) of the Bankruptcy Code, (ii) the use, sale, lease, license or other disposition of the Prepetition Collateral (including the Cash Collateral) pursuant to section 363(c) of the Bankruptcy Code, and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the Prepetition Agent, for the benefit of the Prepetition Lender, pursuant to Section 105(a) and 363(e) of the Bankruptcy Code, shall:<br><br>(a)   Receive valid, enforceable, fully perfected security interests in and liens upon the DIP Collateral to secure the repayment of the Senior Cash Collateral Claims, which liens shall only be junior and subordinate to (1) the liens securing the DIP Obligations, (2) the Senior Permitted Liens, and (3) the Carve-Out;<br><br>(b)   Maintain, subject to the terms of the Final DIP Order, all of its Prepetition Liens (as defined in the Interim Cash Collateral Order), which liens shall only be junior and subordinate to (1) the liens securing the DIP Obligations, (2) the liens securing the repayment of the Senior Cash Collateral Claims, (3) the Senior Permitted Liens, and (4) the Carve-Out;<br><br>(c)   Receive and maintain, subject to the terms of the Final DIP Order, all of the Adequate Protection Liens granted in Paragraph 9 of the First Interim Cash Collateral Order; however, such Adequate Protection Liens shall be modified such that they are only junior to (1) the liens securing the DIP Obligations, (2) the liens securing the repayment of the Senior Cash Collateral Claims, (3) the Senior Permitted Liens, and (4) the Carve-Out;<br><br>(d)   Receive and maintain, subject to the terms of the Final DIP Order, its Adequate Protection Priority Claims granted in Paragraph 9 of the First Interim Cash Collateral Order, which claims shall include the repayment of the Senior Cash Collateral Claims, subject only to (1) the super-priority claims granted to the DIP Agent and the DIP Lender under the DIP Facility and the Final DIP Order, as the case may be, and (2) the Carve-Out;<br><br>(e)   Receive and maintain, subject to the terms of the Final DIP Order, the adequate protection provisions in Paragraphs 12 (as may be amended by the Final DIP Order as to cash management), 13, and 20 as well as the sale process in Paragraphs 16-19 of the First Interim Cash Collateral Order (which terms shall be included in the Final DIP Order); and |

13

*Nova  DIP Credit Facility*
*Term Sheet*

|  | (f)   Receive and maintain, subject to the terms of the Final DIP Order, the adequate protection rights provided for in Paragraph 11 of the First Interim Cash Collateral Order; *provided, however,* that in accordance with the attached Seneca Budget, the Prepetition Lender will not receive (and has not received) the adequate protection payments provided for in Paragraph 11(i) of the First Interim Cash Collateral Order. |
|  | The Adequate Protection Liens shall be perfected in accordance with Paragraph 14 of the First Interim Cash Collateral Order.  Paragraph 28 of the First Interim Cash Collateral Order shall also be incorporated into the Final DIP Order. |
| **Representations and Warranties:** | The documentation for the DIP Facility and related collateral matters shall contain such representations and warranties as are customary for DIP loan transactions and investments of a similar size and nature and generally shall be consistent with the relevant portions, if any, of the Prepetition Credit Agreement. |
| **Financial Covenants:** | The documentation for the DIP Facility and related collateral matters shall contain such financial covenants as are customary for DIP loan transactions and investments of a similar size and nature, taking into account the term of the DIP Facility and the fact that neither the Seneca Plant nor the Clinton plant is currently operating. |
| **Administrative Expenses and Distributions:** | No portion of the DIP Collateral (including any Cash Collateral generated after the Petition Date) shall: (i) be used by the Borrowers or Guarantors to satisfy administrative expenses in any of their Chapter 11 cases other than as provided for in the Seneca Budget and the Non-Seneca Budget, or (ii) be distributed by any Borrower or Guarantor to any entity or equity holder in the form of an upstream dividend, intercompany loan, or any distribution for less than reasonably equivalent value. |
| **Negative Covenants:** | The documentation for the DIP Facility shall contain negative covenants of each Borrower and Guarantor customary for DIP loan transactions and investments of a similar size and nature and generally shall be consistent with the relevant portions, if any, of the Prepetition Credit Agreement, provided that such covenants shall be modified as appropriate to reflect the current facts and circumstances regarding Debtors, including the fact that the Seneca Plant has been shut down and is not currently operating. |
| **Affirmative Covenants:** | The documentation for the DIP Facility shall include affirmative covenants of each Borrower and Guarantor, customary for DIP loan transactions and investments of a similar size and nature and generally shall be consistent with the relevant portions, if any, of the Prepetition Credit Agreement, provided that such covenants shall be modified as appropriate to reflect the current facts and circumstances |

14

| | |
|---|---|
| | regarding Debtors, including the fact that the Seneca Plant has been shut down and is not currently operating.  In particular, the provisions of the existing Article VIII of the Prepetition Credit Agreement shall be modified to provide a cash management system consistent with the terms of this Term Sheet and covenants relating to any requirements to demonstrate that the Commercial Operations Date or Final Completion shall have occurred shall be eliminated |
| **Waivers:** | The waivers proposed in Paragraphs 26 and 27 of the First Interim Cash Collateral Order, related to sections 506(c), 552 and 726 of the Bankruptcy Code shall be incorporated into the Final DIP Order. |
| **Events of Default:** | The DIP Facility shall include Events of Default customary for DIP loan transactions and investments of a similar size and nature, including, but not limited to: |

1. The use of proceeds of the DIP Facility and/or the Cash Collateral in a manner inconsistent with the Seneca Budget and the Non-Seneca Budget;

2. The payment of claims existing prior to the Petition Date other than as set forth in the Seneca Budget or the Non-Seneca Budget or if payment is approved by the DIP Agent and authorized by an Order of the Bankruptcy Court;

3. Dismissal or conversion to Chapter 7 of any of the Borrower's or Guarantor's Chapter 11 cases;

4. The appointment of a trustee or examiner in any of the Borrower's or Guarantor's Chapter 11 cases;

5. The entry of an order that in any way modifies, stays, reverses, or vacates the Final DIP Order in a manner adverse to the DIP Agent, the DIP Lender, the Prepetition Agent or the Prepetition Lender without their respective written consent which may be withheld in their sole discretion, or if the Final DIP Order ceases to be in full force and effect;

6. The entry of the Final DIP Order shall not have occurred prior to or concurrently with the expiration of the authority to use Cash Collateral under the Interim Cash Collateral Orders;

7. Any Borrower or Guarantor moves the Bankruptcy Court to obtain additional financing *pari passu* or senior to DIP Facility;

8. The entry of an order granting any other super-priority claim or lien equal or superior to that granted to the DIP Agent or the DIP Lender on the assets of the Borrowers and Guarantors;

9.  The entry of an order granting relief from the automatic stay so as to allow any third party to proceed against any material assets of the Borrowers and Guarantors, provided that, as a safe harbor, it shall be agreed that such relief as to assets having a fair market value, in the aggregate as to any one or more such orders, not exceeding $250,000 shall not be deemed material;

10. The entry of any order of the Bankruptcy Court confirming any plan of reorganization that does not contain a provision for termination of the DIP Facility and repayment in full in cash of all of the DIP Obligations under the DIP Facility and the Adequate Protection Priority Claims on or before the effective date of such plan;

11. Any Borrower or Guarantor violates or breaches the Final DIP Order or files any pleadings seeking, joining in, or otherwise consenting to any alteration, violation or breach of the Final DIP Order, in each case in a manner adverse to the DIP Agent, the DIP Lender, the Prepetition Agent or the Prepetition Lender, in the sole determination of such party;

12. Any party in interest files any pleadings seeking to alter, violate or breach the DIP Order, in each case in a manner adverse to the DIP Agent, the DIP Lender, the Prepetition Agent or the Prepetition Lender, in the sole determination of such party;

13. Any Debtor or its affiliate fails to comply with the provisions of Paragraph 20 of the First Interim Cash Collateral Order as incorporated into the Final DIP Order;

14. (A) Any Borrower or Guarantor engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the Prepetition Obligations or the liens on or security interests in the assets of the Borrowers or Guarantors securing the DIP Facility or the Prepetition Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the DIP Facility or the Prepetition Obligations, or (B) any Borrower or Guarantor engages in or supports any investigation or assertion of any claims or causes of action (or supporting the assertion of the same) against the DIP Agent, the DIP Lender, the Prepetition Agent or the Prepetition Lender; provided, however, it shall not constitute an Event of Default if the Borrowers and Guarantors provide written information with respect to the Prepetition Obligations to a party in interest or are compelled to provide information by an Order of the Court and provides prior

notice to the DIP Agent and the DIP Lender of the intention or requirement to do so; _furthermore_, it shall not constitute an Event of Default if the Borrowers and Guarantors engage in oral communication to neutrally assist a party in understanding the Prepetition Loan Documents or other publicly available information with respect to the Prepetition Obligations;

15.  Any person shall seek a determination under Section 506(a) of the Bankruptcy Code with respect to the Prepetition Obligations that is unacceptable to the Prepetition Agent and the Prepetition Lender; _provided_, _however_, it shall not constitute an Event of Default if the Section 506(a) determination is sought either (i) pursuant to the challenge period provided for in Paragraph 30 of the First Interim Cash Collateral Order, or (ii) to determine the value of the Prepetition Agent's and the Prepetition Lender's interest in the estate's interest in the Prepetition Collateral to the extent such valuation is related to the use, sale, lease, license or disposition of DIP Collateral, and does not involve a determination of the validity, extent, perfection, priority, or enforceability of such interest;

16.  The allowance of any claim or claims under Section 506(c), 552(b) or 726 of the Bankruptcy Code against the DIP Agent, the DIP Lender, the Prepetition Agent or the Prepetition Lender with respect to any of the DIP Collateral or the Prepetition Collateral;

17.  The use of Cash Collateral or other assets of the Borrowers other than as expressly contemplated by the Final DIP Order and the Seneca Budget or the Non-Seneca Budget prior to the indefeasible payment in full of the DIP Obligations and the Adequate Protection Priority Claims as well as the termination of the DIP Facility and the Borrowers' ability to use Cash Collateral;

18.  The consummation of the sale of any material portion of any Borrower's or Guarantor's assets unless consented to by the DIP Agent and the DIP Lender, which consent may be withheld in their sole discretion, and authorized by the Bankruptcy Court pursuant to an order, which is in form and substance reasonably acceptable to the Borrowers, Guarantors, DIP Agent and DIP Lender; and

19.  Breach of any covenants or representations and warranties in the DIP Loan Documents or the Final DIP Order, including without limitation, failure to distribute the proceeds of the DIP Collateral as required in the General Waterfall and the

17

*Nova  DIP Credit Facility*
*Term Sheet*

|  | Clinton Waterfall. |
|---|---|
|  | Waiver of any of the foregoing requires the written consent of the DIP Agent and the DIP Lender, and as applicable the Prepetition Agent and the Prepetition Lender. |
| **Remedies On Default:** | The Final DIP Order and the DIP Loan Documents shall provide that, upon the occurrence and during the continuation of an Event of Default under the DIP Facility, the DIP Agent, at the direction of the DIP Lender, shall have customary remedies, including, without limitation, the automatic stay under section 362 of the Bankruptcy Code shall be deemed automatically terminated without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading, to: (i) declare the principal of and accrued interest on the outstanding borrowings and claims, if any, in respect of the DIP Facility to be immediately due and payable, (ii) to terminate any further commitment to lend to the Borrowers under the DIP Facility, if applicable, and (iii) charge the default rate of interest on the outstanding obligations under the DIP Facility. |
|  | The Final DIP Order and the DIP Loan Documents shall provide that, upon the occurrence and during the continuation of an Event of Default under the DIP Facility, the Prepetition Agent, at the direction of the Prepetition Lender, shall have the authority to revoke its consent to the use of the Cash Collateral, and upon exercise of such authority, the automatic stay under section 362 of the Bankruptcy Code and the Debtors' authority to use Cash Collateral shall both be deemed automatically terminated, all without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading, to declare the Senior Cash Collateral Claims to be immediately due and payable. |
|  | In addition, upon five (5) business days' written notice (the "<u>Notice Period</u>") to (i) counsel to the Borrowers and Guarantors, (ii) counsel to the Committee, and (iii) the Office of the U.S. Trustee, the automatic stay shall be deemed automatically terminated, without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading, to permit (x) the DIP Agent to realize on all DIP Collateral and to exercise any and all remedies under the Final DIP Order and the DIP Facility with respect to the DIP Collateral or any part thereof and to set off or seize amounts in any accounts maintained with or under the control of the DIP Agent or DIP Lender and (y) the Prepetition Agent to realize on all DIP Collateral and to exercise any and all remedies under the Final DIP Order with respect to the repayment of the Senior Cash Collateral Claims or any part thereof and to set off |

*Nova DIP Credit Facility*
*Term Sheet*

| | |
|---|---|
| | or seize amounts in any accounts maintained with or under the control of the Prepetition Agent or the Prepetition Lender; provided, however, during the Notice Period, the Borrowers and Guarantors and/or any committee may seek relief from the Bankruptcy Court to re-impose or continue the automatic stay; provided, further, in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing. |
| **Voting:** | Matters requiring the approval of the DIP Lender, including amendments and waivers of the definitive credit documentation, will require, if there is more than one DIP Lender, the approval of DIP Lender(s) holding, in the aggregate, greater than 50% of the outstanding loan exposure under the DIP Facility, subject to exceptions to be set forth in the definitive credit documentation. |
| **Conditions Precedent:** | The closing and the making of any advance under the DIP Facility shall be subject to various conditions precedent customary for DIP loan transactions and investments of a similar size and nature, including but not limited to: |

1.  Receipt of all required court approvals for the DIP Facility;

2.  Execution of definitive DIP Loan Documents, other papers related to the DIP Facility (including, without limitation, the Final DIP Order), each satisfactory in form and substance to the DIP Agent, the DIP Lender, the Prepetition Agent and the Prepetition Lender, as well as each Borrower and Guarantor, in each case in such entity's sole and absolute discretion, including the implementation of a satisfactory cash management system consistent with the terms of this Term Sheet and subject to account control agreements in favor of the DIP Agent and the Prepetition Agent where relevant;

3.  Delivery of the Seneca Budget and the Non-Seneca Budget as approved by the DIP Lender and to be attached to the Final DIP Order entered by the Bankruptcy Court;

4.  Entry of the Final DIP Order, as the case may be, by the Bankruptcy Court, after notice given and a hearing conducted in accordance with Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (and any applicable local bankruptcy rules), authorizing and approving the transactions contemplated by the documents evidencing the DIP Facility and finding that the DIP Lender is extending credit to the Borrowers and Guarantors in good faith within the meaning of Bankruptcy Code section 364(e) and containing the provisions provided for in the sections of this Term Sheet entitled "DIP Order" and "Additional Provisions of DIP

LA1 1516535v.11
PHL02 21792203v.3

Order";

5.    The Final DIP Order, in form and substance satisfactory to the DIP Agent, the DIP Lender, the Prepetition Agent and the Prepetition Lender and each Borrower and Guarantor, shall be in full force and effect and shall not be subject to a pending appeal or have been stayed, reversed, vacated or otherwise modified in a manner adverse to the DIP Agent, the DIP Lender, the Prepetition Agent and the Prepetition Lender, in the sole determination of such party;

6.    Reimbursement in full in cash of the reasonable fees, costs and expenses of the DIP Agent, the DIP Lender and the Prepetition Agent;

7.    Exhaustion of the Cash Collateral; and

8.    No litigation is commenced, which has not been stayed by the Bankruptcy Court and which, if successful, would have a material adverse impact on any Borrower or Guarantor or their businesses or ability to repay the DIP Facility, or which would challenge the transactions under consideration.

The documents evidencing the DIP Facility shall contain conditions precedent to making future advances under the DIP Facility, including but not limited to:

(i)    No Default or Event of Default shall have occurred and be continuing;

(ii)   Representations and warranties shall be true and correct as of the date of the final advance of the DIP Facility;

(iii)  The Final DIP Order, in form and substance satisfactory to the DIP Agent, the DIP Lender, the Prepetition Agent and the Prepetition Lender and each Borrower and Guarantor, shall be in full force and effect and shall not be subject to a pending appeal or have been stayed, reversed, vacated or otherwise modified in a manner adverse to the DIP Agent, the DIP Lender, the Prepetition Agent and the Prepetition Lender, in the sole determination of such party;

(iv)   Receipt by the DIP Agent and the DIP Lender of a borrowing request in the form to be set out in the DIP Loan Documents evidencing the DIP Facility executed by each Borrower.  The Borrowers' request for the final advance of the DIP Facility shall constitute a representation and warranty that the conditions to the making of such advance shall have been satisfied; and

(v)    Payment of all fees and other amounts then due and payable.

20

*Nova  DIP Credit Facility*
*Term Sheet*

| | |
|---|---|
| **Additional Provisions of DIP Order:** | The Final DIP Order shall be in form and substance reasonably acceptable in all respects to DIP Agent, the DIP Lender, the Prepetition Agent and the Prepetition Lender, and each Borrower and each Guarantor, and shall include, without limitation, provisions (i) approving in all respects the definitive documentation evidencing the DIP Facility, and authorizing the Borrowers and Guarantors to execute and become bound by such definitive documentation; (ii) modifying the automatic stay to the extent necessary to permit or effectuate the terms of the Final DIP Order and documents evidencing the DIP Facility, including, without limitation, to permit the creation and perfection of the DIP Agent's liens on the DIP Collateral; (iii) providing for the automatic relief of such stay to permit the enforcement of DIP Agent's and the DIP Lender' remedies under the DIP Facility, subject to the right of the Borrowers and Guarantors and/or the Committee to re-impose or continue the automatic stay as more fully set forth herein and in the Final DIP Order; and (iv) subject to paragraph 30 of the First Interim Cash Collateral Order, providing that the Borrowers and Guarantors acknowledge the accuracy of recitals A-K of the Interim Cash Collateral Order, including: (a) the validity and enforceability of the Prepetition Obligations, without defense, offset or counterclaim of any kind, (b) the validity, perfection and priority of the liens securing the Prepetition Obligations, and that the Borrowers and Guarantors waive any right to challenge or contest such claims and liens and (c) that they have no valid claims or causes of action, whether based in contract, tort or otherwise against the Prepetition Agent or any Prepetition Lender with respect to the Prepetition Credit Agreement or the related documents or transactions. |
| **Expenses:** | All reasonable out-of-pocket costs and expenses of the DIP Agent (including, without limitation, reasonable fees and disbursements of counsel to the DIP Agent and the fees and expenses of the financial advisors advising the DIP Agent) and the DIP Lender to be payable by the Borrowers and Guarantors on submission of detailed invoices which may be redacted in part to preserve attorney-client privilege, whether or not the transactions contemplated hereby are consummated. |
| **Termination:** | Upon the occurrence of an Event of Default, the DIP Lender may terminate the unfunded portion of the DIP Facility, if any, declare the DIP Obligations to be immediately due and payable and exercise all rights and remedies under the documents evidencing the DIP Facility and the Final DIP Order, as applicable and as set forth herein, in the Final DIP Order, and the DIP Loan Documents. |
| **Indemnification and Exculpation:** | Borrowers and Guarantors shall agree, jointly and severally, to indemnify and hold harmless the DIP Agent and the DIP Lender and each of their respective affiliates and each of their respective |

officers, directors, employees, agents, advisors, representatives and professionals (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Borrowers or Guarantors, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Notwithstanding the foregoing, any payment obligations owed by the Borrowers or Guarantors pursuant to their indemnity obligations herein only shall be made upon Bankruptcy Court approval. This indemnity will not pertain to: (i) Indemnified Party acts that occurred prior to the commencement of the Chapter 11, or (ii) to Indemnified Party omissions prior to the commencement of the Chapter 11.

No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any of the Borrowers or Guarantors, any of their affiliates or any of their respective security holders or creditors for or in connection with the transactions contemplated hereby, except for direct damages for contract breach (as opposed to special/indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings), or damages arising from such entities' gross negligence or willful misconduct, which damages must be determined in a final non-appealable judgment by a court of competent jurisdiction.

| | |
|---|---|
| **Continuing Effect and Proof of Claim:** | The provisions of Paragraphs 25, 29 and 31 of the First Interim Cash Collateral Order shall be incorporated into the Final DIP Order. |
| **Challenge Period:** | The binding nature of the DIP Facility and the challenge period described in Paragraph 30 of the First Interim Cash Collateral Order shall be incorporated into the Final DIP Order, except as may otherwise be agreed in writing by the Prepetition Agent and the Prepetition Lender. |
| **Governing Law:** | New York law except as governed by the Bankruptcy Code. |

| | |
|---|---|
| **Miscellaneous:** | This summary of terms and conditions does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive credit documentation for the DIP Facility contemplated hereby, all of which shall be acceptable to the DIP Agent and the DIP Lender and each Borrower and Guarantor. |
| **Reservation of Rights Regarding Clinton Liens and Clinton Collateral:** | Notwithstanding anything to the contrary contained in this Term Sheet, all references to the Clinton Liens on the Clinton Collateral and the validity, extent, amount, perfection, priority, or enforceability thereof are premised upon the non-binding assumptions by the Debtors that the Clinton Liens on the Clinton Collateral are valid, perfected and enforceable.  Such assumptions are made by the Debtors for their convenience in structuring the liens, claims and distributions provided for herein and are not made for the benefit of the Indenture Trustee or the Noteholders.  Nothing herein, the Final DIP Order of the DIP Loan Documents shall constitute or be construed by the Bankruptcy Court or any other person under any circumstance as an admission by the Debtors their estates or any other person regarding the validity, extent, amount, perfection, priority, or enforceability of the Clinton Liens on the Clinton Collateral.  Each of the Debtors and their respective estates as well as all other persons reserve all of their respective rights to investigate and challenge any and all aspects of the Clinton Liens. |

23

LA1 1516535v.11
PHL02 21792203v.3

**Exhibit 1**

**Seneca Budget**

Confidential

## Nova Biofuels Seneca, LLC

($ in 000s)

| | Budget 6/5/09 | Budget 6/12/09 | Budget 6/19/09 | Budget 6/26/09 | Budget 7/3/09 | Budget 7/10/09 | Budget 7/17/09 | Budget 7/24/09 | Budget 7/31/09 | Budget 8/7/09 | Budget 8/14/09 | Budget 8/21/09 | Budget 8/28/09 | Budget 9/4/09 | Budget 9/11/09 | Budget 9/18/09 | Accruals | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash** | $2,408.0 | $1,657.9 | $1,518.5 | $1,177.7 | $1,109.7 | $877.1 | $824.5 | $549.1 | $492.1 | $392.3 | $92.4 | ($204.9) | ($263.0) | ($314.8) | ($629.7) | ($838.5) | ($944.3) | $2,408.0 |
| **Receipts** | | | | | | | | | | | | | | | | | | |
| Inventory Sales - Seneca | $32.7 | $0.0 | $42.0 | $81.1 | $44.5 | $4.4 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $204.6 |
| **Total** | $32.7 | $0.0 | $42.0 | $81.1 | $44.5 | $4.4 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $204.6 |
| **Disbursements** | | | | | | | | | | | | | | | | | | |
| Payroll | (6.9) | (36.4) | 0.0 | (36.4) | (6.9) | (36.4) | 0.0 | (36.4) | (6.9) | (36.4) | 0.0 | (36.4) | (6.9) | (36.4) | 0.0 | (36.4) | (6.9) | (325.7) |
| **OPEX** | | | | | | | | | | | | | | | | | | |
| Utilities | ($52.5) | $0.0 | $0.0 | ($83.0) | ($10.5) | $0.0 | $0.0 | $0.0 | ($28.5) | ($10.5) | $0.0 | $0.0 | ($28.5) | ($10.5) | $0.0 | ($28.5) | $0.0 | ($252.5) |
| Maintenance | (5.0) | 0.0 | 0.0 | 0.0 | (5.0) | 0.0 | 0.0 | 0.0 | 0.0 | (5.0) | 0.0 | 0.0 | 0.0 | (5.0) | 0.0 | 0.0 | 0.0 | (20.0) |
| Equipment/Supplies | (31.5) | 0.0 | (1.0) | (0.1) | (6.0) | 0.0 | (1.0) | 0.0 | (1.0) | (5.0) | (1.0) | 0.0 | (1.0) | (5.0) | (1.0) | 0.0 | (0.5) | (54.1) |
| Disposal | (1.8) | 0.0 | 0.0 | 0.0 | (1.8) | 0.0 | 0.0 | 0.0 | 0.0 | (1.8) | 0.0 | 0.0 | 0.0 | (1.8) | 0.0 | 0.0 | 0.0 | (7.2) |
| Environmental & Permits | (1.5) | 0.0 | 0.0 | 0.0 | (1.5) | 0.0 | 0.0 | 0.0 | 0.0 | (1.5) | 0.0 | 0.0 | 0.0 | (1.5) | 0.0 | 0.0 | 0.0 | (6.0) |
| Telecom & Office Expenses | (2.6) | 0.0 | 0.0 | 0.0 | (2.6) | 0.0 | 0.0 | 0.0 | 0.0 | (2.6) | 0.0 | 0.0 | 0.0 | (2.6) | 0.0 | 0.0 | 0.0 | (10.4) |
| Subtotal | ($94.9) | $0.0 | ($1.0) | ($83.1) | ($27.4) | $0.0 | ($1.0) | $0.0 | ($29.5) | ($26.4) | ($1.0) | $0.0 | ($29.5) | ($26.4) | ($1.0) | ($28.5) | ($0.5) | ($350.2) |
| **Filing/Restructuring Expenses** | | | | | | | | | | | | | | | | | | |
| Sidley Austin - WestLB Counsel | ($248.1) | $0.0 | $0.0 | $0.0 | ($100.0) | $0.0 | $0.0 | $0.0 | $0.0 | ($100.0) | $0.0 | $0.0 | ($100.0) | $0.0 | $0.0 | $0.0 | ($125.0) | ($673.1) |
| Chadbourne & Parke, LLP - WestLB Counsel | (46.1) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (46.1) |
| Young, Conaway, Stargatt & Taylor LLP - WestLB Counsel | (22.4) | 0.0 | 0.0 | 0.0 | (10.0) | 0.0 | 0.0 | 0.0 | 0.0 | (10.0) | 0.0 | 0.0 | 0.0 | (10.0) | 0.0 | 0.0 | (15.0) | (67.4) |
| Capstone - WestLB F.A. | (100.0) | 0.0 | 0.0 | 0.0 | (100.0) | 0.0 | 0.0 | 0.0 | 0.0 | (100.0) | 0.0 | 0.0 | (100.0) | 0.0 | 0.0 | 0.0 | (100.0) | (500.0) |
| Subtotal | ($416.6) | $0.0 | $0.0 | $0.0 | ($210.0) | $0.0 | $0.0 | $0.0 | $0.0 | ($210.0) | $0.0 | $0.0 | ($210.0) | $0.0 | $0.0 | $0.0 | ($240.0) | ($1,286.6) |
| **Total Seneca-only Expenses** | ($485.7) | ($36.4) | $41.0 | ($38.5) | ($199.8) | ($32.0) | ($1.0) | ($36.4) | ($36.4) | ($272.8) | ($1.0) | ($36.4) | ($36.4) | ($272.8) | ($1.0) | ($64.9) | ($247.4) | ($1,757.9) |
| Funding of Non-Seneca Expenses - 85% | ($264.4) | ($103.0) | ($381.8) | ($29.5) | ($32.8) | ($20.5) | ($274.5) | ($20.5) | ($63.5) | ($27.0) | ($296.3) | ($21.6) | ($15.5) | ($42.1) | ($207.8) | ($40.9) | ($941.3) | ($2,783.0) |
| **Total Cash Inflow / (Outflow)** | ($750.0) | ($139.4) | ($340.8) | ($68.0) | ($232.6) | ($52.6) | ($275.5) | ($57.0) | ($99.8) | ($299.9) | ($297.3) | ($58.0) | ($51.9) | ($314.9) | ($208.8) | ($105.8) | ($1,188.7) | ($4,541.0) |
| **Ending Cash** | $1,657.9 | $1,518.5 | $1,177.7 | $1,109.7 | $877.1 | $824.5 | $549.1 | $492.1 | $392.3 | $92.4 | ($204.9) | ($263.0) | ($314.8) | ($629.7) | ($838.5) | ($944.3) | ($2,133.0) | ($2,133.0) |

Note: Professional fees not paid in the budgeted period may be carried forward to any week during this budget and as consistent with any orders of the Court regarding interim compensation of professionals.

**Exhibit 2**

**Non-Seneca Budget**

Confidential

## Non-Seneca / Corporate

($ in 000s)

| | Budget 6/5/09 | Budget 6/12/09 | Budget 6/19/09 | Budget 6/26/09 | Budget 7/3/09 | Budget 7/10/09 | Budget 7/17/09 | Budget 7/24/09 | Budget 7/31/09 | Budget 8/7/09 | Budget 8/14/09 | Budget 8/21/09 | Budget 8/28/09 | Budget 9/4/09 | Budget 9/11/09 | Budget 9/18/09 | Accruals | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Excluding Technology** | | | | | | | | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | | | | | | | | |
| **Corporate Expenses** | | | | | | | | | | | | | | | | | | |
| Payroll/Consultants | ($13.0) | ($19.2) | ($24.7) | ($29.8) | ($27.6) | ($19.2) | ($25.2) | ($19.2) | ($29.7) | ($22.1) | ($24.7) | ($19.2) | ($12.0) | ($39.7) | ($7.0) | ($41.8) | ($1.5) | ($375.2) |
| Insurance | (275.6) | (97.0) | (26.5) | 0.0 | 0.0 | 0.0 | (26.5) | 0.0 | 0.0 | 0.0 | (26.5) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (452.2) |
| Consultants | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (7.5) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (7.5) |
| Telecom, Office & Other | (13.5) | (5.0) | (15.0) | (5.0) | (11.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | (6.3) | (6.3) | (6.3) | (9.8) | (6.3) | (6.3) | 0.0 | (120.2) |
| Subtotal | ($302.1) | ($121.2) | ($66.2) | ($34.8) | ($38.6) | ($24.2) | ($64.2) | ($24.2) | ($34.7) | ($31.8) | ($57.4) | ($25.4) | ($18.3) | ($49.5) | ($13.3) | ($48.1) | ($1.5) | ($955.1) |
| | | | | | | | | | | | | | | | | | | |
| **Filing/Restructuring Expenses** | | | | | | | | | | | | | | | | | | |
| Blank Rome - Restructuring Counsel | $0.0 | $0.0 | ($160.0) | $0.0 | $0.0 | $0.0 | ($104.0) | $0.0 | $0.0 | $0.0 | ($100.0) | $0.0 | $0.0 | $0.0 | ($100.0) | $0.0 | ($365.0) | ($829.0) |
| Baker and McKenzie - Nova Counsel | 0.0 | 0.0 | (20.0) | 0.0 | 0.0 | 0.0 | (4.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (16.0) | (40.0) |
| Ocean Park - Nova/Seneca F.A./sell-side | 0.0 | 0.0 | (81.4) | 0.0 | 0.0 | 0.0 | (80.0) | 0.0 | 0.0 | 0.0 | (140.0) | 0.0 | 0.0 | 0.0 | (80.0) | 0.0 | (294.1) | (675.5) |
| EPIQ - Claims Agent | (20.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (40.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (60.0) |
| Filing Fee - 10 Entities | (10.3) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (10.3) |
| UST Fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (19.5) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (29.3) | (48.8) |
| Olshan - Creditor Committee Counsel | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (25.6) | 0.0 | 0.0 | 0.0 | (25.6) | 0.0 | 0.0 | 0.0 | (25.6) | 0.0 | (200.0) | (372.8) |
| Glass Ratner - Creditor Committee F.A. | 0.0 | 0.0 | (25.6) | 0.0 | 0.0 | 0.0 | (25.6) | 0.0 | 0.0 | 0.0 | (25.6) | 0.0 | 0.0 | 0.0 | (25.6) | 0.0 | (101.6) | (204.0) |
| Brent King Success Fee | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (100.0) | (100.0) |
| Subtotal | ($30.3) | $0.0 | ($383.0) | $0.0 | $0.0 | $0.0 | ($258.7) | $0.0 | ($40.0) | $0.0 | ($291.2) | $0.0 | $0.0 | $0.0 | ($231.2) | $0.0 | ($1,106.0) | ($2,340.4) |
| | | | | | | | | | | | | | | | | | | |
| **Total Expenses (Excluding Technology)** | ($332.4) | ($121.2) | ($449.2) | ($34.8) | ($38.6) | ($24.2) | ($322.9) | ($24.2) | ($74.7) | ($31.8) | ($348.6) | ($25.4) | ($18.3) | ($49.5) | ($244.5) | ($48.1) | ($1,107.5) | ($3,295.5) |
| Seneca Shared Expenses - 85% | (282.6) | (103.0) | (381.8) | (29.5) | (32.8) | (20.5) | (274.5) | (20.5) | (63.5) | (27.0) | (296.3) | (21.6) | (15.5) | (42.1) | (207.8) | (40.9) | (941.3) | (2,801.2) |
| Clinton Shared Expenses - 15% | (49.9) | (18.2) | (67.4) | (5.2) | (5.8) | (3.6) | (48.4) | (3.6) | (11.2) | (4.8) | (52.3) | (3.8) | (2.7) | (7.4) | (36.7) | (7.2) | (166.1) | (494.3) |
| | | | | | | | | | | | | | | | | | | |
| **Technology** | | | | | | | | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | | | | | | | | |
| **Corporate Expenses** | | | | | | | | | | | | | | | | | | |
| Payroll | ($2.7) | ($15.5) | $0.0 | ($15.5) | ($1.0) | ($15.5) | $0.0 | ($15.5) | $0.0 | ($16.5) | $0.0 | ($15.5) | $0.0 | ($16.5) | $0.0 | ($15.5) | ($0.6) | ($130.4) |
| Technology Professional Fees | 0.0 | 0.0 | (20.0) | 0.0 | 0.0 | 0.0 | (30.0) | 0.0 | 0.0 | 0.0 | (30.0) | 0.0 | 0.0 | 0.0 | (20.0) | 0.0 | 0.0 | (100.0) |
| | | | | | | | | | | | | | | | | | | |
| **Total Expenses (Technology)** | ($2.7) | ($15.5) | ($20.0) | ($15.5) | ($1.0) | ($15.5) | ($30.0) | ($15.5) | $0.0 | ($16.5) | ($30.0) | ($15.5) | $0.0 | ($16.5) | ($20.0) | ($15.5) | ($0.6) | ($230.4) |
| | | | | | | | | | | | | | | | | | | |
| **Cash Runway** | | | | | | | | | | | | | | | | | | |
| **Beginning Cash** | $21.4 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $21.4 |
| Seneca Shared Expenses - 85% | ($282.6) | ($103.0) | ($381.8) | ($29.5) | ($32.8) | ($20.5) | ($274.5) | ($20.5) | ($63.5) | ($27.0) | ($296.3) | ($21.6) | ($15.5) | ($42.1) | ($207.8) | ($40.9) | ($941.3) | ($2,801.2) |
| Clinton Shared Expenses - 15% | ($49.9) | ($18.2) | ($67.4) | ($5.2) | ($5.8) | ($3.6) | ($48.4) | ($3.6) | ($11.2) | ($4.8) | ($52.3) | ($3.8) | ($2.7) | ($7.4) | ($36.7) | ($7.2) | ($166.1) | ($494.3) |
| Funding from (to) Nova Biofuels Seneca, LLC | $264.4 | $103.0 | $381.8 | $29.5 | $32.8 | $20.5 | $274.5 | $20.5 | $63.5 | $27.0 | $296.3 | $21.6 | $15.5 | $42.1 | $207.8 | $40.9 | $941.3 | $2,783.0 |
| Funding from (to) Nova Biofuels Clinton, LLC | $46.7 | $18.2 | $67.4 | $5.2 | $5.8 | $3.6 | $48.4 | $3.6 | $11.2 | $4.8 | $52.3 | $3.8 | $2.7 | $7.4 | $36.7 | $7.2 | $166.1 | 491.1 |
| **Ending Cash** | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |

Note: Professional fees not paid in the budgeted period may be carried forward to any week during this budget and as consistent with any orders of the Court regarding interim compensation of professionals.