# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| NOVA HOLDING CLINTON COUNTY, LLC, *et al.*,[1] | : | Case No. 09-11081 (KG) |
|  | : |  |
|  | : | (Jointly Administered) |
| Debtors and Debtors-in-Possession | : |  |

Bid Procedures Hearing Date:  August 19, 2009 @ 3:00 p.m. (EDT)
Bid Procedures Objections Due:  August 12, 2009 @ 4:00 p.m. (EDT)
Sale Objections Due:  September 17, 2009 @ 4:00 p.m. (EDT)
Sale Hearing Date:  September 23, 2009 @ 3:00 p.m. (EDT)

**MOTION OF DEBTORS FOR ENTRY OF ORDERS UNDER 11 U.S.C. §§ 105(a), 363, 365 AND 503 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004, 6006 AND 9014 (I) (A) APPROVING BIDDING AND AUCTION PROCEDURES FOR THE SALE OF ALL ASSETS OF THE DEBTORS; (B) APPROVING BIDDING INCENTIVES FOR CLINTON COUNTY BIO ENERGY, LLC, THE CLINTON STALKING HORSE BIDDER; (C) APPROVING NOTICE PROCEDURES FOR THE SOLICITATION OF BIDS, AN AUCTION, AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) SCHEDULING AN AUCTION FOR THE SALE OR SALES OF ALL OR SUBSTANTIALLY ALL OF DEBTORS' ASSETS; (II) APPROVING THE SALE OR SALES OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, INCLUDING, WITHOUT LIMITATION, TO THE CLINTON STALKING HORSE BIDDER AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors" or "Nova") hereby move (the "Motion") under sections 105(a), 363(b), (f), and (m),

365 and 503 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004,

---

[1] The Debtors and the last four digits of their respective tax identification numbers are:  Nova Holding Clinton County, LLC ("Holding Clinton"), a Delaware limited liability company (9944); Nova Biofuels Clinton County, LLC ("Clinton"), a Delaware limited liability company (9809); Nova Holding Seneca, LLC ("Holding Seneca"), a Delaware limited liability company (9237); Nova Seneca, LLC ("Seneca"), a Delaware limited liability company (9222); Nova Holding Trade Group, LLC ("Holding Trade"), a Delaware limited liability company (9278); Nova Biofuels Trade Group, LLC ("Biofuels Trade"), a Delaware limited liability company (9269); NBF Operations, LLC ("NBF"), a Delaware limited liability company (8450); Nova Biosource Technologies, LLC ("Technologies"), a Texas limited liability company (4403); Biosource America, Inc. ("Biosource America"), a Texas corporation (7542); and Nova Biosource Fuels, Inc. ("Biosource Fuels"), a Nevada corporation (8450).

6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rule 2002-1(b), 6004-1, and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of

the United States Bankruptcy Court (the "Bankruptcy Court") for the District of Delaware (the

"Local Rules") for entry of an order substantially in the form annexed as *Exhibit A* hereto that:

(a) approves bidding procedures; (b) approves the form and manner of notice of the sale or sales

of all or substantially all of the Debtors' assets, including, without limitation, the sale of Clinton

assets to Clinton County Bio Energy, LLC, the proposed stalking horse purchaser in respect of

Clinton assets ("Bio Energy" or the "Clinton Stalking Horse Bidder"); (c) approves the form and

manner of notices of the assumption and assignment, including cure amounts, of executory

contracts and unexpired leases (one in respect of Seneca and Technologies contracts and leases,

and one in respect of Clinton contracts and leases); (d) approves bidding incentives including a

breakup fee and overbid amount for the Clinton Stalking Horse Bidder; (e) establishes a date for

an auction; (f) establishes a date for a sale hearing (collectively, items "a" through "f", the

"Procedures Order"); (g) authorizes the Debtors to assume and assign executory contracts and

unexpired leases; and (h) grants related relief. In support of this Motion, the Debtors respectfully

represent as follows:

## SUMMARY OF RELIEF REQUESTED

The Debtors are in the process of marketing substantially all of their assets for sale and

seek to establish procedures for a bid and sale process. The goal is a transparent process

designed to determine the highest and best bid for the assets under current market conditions.

The Debtors believe that a sale of the Debtors' assets to an interested party will maximize the

value of the estates and will represent the best possible outcome for these cases.

This motion implements the Debtors' plan to auction all of their assets in one unitary

process. The Debtors are offering for sale all of the Sale Assets (defined below). The Sale

131655.01602/21801813v.7

Assets can be divided into three classes (each a "Class" and collectively, the "Classes").  The

Classes are: (i) the Seneca Assets (defined below); (ii) the Clinton Assets (defined below); and

(iii) the Process Technology (specifically, the Debtors' intellectual property, defined below).

The three Classes are collectively referred to hereafter as the "Sale Assets" and include any

Subject Contracts (defined below).  The Debtors have received strong expressions of interest in

all Classes and, in respect of the Clinton Assets, an offer and proposed agreement with the

Clinton Stalking Horse Bidder.  This proposed agreement provides a basis for the Debtors to

seek hereby additional bidding protections for the Clinton Stalking Horse Bidder as stalking

horse as to the Clinton Assets.  These protections are part of a broader auction regime where bids

will be entertained by the Debtors for all three Classes.

## JURISDICTION

1.      The Bankruptcy Court has jurisdiction over this Motion under 28 U.S.C. §§ 157

and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A),

(M), (N), and (O).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are Bankruptcy Code sections

105(a), 363(b), (f), and (m), and 365, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local

Rule 6004-1.

## BACKGROUND

**A.      The Chapter 11 Filing**

3.      On March 30, 2009 (the "Petition Date"), the Debtors each commenced a case by

filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to

operate their businesses and manage their properties as debtors and debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases

(the "Chapter 11 Cases") are being jointly administered.

3

4.     An Official Committee (the "Committee") of Unsecured Creditors of the Debtors

was appointed in these Chapter 11 Cases by the United States Trustee on April 15, 2009.  [Dkt.

No. 44].  Its members are:  (i) Highbridge International LLC; (ii) DePue Mechanical, Inc.; (iii)

The Bank of New York Mellon Trust Company, N.A., (iv) Lipid Logistics, LLC, and (v) Veolia

Environmental Services, Industrial Service ("Veolia").  Veolia has since resigned from the

Committee.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

**B.     The Debtors**

5.     Biosource Fuels is a publicly held Nevada corporation with its corporate

headquarters located at 614 Shipyard Road, Seneca, IL 61360.  Biosource Fuels is the ultimate

corporate parent of all of the other Debtors.  The Debtors are United States-based entities within

the Biosource Fuels corporate organization.

6.     On March 30, 2009, the Debtors filed the Declaration of Kenneth T. Hern (the

"Hern Declaration") in Support of Chapter 11 Petitions and Related Relief [Dkt. No. 3], which

contains a detailed overview of the Debtors' businesses, conditions, capital structure and other

matters as of the Petition Date.  Any term that is initially capitalized but otherwise not defined

herein shall have the meaning set forth in the Hern Declaration.

### Overview of the Debtors' Businesses

7.     Nova is an energy company that refines and markets biodiesel and related co-

products from a variety of feedstocks through the deployment of its proprietary patented process

technology, which enables the use of a broader range of lower cost feedstocks.  Biodiesel is a

clean burning, biodegradable and renewable fuel made from a variety of feedstocks, such as

animal-derived fats, oils and greases and vegetable-based oils.  Biodiesel is typically blended

with petroleum diesel to create a biodiesel blend that is nearly indistinguishable from, and in

some respects superior to, 100% petroleum diesel.

8.	The proprietary, patented process technology (the "<u>Process Technology</u>") utilized by Nova in the production of biodiesel is owned by Technologies. The Process Technology allows Nova to process over 25 different animal-derived fats, oils and greases and vegetable-based oils with free fatty acid levels in excess of 20% to produce their two primary marketable products: biodiesel and technical grade glycerin. Because feedstock represents 70 to 80% of biodiesel production costs, the ability to use a variety of potentially cheaper sources, animal fats in particular, dramatically increases Nova's potential profitability. Nova's ability to process a wide range of feedstocks, including single feedstock or blends of feedstocks, such as animal-derived feedstocks with higher free fatty acid content, without modification to the process equipment, gives Nova a significant cost advantage because many of these feedstocks are residual by-products that have limited alternative uses. Many of Nova's competitors are limited to a more narrow range of feedstocks and, in many instances, their feedstock options are limited to vegetable-based oils, and they have little or no ability to economically process meaningful amounts of lower cost animal-based feedstocks.

9.	The Process Technology produces biodiesel that consistently exceeds domestic and European quality specifications. The quality of biodiesel produced by the Process Technology also meets the more stringent quality requirements anticipated for monoglyceride content. In addition, Nova's process does not generate significant amounts of toxic or hazardous byproducts that are often found in alternative processes. The principal byproduct generated in Nova's production process is technical grade glycerin with additional byproducts consisting of crude glycerin, a biodiesel "bottoms," which can be used as a burner fuel, and a "sweetwater" product, which can be used as fertilizer in some applications. Each of the co-products can be

sold to reduce Nova's net biodiesel processing costs. Based upon Nova's experiences to date, the minimal environmental impact of Nova's facilities has resulted in faster facility permitting.

10. The Nova process is a completely closed loop system, allowing for the recovery and treatment of vapors and condensable products to provide for odor control and limits on emissions to comply with air quality standards and permit limits. By eliminating the "water wash" step used in traditional processes, the Nova process substantially reduces the amount of waste water and the related water disposal challenges. For example, for a 20,000,000 gallons per year refinery, the traditional process would generate approximately 8,000,000 gallons of waste water. In contrast, the Nova process generates only approximately 140,000 gallons of waste water: a 98.25% reduction in waste water discharge.

11. Prior to the Petition Date, the Debtors had three main operating entities: Seneca, Clinton, and Biosource America. Holding Seneca holds 100% of the member interests of Seneca. Holding Clinton holds 100% of the member interests of Clinton. NBF holds 100% of the member interests of Biosource America.

12. Seneca owns the Seneca, Illinois refinery, the Debtors' flagship refinery. The Seneca refinery is designed to have production capacity of 60,000,000 gallons per year. It began startup operations in March 2008, and has the most up-to-date technology created by the Debtors. The Seneca refinery consists of three independent production systems or trains, each capable of producing and refining 2,400 gallons per hour or 20 million gallons per year of biodiesel (which would require approximately 3.5 million pounds of feedstock per week per train). The Seneca refinery is not in active operation. The Seneca refinery and all other Seneca property, including, without limitation, certain real property owned by non-Debtor affiliate,

131655.01602/21801813v.7

Nova Biofuels Seneca SIP, LLC ("Seneca SIP"),[2] are available for sale pursuant to the procedures set forth in this Motion (the "Seneca Assets").

13.     Clinton owns and operates the Clinton County, Iowa refinery.  The Clinton refinery is designed to have a production capacity of 10,000,000 gallons per year.  It began start-up operations in May 2006, and the Debtors purchased the Clinton refinery in September 2007. The Clinton refinery suffered a property casualty in late September 2008.  Although repairs have been completed, the Clinton refinery has not resumed operations.  The Clinton refinery and all other Clinton property are available for sale pursuant to the Motion (collectively, the "Clinton Assets").

14.     Prior to the Petition Date, Biosource America provided engineering, procurement and construction (EPC) services to third parties, as well as to Clinton and Seneca when appropriate and necessary.

**WestLB Credit Facilities**

15.     As stated in paragraph H of that certain Final DIP Order: (i) Authorizing Debtors to Obtain Post-Petition Financing, (ii) Authorizing Debtors to Utilize Cash Collateral, and (iii) Granting Adequate Protection to WestLB, Pursuant to Bankruptcy Code sections 105, 361, 362, 363, 363, 364 and Bankruptcy Rules 2002, 4001 and 9014 [Dkt. No. 143] (the "Final DIP Order"), as amended by that certain First Stipulation Extending Certain Dates Set forth in the Final Order [Dkt. No. 152], that certain Second Stipulation Extending Certain Dates Set Forth in the Final Order [Dkt. No. 157], and that certain Third Stipulation Extending Certain Dates Set Forth in the Final Order [Dkt. No. 170], Seneca is obligated to WestLB AG (New York Branch) ("WestLB") in the approximate amount of $41 million and all of the Seneca Assets are subject to

---

[2]  Seneca SIP is wholly owned by Nova Holding Seneca SIP, LLC, also a non-Debtor affiliate of Seneca ("Holding Seneca SIP").  Holding Seneca SIP is wholly owned by NBF, which is in turn wholly owned by Biosource Fuels.

131655.01602/21801813v.7

WestLB's prepetition liens and security interests securing this obligation. As further evidenced by the Final DIP Order, the Debtors' obligations under a certain $2.03 million DIP facility and certain senior adequate protection claims from May 22, 2009 and thereafter are secured by liens and security interests on all Sale Assets.

## THE SALE AND AUCTION PROCESS

16. The process proposed herein proposes a sale of the Clinton Assets to the Clinton Stalking Horse Bidder, but also permits a competing or other prospective purchaser to submit a bid for all Sale Assets, or for each of the Classes of the Sale Assets, or for any combination of the three Classes of the Sale Assets, subject to all relevant procedures, including, without limitation, stalking horse protections.

17. Pursuant to sections 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 6006, the Debtors seek approval of procedures for the submission of bids and the sale of the Sale Assets and assumption and assignment of associated executory contracts (the "Subject Contracts"). Pursuant to those certain Interim Orders (i) Authorizing the Use of Cash Collateral by Certain Debtors pursuant to 11 U.S.C. § 363, (ii) Granting Adequate Protection to WestLB pursuant to 11 U.S.C. §§ 361 and 363, and (iii) for other relief [Dkt. Nos. 17, 64, 94, and 137], and the Final DIP Order, the Debtors are required to file a motion to establish bidding procedures in connection with the Sale Assets and Subject Contracts by July 31, 2009.

18. In anticipation of this deadline, the Debtors have been conducting an extensive diligence process in connection with the Sale Assets and the Subject Contracts with over one hundred and twenty prospective purchasers and strategic counter-parties, through their financial advisor, Ocean Park Advisors ("OPA"). A data room has been established, 42 prospective purchasers have signed non-disclosure agreements as of this Motion, and multiple prospective

purchasers have and remain engaged in substantial diligence regarding the Sale Assets and the Subject Contracts.

**Clinton Stalking Horse Bid**

19.     The Debtors have identified Bio Energy as the Clinton Stalking Horse Bidder. Accordingly, the Debtors and Bio Energy have prepared a certain asset purchase agreement by and among Bio Energy and Clinton for the sale of the Clinton Assets (the "Clinton Purchase Agreement"), which is substantially in the form of *Exhibit B*, attached hereto.  After conducting negotiations with several potential purchasers of the Clinton Assets, the Debtors and their advisors have determined that the Clinton Purchase Agreement represents the best opportunity for the Debtors to maximize the value of their assets and serve as a basis for conducting an auction of the Clinton Assets, while at the same time seeking higher and better offers.

20.     The Clinton Purchase Agreement[3] contemplates the sale of substantially all of the Clinton Assets, subject to higher and/or better bids, on terms that include the following:

- **Consideration**.  Cash at closing of One Million Two Hundred Thousand Dollars ($1,200,000) plus (A) Pre-Paid Expenses, and (B) the dollar amount of any sales Tax, use Tax or similar tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order or by Section 1146(c) of the Bankruptcy Code (the "Clinton Cash Consideration") and exclusive of Bio Energy's payment of Cure Amounts (Clinton Purchase Agreement, §§ 3.3, 4.1).

- **Assets to be Sold**.  The Clinton Assets are further described in Article 3.1 of the Clinton Purchase Agreement and include: all Inventory; all Equipment; the Assigned Contracts and Leases (referred to herein as the "Clinton Subject Contracts"); the real property listed on Schedule 3.1(d) to the Clinton Purchase Agreement; all Permits and pending applications therefor, in each case to the extent assignable, used exclusively in connection with the Business; Technology Licenses listed or described on Schedule 3.1(f) to the Clinton Purchase Agreement; Design Documents listed or described on Schedule 3.1(g) to the Clinton Purchase Agreement; all goodwill associated with the Business; Documents relating to

---

[3] Capitalized terms used in this paragraph but not otherwise defined herein shall have the same meaning ascribed them in the Clinton Asset Purchase Agreement, attached hereto as *Exhibit B*.

Purchased Assets, to the extent applicable; all assets set forth in Schedule 3.1(k) to the Clinton Purchase Agreement; all rights under or pursuant to all warranties, representation and guarantees made by suppliers, manufacturers, contractors or others to the extent relating to the Purchased Assets; all telephone, telex facsimile numbers and directory listing relating to the business; and all other or additional privileges, rights and interest associated with the Purchased Assets (Clinton Purchase Agreement, § 3.1).

- **Assumed Liabilities and Cure Amounts**. In addition to payment of the Clinton Cash Consideration, Bio Energy has agreed to assume, effective as of the closing date of the Clinton Purchase Agreement, and to timely perform and discharge in accordance with their respective terms, (i) all of Sellers' liabilities and obligations arising from and after the Closing Date under the Clinton Subject Contracts, and (ii) the Cure Amounts (Clinton Purchase Agreement, §§ 3.3, 3.4).

- **Excluded Assets**. Bio Energy has not agreed to purchase and the Clinton Sellers have not agreed to sell the "Clinton Excluded Assets," as set forth in Article 3.2 of the Clinton Purchase Agreement, including: the Purchase price delivered to Seller pursuant to this Agreement; all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits as of the Closing Date, in each case excluding any item described in Section 3.1(i)(m) of the Clinton Purchase Agreement and excluding any deposit amounts included in Pre-Paid Expenses; all Owned Real Property not listed or described on Schedule 3.1(d) of the Clinton Purchase Agreement and not otherwise comprising any portion of the Facilities; all Trade Secrets; all capitalized leases; any shares of capital stock or other equity interest of any Seller or any of Seller's Subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller or any of Seller's Subsidiaries; all minute books, stock ledgers, corporate seals and stock certificates of Seller; any Contracts or Leases that are not Assigned Contracts and Leases; any refunds of Taxes paid by Seller with respect to a Pre-Closing Tax Period and not otherwise reimbursed by Purchaser hereunder; all Accounts Receivable; all insurance policies and rights to proceeds thereof; all telephone, telex and telephone facsimile numbers and other directory listings, other than telephone, telex and facsimile numbers specific exclusively to the Facilities and included in Purchased Assets pursuant to Section 3.1(n); all Permits and pending applications therefor other than those specified in Section 3.1(i)(e); all Excluded Deposits; the Avoidance Actions; and any rights, claims or causes of action of Seller under this Agreement or any other Transaction Document. (Clinton Purchase Agreement § 3.2).

- **Deposit**. Cash deposit of $120,000, which is equal to 10% of the Purchase Price (Clinton Purchase Agreement, § 4.2).

- **Break-Up Fee**. $36,000 (the "Clinton Break-Up Fee"), which is equal to 3% of the estimated Clinton Cash Consideration (exclusive of payment by Bio Energy of the Cure Amounts) to be received under the Clinton Purchase Agreement, with the Clinton Break-Up Fee to be payable in the event that, as a result of an Auction, all or substantially all of the Purchased Assets are sold by reason of a Qualified Bid(s), or if the Purchase Agreement is terminated by Bio Energy. Bio Energy shall have a joint and several administrative priority expense claim in each of Sellers' Bankruptcy Cases, without duplication, for payment of the Clinton Break-Up Fee and a return of the Deposit (Clinton Purchase Agreement, §§ 2.3, 9.2).

- **Closing.** A closing shall take place on the date that is not more than three (3) Business Days following the satisfaction or waiver of the conditions set forth in Article 8 of the Clinton Purchase Agreement, unless another time or date, or both, are agreed to by the parties. (Clinton Purchase Agreement, § 5.1). The Clinton Purchase Agreement may be terminated by either party if the closing has not occurred by the close of business on October 6, 2009; provided, however, that, if the closing shall not have occurred because a Bankruptcy Court order for the sale of Clinton Assets has not yet been entered, but all other closing conditions that are capable of being fulfilled by such date shall have been fulfilled or waived, then no party may terminate the Clinton Purchase Agreement prior to September 30, 2009 (Clinton Purchase Agreement, § 9.1).

**General Bidding and Auction Procedures**

21. While the procedures proposed herein adopt bidding protections and related "stalking provisions," with regard to the Clinton Stalking Horse Bidder, the Debtors propose to set bidding procedures by August 19, 2009, and if any additional stalking horse expressions of interest in the Seneca Assets and the Process Technology are received by September 1, 2009, the Debtors may also seek a supplemental hearing date for any supplemental stalking horse procedures (any Debtor decision to seek a stalking horse auction feature for this process regarding the Seneca Assets or Process Technology, and/or to enter into a stalking horse agreement relating to the Seneca Assets or Process Technology, will be subject to consultation with the Committee and the consent of WestLB, which it may withhold in its sole discretion).

131655.01602/21801813v.7

The Debtors seek a sale hearing date of September 23, 2009, subject to the Bankruptcy Court's convenience (the "Sale Hearing").  The Debtors will obtain final bids from prospective purchasers on September 11, 2009, proceed to auction on September 16, 2009, and then to a Sale Hearing date of September 23, 2009.

22.     In order to facilitate an orderly sale process with regard to the Sale Assets, and subject to the Clinton Purchase Agreement, if the Clinton Stalking Horse Bidder's bid is not topped or if the Clinton Stalking Horse Bidder is the successful bidder at auction for the Clinton Assets, the Debtors have prepared a "form" asset purchase agreement (the "General Asset Purchase Agreement") providing for the purchase and sale of the Sale Assets and the assumption and assignment of the Subject Contracts in a form attached to this Motion as *Exhibit C*.  The use of a uniform agreement will enable the Debtors and the stakeholders with which the Debtors will consult, the Committee and WestLB, to easily compare and contrast the differing terms of any bids that may be received on or prior to the deadline for bids.  The General Asset Purchase Agreement contains the Debtors' preferred transaction terms and transaction structure, but interested bidders may mark-up the General Asset Purchase Agreement in connection with their bids, subject to review and acceptance of any changes by the Debtors, in consultation with WestLB and the Committee.

23.     Notwithstanding the selection of the Clinton Stalking Horse Bidder as the prospective purchaser of the Clinton Assets, the General Asset Purchase Agreement contemplates sales of the Sale Assets and Subject Contracts or any combination thereof, including, without limitation, a topping bid for the Clinton Assets, free and clear of liens, claims, encumbrances and other interests, with all such interests to attach to the proceeds of the sale in the order of priority and with the same validity, force and effect that such interest has against the

Sale Assets and the Subject Contracts. The General Asset Purchase Agreement contains the following material terms[4]:

- **Purchased Assets** – Sale Assets (or any combination of the constituent Classes thereof: (i) Clinton Assets, (ii) Seneca Assets; and/or (iii) Process Technology) (General Asset Purchase Agreement, § 3.1);

- **Assumed Contracts** – each bidder is entitled to select the Subject Contracts; *i.e.*, executory contracts and unexpired leases that the bidder desires to acquire (General Asset Purchase Agreement, § 3.3);

- **Purchase Price** – paid in immediately available funds at closing (General Asset Purchase Agreement, § 4.1);

- **Assumed Liabilities** – include "cure" payments under assumed contracts, post-closing liabilities under assumed contracts, certain employee-related liabilities and post-closing liabilities related to or arising from the Purchased Assets or the Business (General Asset Purchase Agreement, §§ 1.1 and 3.3);

- **Required Cash Deposit** – 10% of the initial Qualified Bid (defined below) (General Asset Purchase Agreement, § 4.2);

- **Postclosing Indemnification by Debtor** – none; and

- **Excluded Assets** – includes, without limitation, any Seneca inventory, all cash and accounts receivable (General Asset Purchase Agreement, § 3.2).

24.     The General Asset Purchase Agreement will be "shopped" in the marketplace using the sale process described below so as to ensure that the estates realize the maximum value for the Sale Assets and the Subject Contracts. The Debtors' proposed process for continuing to market the Sale Assets and Subject Contracts for sale (the "Proposed Sale Process") is intended to ensure that all interested parties can compete on a level playing field in an open and fair process. Parties must submit bids in accordance with the procedures described herein or as otherwise approved by the Bankruptcy Court. Accordingly, the Debtors request that this Court

---

[4] Capitalized terms used in this paragraph but not otherwise defined herein shall have the same meaning ascribed them in the General Asset Purchase Agreement, attached hereto as *Exhibit C*.

approve the Proposed Sale Process, including the following suggested bid procedures (the "Bid Procedures"):

a.    The Debtors are offering for sale all of the Sale Assets. The Sale Assets can be divided into three classes. The Classes are: (i) the Seneca Assets; (ii) the Clinton Assets; and (iii) the Process Technology.

b.    Subject to Bankruptcy Court approval, Bio Energy is the designated Clinton Stalking Horse Bidder for the Clinton Assets, as set forth more fully in the Clinton Purchase Agreement. At the Sale Hearing, the Debtors may seek entry of an order from the Bankruptcy Court authorizing and approving the sale of the Clinton Assets (the "Clinton Sale") to the Clinton Stalking Horse Bidder or another Qualified Bidder (defined below) that the Debtors determine to have made the highest or best offer for the Clinton Assets (the "Clinton Sale Order"). In addition, the Debtors may seek entry of one or more order(s) from the Bankruptcy Court authorizing and approving the sale of some or all of the Debtors' remaining Sale Assets ("Seneca and Process Technology Sale", together with the Clinton Sale, each a "Sale" and collectively, the "Sales") to, if applicable, such other Qualified Bidder that the Debtors determine to have made the highest or best offer (the "Sale Order").

Qualified Bidders may submit a bid for (i) all of the Classes, (ii) any one or more of the Classes, or (iii) any portion of the Sale Assets of any Classes. The Debtors reserve the right to enter into agreements for the Sale of any of the Sale Assets, individually or as part of a package, until the Bid Deadline (defined below) which agreements, if any, shall be subject to higher or otherwise better bids at the Auction (defined below). The Debtors shall retain all rights to the Sale Assets that are not subject to a bid accepted by the Debtors and approved by the Bankruptcy Court at the Sale Hearing.

c.    **The Bidding Process.** The Debtors and their advisors, after consultation[5] with the Committee and WestLB (in its capacity as Prepetition Agent and DIP Agent as such terms are defined in the Final DIP Order), shall (i) determine whether any person is a Qualified Bidder, (ii) coordinate the efforts of Qualified Bidders in conducting their due diligence investigations, (iii) receive offers from Qualified Bidders, and (iv) negotiate any offers made to purchase all or a portion of the Sale Assets (collectively, the "Bidding Process"). The Debtors, after consultation with the Committee and WestLB, shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein) that will better promote the goals of the Bidding Process;

---

[5] All consultations relating to the Sales, the Auction, or the Bid Procedures referenced in this Motion, whether oral or written, shall be made in confidence, and shall be confidential.

provided, however, that such other rules are not inconsistent with, if applicable, any of: (i) the provisions of the Clinton Purchase Agreement, as it concerns the Clinton Assets, (ii) the Clinton Bid Deposit Requirement (defined below) (iii) the Clinton Break-Up Fee requirement, and (iv) the bid protections granted to the Clinton Stalking Horse Bidder herein, all as consented to by WestLB.

d. **Participation Requirements.** Any person that wishes to participate in the Bidding Process (a "<u>Potential Bidder</u>") must become a Qualified Bidder (defined below). As a prerequisite to becoming a Qualified Bidder, a Potential Bidder, other than WestLB, must deliver (unless previously delivered) to the Debtors, not later than **September 11, 2009**:

    i.    an executed confidentiality agreement in form and substance acceptable to the Debtors;

    ii.    A letter of indication stating on which of the Sale Assets the Potential Bidder is interested in bidding and the estimated purchase price and consideration for such Sale Assets (including any Sale Assets to be excluded from such bid, if any); and

    iii.    Sufficient information, as may be requested by the Debtors, to allow the Debtors to determine that the Potential Bidder has the financial wherewithal to close a Sale of the Sale Assets on which the Potential Bidder intends to bid, including, but not limited to, a signed commitment for any debt or equity financing, a bank account statement showing the ability of a Potential Bidder to pay cash for the designated Sale Assets, and current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtors) of the Potential Bidder or those entities that will guarantee the obligations of the Potential Bidder.

A "<u>Qualified Bidder</u>" is a Potential Bidder that delivers the documents described in subparagraphs (i) – (iii) above, and that the Debtors determine is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other consideration deemed relevant by the Debtors), to submit a bona fide offer and be able to consummate a Sale if selected as a Successful Bidder (defined below). Notwithstanding the foregoing, the Clinton Stalking Horse Bidder and WestLB shall be deemed Qualified Bidders. Not later than three (3) business days after a Potential Bidder delivers all of the materials required by subparagraph (i) – (iii) above, the Debtors shall determine, in consultation with the Committee and WestLB, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.

e.     **Due Diligence.**  Any person that wishes to participate in the Bidding Process must be a Qualified Bidder.  Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Qualified Bidder. The Debtors will afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence; provided, however, that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (defined below).  The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. Neither the Debtors nor any of their respective representatives are obligated to furnish any information to any person other than a Qualified Bidder or its representatives.  Neither the Debtors nor their representatives are responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders pursuant hereto.

f.     **Bid Deadline.**  A Qualified Bidder that desires to make a bid, other than WestLB, shall deliver written copies of its bid to: (i) the Debtors, c/o Nova Biofuels Seneca, LLC and Affiliated Debtors, 614 Shipyard Road, Seneca, IL 61360, Attention: Brent King, Chief Restructuring Officer; and (ii) counsel to the Debtors, Blank Rome LLP, One Logan Square 130 North 18th Street, Philadelphia, PA 19103-6998, Attention: Samuel H. Becker, Esq. and Michael B. Schaedle, Esq., Facsimile Number (215) 569-5555, not later than 5:00 p.m. (prevailing eastern time) on **September 11, 2009** (the "Bid Deadline").  The Bid Deadline for WestLB to submit a credit bid is September 11, 2009.  The Debtors shall deliver copies of all bids submitted by Qualified Bidders to counsel for WestLB and the Committee.  In the event that a bid is received for the Clinton Assets, the Debtors shall deliver a written copy of any such bid to counsel to the Clinton Stalking Horse Bidder, Frey, Haufe & Current, P.L.C., 408 South 2nd Street, P.O. Box 668, Clinton, IA 52733-0668, Attention: T. Randy Current, Esq. (Fax No. (563) 242-1845).

g.     **Bid Requirements.**  All bids, other than that of the Clinton Stalking Horse Bidder, must include (unless such requirement is waived by the Debtors, provided that such waiver will not to be granted with respect to any bids covering the Clinton Assets without the prior written consent of Clinton Stalking Horse Bidder without the prior written consent thereof), other than a credit bid by WestLB, the following information and documents (the "Required Bid Materials"):

i.     For bids that cover the Clinton Assets, a specified purchase price equal to or greater than **$1,275,000** (as defined in the Clinton Purchase Agreement);

ii.    The purchase price proposed by the Qualified Bidder for the other Sale Assets for which they are submitting a bid;

iii.    A letter stating that the Qualified Bidder's offer is irrevocable until two (2) business days after the Sale Assets on which the Qualified Bidder is submitting a bid have been sold pursuant to the closing of the Sale or Sales approved by the Bankruptcy Court;

iv.    An executed copy of the applicable asset purchase agreement and a blackline of a Qualified Bidder's proposed asset purchase agreement against: (a) for bids that cover the Clinton Assets, that of the Clinton Purchase Agreement; (b) for bids that cover Seneca Assets and Process Technology, that of the proposed form of General Asset Purchase Agreement; and (c) for bids that cover all Sale Assets, that of the Clinton Purchase Agreement and the General Asset Purchase Agreement.  For the avoidance of doubt, in marking up the General Asset Purchase Agreement or Clinton Purchase Agreement, without limitation, but subject to other express provisions of these Bid Procedures, any Potential Bidder may mark up and modify the definition of Purchased Assets and may exclude items of property, or in respect of the General Asset Purchase Agreement, exclude either the Seneca Assets or Process Technology Classes.  All Qualified Bids must provide a commitment to close as soon as reasonably practicable following the entry of the Sale Order, but no later than **October 6, 2009** (the "Closing Date");

v.    A deposit (paid in the form of a cashiers' check or certified check payable to the order of Seneca, as Escrow Agent, or sent by wire transfer to Seneca, as Escrow Agent, pursuant to Federal Reserve wire transfer instructions that Debtors' counsel will provide upon request) in the amount of 10% of the proposed purchase price, unless otherwise specified in the Clinton Purchase Agreement or asset purchase agreement of a Successful Bidder (defined below), as applicable (the "Bid Deposit"); provided that with respect to bids that cover the Clinton Assets, **$127,500** out of such deposit (such portion, "Clinton Bid Deposit") shall be placed in a segregated account (the "Escrow Account").  The Bid Deposit and Escrow Account shall not be subject to the claims, liens, security interests, or encumbrances of Debtors' creditors, including WestLB as DIP Agent and Prepetition Agent.  Funds in the Escrow Account shall be disbursed only as follows: (a) if the Qualified Bidder becomes the Successful Bidder for the Clinton Assets, its Clinton Bid Deposit will be used to satisfy the Clinton Break-Up Fee to which the Clinton Stalking Horse Bidder is entitled under the Clinton Purchase Agreement by reason of its not being the Successful Bidder for the Clinton Assets, with the balance, if any, to be released to the Debtors or applied as provided under any asset purchase agreement between the Debtors and such Successful Bidder, or (b) if such Qualified Bidder for the Clinton Assets is not

17

the Successful Bidder for the Clinton Assets, then its Clinton Bid Deposit shall be returned to it (subject to the other provisions of these Bid Procedures). The Bid Deposit, other than the Escrow Account, if applicable, shall be disbursed as follows: (a) if the Qualified Bidder becomes the Successful Bidder for the Sale Assets covered by its bid, its Bid Deposit will be released to the Debtors or applied as provided under any asset purchase agreement between the Debtors and such Successful Bidder, or (b) if such Qualified Bidder is not the Successful Bidder for the Sale Assets covered by its bid, then its Bid Deposit shall be returned to it (subject to the other provisions of these Bid Procedures). Each respective Bid Deposits paid by a Qualified Bidder (except for that of the Successful Bidder) shall be returned thereto promptly following the lapse of the period set forth in subsection (iii) immediately above.

vi. Written evidence of a commitment for financing or other evidence of Qualified Bidder's ability to consummate the proposed transaction and which the Debtors believe to be sufficient to satisfy the standards to provide adequate assurance of future performance under section 365 of the Bankruptcy Code.

vii. A list of the Subject Contracts with respect to which the bidder seeks assignment from the Debtors.

A bid received from a Qualified Bidder that includes all of the Required Bid Materials is a "Qualified Bid." The Debtors, in consultation with the Committee and WestLB, reserve the right to determine the value of any Qualified Bid (either by itself or in connection with one or more other Qualified Bid or the Debtors' other restructuring alternatives), and which Qualified Bid constitutes the highest or best offer. Upon the request of the Debtors, a Qualified Bidder who has submitted a bid for the Sale Assets of more than one Class shall, not later than the second business day after the Bid Deadline, allocate its purchase price among the Classes sought to be acquired.

h. **WestLB Credit Bidding.** WestLB may make one or more credit bids for some or all of the collateral securing their claims to the full extent permitted by section 363(k) of Bankruptcy Code. WestLB shall have the unqualified right to credit bid and may credit bid up to the full amount of the Prepetition Obligations (as such term is defined in the Final DIP Order) (with no set-offs, reductions or defenses, except as provided for in paragraph 48 of the Final DIP Order) for any Prepetition Collateral (as such term is defined in the Final DIP Order) and/or the DIP Obligations (with no set-offs, reductions or defenses) against any DIP Collateral (as such term is defined in the Final DIP Order). WestLB shall not be required to post a cash deposit, except that if WestLB wishes to credit bid

for the Clinton Assets, WestLB must post a cash deposit equal to the Clinton Bid Deposit which shall be placed in the Escrow Account in accordance with the provisions set forth above. In order to be a Qualified Bid, a credit bid of Prepetition Obligations must provide for payment in cash at closing and/or the assumption of the cure claims, the Clinton Break-up Fee, and sale-related administrative expense claims, and all carve-outs authorized by the Final DIP Order. In the event WestLB submits a credit bid for all or a portion of their collateral pursuant to these Bid Procedures, the Debtors may choose not to consult with WestLB with respect to the Sale of such Sale Assets and if the Debtors elect not to consult with WestLB in respect of such Sale, the Committee will not consult with WestLB with respect to such Sale; however, WestLB shall retain all of its consent rights provided for herein and under section 363(f) of the Bankruptcy Code. WestLB may, in its sole discretion, consent to an affiliate or a third party credit bidding or assuming all or part of the Prepetition Obligations or DIP Obligations as part of such party's Qualified Bid.

i.      **"As Is, Where Is".**  The Sale of the Sale Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates. By submitting a bid, each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence it requires regarding the Sale Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Sale Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Sale Assets, or the completeness of any information provided in connection therewith or the Auction (defined below), except: (i) as expressly stated in these Bidding Procedures, (ii) as expressly stated in the Clinton Purchase Agreement, or (iii) as expressly stated in the asset purchase agreement of any Successful Bidder.

j.      **Free of Any and All Interests.**  Except as otherwise provided in the Clinton Purchase Agreement or another Successful Bidder's purchase agreement, in the event that WestLB consents in writing to the proposed sale evidenced by such purchase agreement, which consent may be withheld in its sole discretion, all of Debtors' right, title and interest in and to the Sale Assets subject thereto shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "<u>Interests</u>") to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the Sale of the Sale Assets with the same validity and priority as such Interests applied against the Sale Assets.

131655.01602/21801813v.7

k.  **The Auction and Auction Procedures.**  If a Qualified Bid, other than that submitted by the Clinton Stalking Horse Bidder, has been received by the Debtors, the Debtors may conduct an auction (the "Auction") with respect to all or some of the Sale Assets.  The Auction shall be conducted at the Offices of Blank Rome LLP, One Logan Square, Philadelphia, PA 19103 at 12:00 p.m. (prevailing Eastern time) on **September 16, 2009**, or such other date, place and time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids and expressed their intent to participate in the Auction as set forth above.

Except as otherwise provided herein, or as restricted by the Clinton Purchase Agreement, based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtors determine is relevant, the Debtors, in consultation with the Committee and WestLB, may conduct the Auction in any manner that they determine will achieve the maximum value for the Sale Assets.  For example, the Debtors may commence the Auction by entertaining bids for individual Classes, for certain Sale Assets within individual Classes or for Sale Assets from multiple Classes as determined by the Debtors.  Except as expressly provided in the Clinton Purchase Agreement, the Debtors thereafter, in consultation with the Committee and WestLB, may offer the Sale Assets in such lots in such successive rounds as the Debtors determine to be appropriate so as to obtain the highest or otherwise best bid or combination of bids for the Sale Assets.  Except as otherwise provided herein or as expressly restricted by the Clinton Purchase Agreement, the Debtors also may set opening bid amounts in each round of bidding as the Debtors determine to be appropriate.

If Qualified Bidders submit Qualified Bids, then as soon as practicable after the conclusion of the Auction or, if the Debtors, in consultation with the Committee and WestLB, determine not to hold an Auction, then promptly following the Bid Deadline, the Debtors shall: (i) review each Qualified Bid on the basis of the financial and contractual terms and the factors relevant to the Sale process, including those factors affecting the speed and certainty of consummating the Sale; (ii) identify the highest or otherwise best offers for the Sale Assets (to the extent any such bid is acceptable to Debtors, in consultation with the Committee and WestLB, each a "Successful Bid" and each bidder making such bid, a "Successful Bidder"); and (iii) designate any Back-Up Bidders (as defined below).

All Qualified Bidders attending the Auction shall agree to remain ready, willing and able to close a transaction with respect to the given Sale Assets upon which their last Qualified Bid was based as the back-up bidder (the "Back-Up Bidder") and such last and best bid (the "Back-Up Bid") shall remain irrevocable until two (2) business days after the Sale Assets upon which such Qualified Bidder submitted a bid has been sold

pursuant to the closing of the Sale or Sales approved by the Bankruptcy Court.

At the Sale Hearing, the Debtors, after consultation with the Committee and after receiving WestLB's written consent to a sale or sales on the terms of one or more Successful Bids, which consent may be withheld in its sole discretion, may present any Successful Bids to the Bankruptcy Court for approval. The Debtors reserve all rights not to submit any bid, which is not acceptable to the Debtors for approval to the Bankruptcy Court. Except as otherwise provided herein or as restricted by the Clinton Purchase Agreement, the Debtors, in the exercise of their fiduciary duties, may adopt rules for bidding at the Auction that, in its business judgment, will better promote the goals of the bidding process, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

l.   **Break-Up Fee and Expense Reimbursement.**  To provide an incentive and to compensate the Clinton Stalking Horse Bidder for performing the substantial due diligence necessary and entering into the Clinton Purchase Agreement with the knowledge and risk that arises from participating in the Sale and the Bidding Process, the Debtors have agreed to pay the Clinton Stalking Horse Bidder, under the conditions outlined herein and in the Clinton Purchase Agreement, the Clinton Break-Up Fee in the amount of 3% of the proposed purchase price ($36,000).

The Clinton Break-Up Fee: (i) shall be paid to the Clinton Stalking Horse Bidder under conditions outlined in the Clinton Purchase Agreement, (ii) shall be funded from the Clinton Bid Deposit of the Successful Bidder for the Clinton Assets, (iii) shall be secured by a first priority, unprimable security interest in the Clinton Bid Deposit of the Successful Bidder for the Clinton Assets and perfected by language in the Procedures Order, attached hereto as *Exhibit A*, without need for further action to perfect such security interest, (iv) shall be approved and payment authorized by the Bankruptcy Court in the Procedures Order and (v) shall automatically be deemed an allowed super priority administrative expense under sections 503(b)(1) and 364(c)(1) of the Bankruptcy Code in the Procedures Order.

The Clinton Break-Up Fee was a material inducement for, and a condition of, the Clinton Stalking Horse Bidder's entry into the Clinton Purchase Agreement. The Clinton Break-Up Fee shall be payable as set forth in the Clinton Purchase Agreement, regardless of whether a Bankruptcy Court has finally approved the entire Clinton Purchase Agreement.

Except as expressly stated above with regard to the Clinton Stalking Horse Bidder, no Qualified Bid shall include any request or entitle any Qualified Bidder to receive any break-up fee, termination fee, expense reimbursement or similar payment.

21

The Clinton Stalking Horse Bidder has the right to credit bid the amount of the Clinton Break-Up Fee, as part of any subsequent bid made by the Clinton Stalking Horse Bidder at the Auction.

m. **Forfeiture of Bid Deposit.** If a Successful Bidder subsequently defaults or breaches its commitment to purchase the applicable Sale Assets, then the balance of the Bid Deposit submitted by such bidder shall be deemed forfeited and shall be retained by the Debtors.

n. **Clinton Overbid Amount.** With respect to Qualified Bids for Clinton Assets, there shall be an overbid amount that a Qualified Bidder must bid to exceed the bid of the Clinton Stalking Horse Bidder ("Clinton Overbid Amount"), and that amount shall be $75,000. The Debtors shall not be allowed or authorized to accept a Qualified Bid amount less than the Clinton Overbid Amount for the Clinton Assets, unless the Debtors have deemed the bid of the Clinton Stalking Horse Bidder a Successful Bid.

o. **Clinton Minimum Bid Increment.** With respect to bids for the Clinton Assets, there shall be a minimum bid increment of at least $25,000 for all bids made by Qualified Bidders (the "Clinton Minimum Bid Increment").

p. **General Minimum Bid Increment.** With respect to bids for Sale Assets other than the Clinton Assets, there shall be an initial minimum bid increment and subsequent bid increment announced by the Debtors (after consultation with WestLB and the Committee), prior to the commencement of bidding at the Auction.

q. **Acceptance of Qualified Bids.** The Debtors shall sell the Sale Assets to any Successful Bidder only upon (i) receiving WestLB's written consent to a sale on the terms of Successful Bid, which consent may be withheld in its sole discretion, and (ii) the approval of a Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtors' presentation of a particular Successful Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been consented to in writing by WestLB and approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of any Successful Bidder (including the assignment of any of such objector's assumed executory contract or unexpired lease thereto, provided, however, that any objection to such assignment on the basis of the cure amount must be made and/or reserved as set forth in any order of the Bankruptcy Court).

r. **Sale Hearing.** The Sale Hearing is scheduled for **September 23, 2009** at 3:00 p.m. (prevailing Eastern time). Following the approval of the Sale of all or a portion of the Sale Assets to any Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved Sale

within a reasonable time period following the Sale Hearing, the Debtors shall be authorized, but not required, to deem (subject to receiving WestLB's prior written consent) the next highest or otherwise best Back-Up Bid(s), as disclosed at the Sale Hearing as the Successful Bid(s), and the Debtors shall be authorized, but not required, to consummate the Sale with such replacement Successful Bidder(s) submitting such bid without further order of the Bankruptcy Court. The Debtors, in the exercise of their business judgment, reserve their right to change the date of the Sale Hearing in order to achieve the maximum value for the Sale Assets so long as proper notice of such changed date is provided for the appropriate parties.

s. **Withdrawal.**  The Debtors reserve the right to refuse to sell any or all of the Sale Assets, except as provided for in the Clinton Purchase Agreement, or, if the Debtors were later, after consultation with the Committee and upon the consent of WestLB, which consent may be withheld in its sole discretion, to seek to modify these Bid Procedures to sell Seneca Assets or Process Technology to a stalking horse bidder, in any applicable stalking horse purchase agreement for Seneca Assets or Process Technology, and to withdraw any pending requests with respect to the same at or prior to the conclusion of the Sale Hearing.  WestLB reserves the right not to consent to the Sale of any or all of the Sale Assets, except as provided for in the Clinton Purchase Agreement or in any applicable stalking horse purchase agreement referred to in the immediately preceding sentence of this paragraph for the Seneca Assets or Process Technology.

t. **Modifications.**  The Debtors, in consultation with the Committee and WestLB, may (a) determine which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is inadequate or insufficient, (i) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of Sale, or (ii) contrary to the best interests of the Debtors, their estates and creditors.

u. **Jurisdiction.**  Any and all disputes related or pertaining to or resulting or arising from the selection of the Successful Bids, the Sale of the Sale Assets, and/or the conduct of any Bidder, the Debtors, WestLB or the Committee, in connection therewith, shall be adjudicated solely by the Bankruptcy Court.  The submission of the documents necessary to become a Qualified Bidder shall constitute such parties' express consent to the exclusive jurisdiction of the Bankruptcy Court for all such matters.

25.    The Debtors believe that the Proposed Sale Process offers the best opportunity for

the Debtors to maximize the value of the Sale Assets and Subject Contracts for the benefit of

their estates given the current circumstances and lending environment available to the Debtors. The Debtors submit that implementation of the Proposed Sale Process is in the best interests of their estates, and should be approved.

**Proposed Notice Of Auction And Sale Hearing**

26.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 20 days' notice of the Sale Hearing by separate motion.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested in the Motion.  The Debtors propose that the deadline for objecting to approval of the proposed Sale be set for 4:00 p.m. (EST) on September 17, 2009.

27.     Within two (2) business days after entry of the Procedures Order, the Debtors will serve a notice (the "Auction and Hearing Notice") by first-class mail, postage prepaid upon the following parties: (a) the Office of the U.S. Trustee for the District of Delaware ("OUST"); (b) counsel to WestLB; (c) counsel to the Committee; (d) counsel to the Indenture Trustee; (e) all other known potential creditors in these chapter 11 cases; (f) all parties that have filed notices of appearance requesting service in these cases; (g) the local office for each of the Internal Revenue Service and the United States Securities and Exchange Commission ("SEC"); (h) all persons who are parties to contracts or unexpired leases of the Debtors; and (i) all parties that have signed NDAs with the Debtors regarding the Sale Assets (the "Notice Parties").  The proposed Auction and Hearing Notice is attached to this Motion as *Exhibit D* and indicates that the Motion and the Asset Purchase Agreement can be obtained without charge from counsel for the Debtors. In addition, the Debtors will serve the Motion, including copies of Clinton Purchase Agreement and the General Asset Purchase Agreement on those persons in categories (a) through (e), above. Further, within two business days after entry of the Procedures Order, or as soon as practicable

24

thereafter, the Debtors will place a publication version of the Auction and Hearing Notice for one day in the *Chicago Tribune* in order to enhance the prospects for a sale of the Debtors' assets.

28.     The Auction and Hearing Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the Sale once they are set by the Bankruptcy Court, and, will therefore, comply with Bankruptcy Rule 2002(c).  The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Sale Assets and the Subject Contracts.  Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

### Proposed Procedures For And Notice Of Assumption And Assignment Of Executory Contracts And Unexpired Leases

29.     Additionally, the Debtors, as part of the sale, are prepared to assume and assign the Subject Contracts to the applicable Successful Bidder(s) to the extent that such Successful Bidder(s) desires Subject Contracts as part of the corresponding Successful Bid.  As soon as practicable, but no later than ten (10) days after the entry of the Procedures Order, the Debtors will file with the Bankruptcy Court two schedules of cure obligations (the "Cure Schedules") each with a notice (the "Assumption and Assignment Notice") respecting the Subject Contracts: (i) Assumption and Assignment Notice and Cure Schedule of Clinton Subject Contracts ("Clinton Assumption and Assignment Notice"), substantially in the form of *Exhibit E*, attached hereto, and (ii) Assumption and Assignment Notice and Cure Schedule for all other Subject Contracts ("General Assumption and Assignment Notice"), substantially in the form of *Exhibit F*, attached hereto.  Each Cure Schedule will include a description of each Subject Contract potentially to be assumed and assigned under the Asset Purchase Agreement or other agreement with a Successful Bidder and the amount, if any, the Debtors believe is necessary to cure such

25

agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Amounts").  A copy of

each Cure Schedule and Assumption and Assignment Notice will be served on each of the non-

Debtor parties listed on the Cure Schedules by first class mail on the date that the Cure

Schedules are filed with the Bankruptcy Court.[6]  Any objections to the assumption and

assignment of any Subject Contract identified on the Cure Schedules, including, but not limited

to, objections relating to adequate assurance of future performance or to the Cure Amounts set

forth on such Cure Schedule, must be in writing, filed with the Bankruptcy Court, and be

actually received on or before September 17, 2009 at 4:00 p.m. (EST) by (i) Nova Biofuels

Seneca, LLC and Affiliated Debtors, 614 Shipyard Road, Seneca, IL 61360, Attention: Brent

King, Chief Restructuring Officer (Fax no.: (815) 357-1152, (ii) counsel to the Debtors, Blank

Rome LLP, One Logan Square, Philadelphia, Pennsylvania 19103, Attention: Samuel H. Becker,

Esq. and Michael B. Schaedle, Esq. (Fax no.: (215) 569-5555), (iii) financial advisors to the

Debtors, Ocean Park Advisors, 6033 West Century Boulevard, Suite 1290, Los Angeles, CA

90045, Attention: W. Bruce Comer and Mark Fisler (Fax no.: (310) 670-4107), (iv) counsel to

WestLB, Sidley Austin, LLP, 555 West Fifth Street, Los Angeles, CA  90013, Attention:

Jennifer C. Hagle, Esq. (Fax. no.: (213) 896-6600), (v) counsel to the Committee, Olshan

Grundman Frome Rosenzweig & Wolosky LLP, Attention:  Adam H. Friedman, Esq., Park

Avenue Tower, 65 East 55th Street, New York, NY 10022 (Fax no: (212) 451-2222), and (vi)

counsel to the Clinton Stalking Horse Bidder, Frey, Haufe & Current, P.L.C., 408 South 2nd

Street, P.O. Box 668, Clinton, IA, 52733-0668, Attention: T. Randy Current, Esq. (Fax no.:

(563) 242-1845).  Any objection to the Cure Amounts shall set forth the specific default or

---

[6] The designation of a contract on the Cure Schedules is without prejudice to the Debtors' rights and claims under
applicable bankruptcy and non-bankruptcy law and shall not constitute an admission that such contracts are
executory or enforceable against the Debtors.

defaults in any Subject Contracts and set forth the specific monetary amount that differs from the amount (if any) specified by the Debtors in each Cure Schedule.

30. If no objections are received, then the Cure Amounts set forth in each Cure Schedule will be binding upon the non-Debtor parties to the Subject Contracts for all purposes in these chapter 11 cases and otherwise, and will constitute a final determination of the total Cure Amounts required to be paid by the Debtors in connection with the assumption and assignment of the Subject Contracts. In addition, all counterparties to the Subject Contracts will: (a) be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts with respect to the Subject Contracts, and the Debtors and the Successful Bidder(s) will be entitled to rely solely upon the Cure Amounts set forth in each Cure Schedule, (b) be deemed to have consented to the assumption and assignment, and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder(s) that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Subject Contracts or that there is any objection or defense to the assumption and assignment of such Subject Contracts.

31. Where a non-Debtor counterparty to a Subject Contract files an objection asserting a cure amount higher than the proposed Cure Amounts (the "Disputed Cure Amount"), then: (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the consent of the Successful Bidder(s) to such resolution, the Debtors shall promptly provide the Committee, WestLB, and other parties in interest notice and an opportunity to object to such proposed resolution, or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount

131655.01602/21801813v.7

will be determined at the Sale Hearing (or at such other date and time as may be fixed by this

Court).  At the election of the Debtors, the executory contract that is the subject of a Disputed

Cure Amount may none the less be assigned to the Successful Bidder(s) at closing free and clear

of the objection so long as the amount relating to the Disputed Cure Amount is escrowed by the

relevant Debtor.  The Debtors intend to cooperate with counterparties to Subject Contracts to

attempt to reconcile any differences in a particular Cure Amount.

32.     The Debtors request that any party failing to object to the proposed transactions

be deemed to consent to the treatment of its executory contract and/or unexpired lease under

section 365 of the Bankruptcy Code.  *See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*,

175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to

consent); *Pelican Homestead v. Wooten (In re Gabeel)*, 61 B.R. 661, 667 (Bankr. W.D. La.

1985) (same).  Moreover, the Debtors request that each such party be deemed to consent to the

assumption and assignment of its executory contract and/or unexpired lease notwithstanding any

anti-alienation provision or other restriction on assignment.  *See 11 U.S.C. §§ 365(c)(1)(B),*

*(e)(2)(A)(ii), and (f)*.

## RELIEF REQUESTED

33.     By this Motion, the Debtors request that the Bankruptcy Court grant the following

relief:

> a.      Following the Procedures Hearing, enter the Procedures Order in a form
> attached to this Motion as *Exhibit A* approving the: (i) Proposed Sale
> Process and the Bid Procedures, including the procedures for submitting
> Qualified Bids, conducting the Auction and identifying the Successful
> Bid(s) and the Back-Up Bids, (ii) the Clinton Break-Up Fee, the Clinton
> Overbid Amount, and the Clinton Minimum Bid Increment, (iii) the
> Proposed Notice of Auction and Sale Hearing, and (iv) the Clinton
> Assumption and Assignment Notice and the General Assumption and
> Assignment Notice; and

b.     Following the Sale Hearing, enter an order (the "Clinton Sale Order") in a form attached to the this Motion as *Exhibit G* approving the sale of the Clinton Assets and the Clinton Subject Contracts in accordance with the Proposed Sale Process and making the following determinations, among others, with respect to such Sale or Sales:

   i.      that such Sale has been agreed upon by the applicable parties, and will be made and completed, in good faith, for purposes of the provisions of section 363(m) of the Bankruptcy Code;

   ii.     that such Sale shall be made, and the Clinton Sale Assets and the Clinton Subject Contracts shall be delivered to the Successful Bidder(s), free and clear of any and all liens, claims, encumbrances and interests (other than as specified in the definitive agreement) with any liens, claims, encumbrances and interests to attach to the sale proceeds in the same manner and priority as existed on the Petition Date;

   iii.    that the party who submitted the Successful Bid(s) shall receive good, valid and marketable title to the Clinton Sale Assets and the Clinton Subject Contracts (including the executory contracts and unexpired leases included within each Successful Bid that is approved by the Court);

   iv.     that the Debtors have the authority at the Closing Date to assume and assign to the Successful Bidder(s) all Clinton Subject Contracts designated by each Successful Bidder in its asset purchase agreement free and clear of liens, claims and encumbrances, and to find that the Cure Amounts are in full satisfaction of all amounts due and owing to cure the same; and

   v.      that the ten (10) day stay period provided for in Bankruptcy Rules 6004(h) and 6006(d) shall not be in effect with respect to the Clinton Sale Order and the Clinton Sale Order shall be effective and enforceable immediately upon its entry.

c.     Following the Sale Hearing, enter an order (the "General Sale Order") in a form attached to the this Motion as *Exhibit H* approving the sale of the Sale Assets and the Subject Contracts in accordance with the Proposed Sale Process and making the following determinations, among others, with respect to such Sale or Sales:

   i.      that such Sale has been agreed upon, and will be made and completed, in good faith, for purposes of the provisions of section 363(m) of the Bankruptcy Code;

   ii.     that such Sale shall be made, and the Sale Assets and the Subject Contracts shall be delivered to the Successful Bidder(s), free and

clear of any and all liens, claims, encumbrances and interests (other than as specified in the definitive agreement) with any liens, claims, encumbrances and interests to attach to the sale proceeds in the same manner and priority as existed on the Petition Date;

iii.     that the party who submitted the Successful Bid(s) shall receive good, valid and marketable title to the Sale Assets and the Subject Contracts (including the executory contracts and unexpired leases included within each Successful Bid that is approved by the Court);

iv.     that the Debtors have the authority at the Closing Date to assume and assign to the Successful Bidder(s) all Subject Contracts designated by each Successful Bidder in its asset purchase agreement free and clear of liens, claims and encumbrances, and to find that the Cure Amounts are in full satisfaction of all amounts due and owing to cure the same; and

v.     that the ten (10) day stay period provided for in Bankruptcy Rules 6004(h) and 6006(d) shall not be in effect with respect to the General Sale Order and the General Sale Order shall be effective and enforceable immediately upon its entry.

## LEGAL ARGUMENTS IN SUPPORT OF REQUESTED RELIEF

**A.     Entry Of The Procedures Order Is Necessary And Appropriate Under The Facts And Circumstances Of These Cases.**

34.     After notice and a hearing, a debtor may sell assets outside the ordinary course of business. *11 U.S.C. § 363(b).* Generally, to obtain approval of a proposed sale of assets under section 363(b), a debtor should demonstrate that the proffered purchase price is the highest or best offer under the circumstances of the case. *See e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price

131655.01602/21801813v.7

or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

35.     The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside the ordinary course of business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest or best recovery for a debtor's estate.  The proposed Bidding Procedures and the opportunity for competitive bidding embodied therein are both reasonable and designed to maximize the value received for the Debtors' Sale Assets by facilitating a competitive bidding process in which all potential and qualified bidders are encouraged to participate and submit competing bids.

36.     The Debtors desire to receive the greatest value possible for their assets.  The Bidding Procedures were developed so as to be consistent with the Debtors' need to expedite the sale process but with the object of promoting active bidding that will result in the highest and/or best offer(s) possible.  In addition, the proposed Bidding Procedures reflect the Debtors' objective of conducting an Auction in a controlled, but fair and open, manner that promotes maximum interest in the Sale Assets by financially capable, motivated bidders who are likely to close a transaction(s), while simultaneously discouraging offers from persons the Debtors do not believe are sufficiently capable or likely to actually consummate a transaction.

37.     In the event Qualified Bids are received by the Bid Deadline, the Debtors currently propose to hold an auction of the Debtors' Sale Assets on **September 16, 2009 at 12:00 p.m. (Eastern Time)** at the offices of Blank Rome LLP, or such other location determined by the Debtors.  At the Auction, the Debtors may select the highest and/or best Qualified Bid for any particular asset of the Debtors.  **ALL BID(S) SHALL BE SUBJECT TO THE APPROVAL OF THE BANKRUPTCY COURT.**

38. Parties who submit Qualified Bids prior to the Bid Deadline, representatives of WestLB, the Committee, OUST, and the Debtors, and professionals representing the foregoing shall be entitled to attend and be heard at the Auction. Any creditor of the Debtors that wishes to attend the Auction may do so as long as it provides written notice of its planned attendance to undersigned counsel for the Debtors at least two business days prior to the Auction.

39. During the Auction, bidding with respect to the Sale Assets as a whole shall begin with the highest Qualified Bid, continue with the Debtor established first incremental bid amount over and above the previous highest Qualified Bid, and continue thereafter in Debtor established minimum increments. The Debtors shall also consider bids for less than all of their Sale Assets, provided that such bids exceed in the aggregate the highest or otherwise best bid for all or substantially all of the Sale Assets.

40. All participating bidders will be permitted sufficient time, to be determined by the Debtors in consultation with WestLB and the Committee, in which to respond to the previous bid made at the Auction. The Debtors, in consultation with WestLB and the Committee, shall determine when bidding for certain or all of Sale Assets shall conclude.

41. The Clinton Stalking Horse Bidder has the right to credit bid the amount of the Clinton Break-Up Fee, as part of any subsequent bid made by the Clinton Stalking Horse Bidder at the Auction.

42. The Debtors will have no obligation to accept or submit for Bankruptcy Court approval any offer presented prior to or at the Auction. The Debtors reserve the right to reject any offer at any time prior to entry of an order approving a sale of the Debtors' assets.

43. Given the current circumstances of these cases, the Debtors, WestLB, and the Committee believe that implementation of a prompt sale process is the best way to maximize the

value of the Debtors' assets. Entry of the Procedures Order will permit the sale process contemplated by the proposed Bidding Procedures to begin as expeditiously as possible.

**B.     The Proposed Clinton Break-Up Fee Is Fair And Reasonable And Should Be Approved Under Applicable Standards And Practice Of This Court.**

44.     In recognition of the Bio Energy's significant expenditure of time, energy, and resources invested and to be invested in this process, and the benefits afforded by the Clinton Purchase Agreement to the Debtors' estates, the Debtors request approval of the proposed Clinton Break-Up Fee.

45.     The use of a break-up fee such as that proposed here has become an established practice in chapter 11 cases involving the sale of significant assets. Break-up fees, and similar bidding incentives enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor and its bankruptcy estate with the potential of obtaining an enhanced price through an auction process. Historically, bankruptcy courts have approved bidding incentives similar to the Clinton Break-Up Fee by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal citation omitted); s*ee also In re Integrated Resources*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

46.     The Third Circuit Court of Appeals has clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context. In *Calpine Corp. v. O'Brien Envtl Energy, Inc. (In re O'Brien Envtl Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment

33

standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide benefit to a debtor's estate. *Id.* at 532-33.

47.     *O'Brien* identified at least two instances in which bidding incentives may provide benefit to the estate. First, a break-up fee may be necessary to preserve the value of the estate if assurance of the incentives "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.; see also O'Brien* at 536 (reviewing nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee, which factors include the reasonableness of the break-up fee relative to the purchase price and the support of the principal secured creditors and creditors committee).

48.     The Clinton Break-Up Fee is consistent with the "business judgment rule" and satisfies *O'Brien*. Potential purchasers will be afforded an opportunity to submit competing bids modeled on the Clinton Purchase Agreement. The proposed $36,000 Clinton Break-Up Fee is 3% of the proposed purchase price of the Clinton Assets of $1,200,000 (subject to certain adjustments as described in the Clinton Purchase Agreement), exclusive of any additional amounts paid by Bio Energy as the Cure Amounts. The proposed Clinton Break-Up Fee is consistent with the range of bidding protection regularly approved by bankruptcy courts in this district.

34

49.     Further, the Clinton Break-Up Fee has already encouraged bidding, in that the Clinton Break-Up Fee was a material inducement for, and a requirement by, Bio Energy to enter into the Clinton Purchase Agreement.  The Clinton Break-Up Fee has thus "induce[d] a bid that otherwise would not have been made and without which bidding would [be] limited." *O'Brien* at 537.  Similarly, the Clinton Purchase Agreement will serve as a minimum or floor bid upon which other bidders will rely, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

50.     The Debtors have consulted the Committee and WestLB and their respective professionals in connection with the sale process and the negotiation of the Clinton Break-Up Fee and Clinton Purchase Agreement.  Based upon the involvement of the Committee and WestLB thus far, the Debtors do not believe WestLB or the Committee will object to approval of the Clinton Break-Up Fee.

51.     Finally, the existence of the Clinton Break-Up Fee will permit the Debtors to insist that competing bids for the Debtors' assets be materially higher or otherwise better than that offered by Bio Energy, a clear benefit to the Debtors' estates and creditors if Qualified Bids are received.

52.     The proposed Clinton Break-Up Fee is fair and reasonable in view of, among other things, (a) the intensive analysis, due diligence investigation and negotiations Bio Energy has and will have undertaken in connection with the proposed sale and (b) the fact that if the Clinton Break-Up Fee is triggered, the efforts of Bio Energy will have generated the opportunity for the sellers to receive the highest or otherwise best offer for their assets, to the benefit of the Debtors' estates, creditors, employees, and customers.  Because the proposed Clinton Break-Up Fee is (i) fair and reasonable, (ii) reasonably calculated to produce the highest and/or best offers

for the sellers' assets and thereby confer actual benefits upon the estates herein, and (iii) within

the range of bidding incentives customarily approved by courts in this district, the Clinton Break-

Up Fee should be approved by this Court.

**C.** **The Proposed Sale Of Sale Assets and Subject Contracts Is Within The Sound Business Judgment Of The Debtors And The Proposed Bid Procedures Are Appropriate And Reasonable.**

53.     Section 363 of the Bankruptcy Code provides that debtors in possession, "after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate ...." *11 U.S.C. § 363(b) (1); see also Bankruptcy Rule 6004(b)(1)* ("All

sales not in the ordinary course of business may be by private sale or by public auction").

54.     The decision to sell assets outside the ordinary course of business is based upon

the sound business judgment of the debtor. *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141 (2d

Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 772 F.2d 1063,

1071 (2d Cir. 1983); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y.

July 31, 2002). *See also Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re

Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir.

1993), (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)) ("the business judgment

rule 'is a presumption that in making a business decision the directors of a corporation acted on

an informed basis, in good faith and in the honest belief that the action was in the best interests

of the company,'" which has continued applicability in bankruptcy).  Under Delaware law, the

business judgment rule operates as a presumption that "directors making a business decision, not

involving self-interest, act on an informed basis, in good faith and in the honest belief that their

actions are in the corporation's best interest." *Continuing Creditors' Comm. of Star Telecomm.,

Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (*quoting Grobow v. Perot*, 539 A.2d

180, 187 (Del. 1988)); *see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v.*

*Wolford*, 554 F. Supp. 2d 538, 555 n. 111 (D. Del. 2008). Thus, this Court should approve the proposed sale if the Debtors demonstrate a sound business reason or justification in support thereof. *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del. 1991); *In re Phoenix Steel Corp.,* 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (section 363 sale should be approved if "the proposed sale is fair and equitable, ...a good business reason [exists] for completing the sale and the transaction is in good faith"); *In re Lionel Corp.,* 722 F.2d 1063, 1070 (2d Cir. 1983).

55.     Courts generally show great deference to a debtor in possession's decisions when applying the business judgment standard. *See In re Global Crossing, Ltd.*, 295 B.R. 726, 744 n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a bankruptcy court to substitute its own business judgment for that of the [d]ebtors and their advisors, so long as they have satisfied the requirements articulated in the caselaw."). Deference is inappropriate only if such business judgment is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Richmond Metal Finishers*, 756 F.2d at 1047; *In re Integrated Res., Inc.*, 147 B.R. at 656 (there is a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company").

56.     Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether: (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *In re Betty Owens Sch.*, 1997 U.S. Dist. Lexis 5877 (S.D.N.Y. 1997); *accord In re Delaware and Hudson Ry. Co.*, 124 B.R. 169,

166 (D. Del. 1991); *In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749 at *3

(Bankr. D. Del. May 20, 2002).  The business judgment standard has been met here as are

requirements of adequate notice, fairness and good faith.

57.     The Seneca and Clinton refineries are currently not operating at this juncture and

the Debtors are attempting to dispose of their assets for the benefit of their estates and creditors

in an orderly, value-maximizing manner.  The Debtors have limited liquidity and funding

sources have diminished in this difficult lending market.  As part of the Sale Process, the Debtors

seek to potentially generate cash proceeds for the benefit of the Debtors' estates and creditors.

For all of the reasons that follow, the proposed sale of the Debtors' assets and the assumption

and assignment of the Debtors' executory contracts in connection with the Bid Procedures

satisfies the business judgment standard and the Bid Procedures are abundantly reasonable and

appropriate and allow for a significant period of time for interested bidders to submit bids for the

Sale Assets and the Subject Contracts.

58.     First, the timeline for submitting bids under the proposed Bid Procedures is

necessary to obtain the maximum value for the Debtors' assets and to preserve the value of the

Seneca Assets, the Clinton Assets and the Process Technology under the circumstances.  This

suggested timeframe provide parties with ample opportunity to object, appear and be heard with

respect to all dispositions contemplated by the auction process.  *See In re US Airways Group,*

*Inc.*, 287 B.R. 643, 646-49 (Bankr. E.D. Va. 2002) (approving even "fast track" authority to

renegotiate or reject executory contracts where rights of interested parties are preserved).

59.     Second, subject to the Bankruptcy Court's approval, the Debtors will provide

notice of the Auction to interested parties by serving the Auction and Sale Notice which will

clearly identify (i) the deadline fixed for filing objections to any sale of the Debtors' assets and

assumption and assignment of the executory contracts, (ii) the date of the Auction, and (iii) the date of the Sale Hearing. Service of the Auction and Sale Notice upon the Notice Parties identified herein complies with the Bankruptcy Rules.

60. Third, the Bid Procedures contemplate a fully negotiated arm's-length transaction between the Debtors and the potential buyer. A purchaser's good faith may be satisfied where a sale is the product of arm's-length negotiations between parties. *See WBQ Partnership*, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) (stating that "[a] negotiation conducted at arm's length helps to ensure that the agreed price ultimately will be fair and reasonable"); *In re Apex Oil Co.*, 92 B.R. 847, 870 (Bankr. E.D. Mo. 1988). Alternatively, lack of good faith is typically determined by actions that involve fraudulent conduct, collusion or an attempt to take unfair advantage of other bidders during the sale proceedings. *See Willemain v. Kivitz (In re Willemain)*, 764 F.2d 1019, 1023 (4th Cir. 1985).

61. Fourth, the Bid Procedures will ensure that that any price obtained for the assets will be fair and reasonable. The competitive bidding process should enable the Debtors to capture value from the Sale Assets for the benefit of the Debtors' estates and their creditors by taking full advantage of the potential buyer pool, which has been and will be marketed extensively. The financial information required of Potential Bidders will also permit the Debtors, WestLB, and the Committee to analyze each bid with respect to the potential purchaser's ability to satisfy the financial obligations assumed thereby. Moreover, the open nature of the Auction will also provide transparency to the bidding process and make reasonably certain that any successful bid is the highest or otherwise best bid for such asset, all under the direction of the Debtors and the supervision of WestLB and the Committee.

62.     Finally, the marketing efforts the Debtors have undertaken and intend to undertake prior to the Auction will ensure that any successful bids represent a fair value for the Sale Assets and the Subject Contracts.  *See In re W.A. Mallory Co.*, 214 B.R. 834, 837-38 (Bankr. E.D. Va. 1997).  The flexibility provided by the Bid Procedures is consistent with the discretion typically afforded procedures governing the disposition of assets under section 363(b).  *See Id*. at 838 (stating that "[e]stablishing an arbitrary percentage which a proposed purchase price needs to meet before a sale is consummated does not serve the purposes of the Bankruptcy Code...").  If a party raises legitimate concerns about the extent to which the Bid Procedures will ensure fair value for the Debtors' assets, the Debtors intend to present evidence at the Sale Hearing confirming that such a price is reasonable under the circumstances.

63.     In sum, the sale of the Debtors' assets and the Bid Procedures contemplated herein reflect a sound business purpose, are a valid exercise of the Debtors' business judgment, and are abundantly fair and reasonable.

**D.     The Auction Will Satisfy The Requirements Of Section 363(f) For A Sale Free And Clear.**

64.     In the interest of attracting the best offers, the sale of the Debtors' assets, subject to WestLB's written consent to each Successful Bid, which consent may be withheld in its sole discretion, should be free and clear of any and all liens, claims, encumbrances, and interests in accordance with section 363(f) of the Bankruptcy Code, with such liens, claims, encumbrances, and interests attaching to the proceeds of the sale.  Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate free and clear of all interests (including liens, claims and encumbrances) if:

(a)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest,

(b)     the entity with the interest consents,

40

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property,

(d)     such interest is in bona fide dispute, or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest.

*See 11 U.S.C. § 363(f)*; *see also Precision Indus. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th Cir. 2003). Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Satisfaction of any one of the factors set forth in section 363(f) allows a sale, including the dispositions contemplated herein, and transfer assets of the estates free and clear.

65.     With respect to any party asserting a lien, claim, or encumbrance against the Sale Assets, other than WestLB, the Debtors believe that they will be able to satisfy one or more of the conditions set forth in Bankruptcy Code section 363(f). In particular, the Debtors believe that any lienholder other than WestLB will be adequately protected by having their interest, if any, attach to all proceeds ultimately attributable to the Sale Assets in which such creditor alleges an interest, in the same order of priority and with the same validity, force and effect that such creditor had prior to the sale, subject to any claims and defenses the Debtors and their estates may have with respect thereto.

66.     Finally, the Debtors believe that creditors with any interest in the assets and/or executory contracts, including WestLB, are likely to consent to a proposed sale free and clear of liens, claims, encumbrances and interests, if applicable. *See 11 U.S.C. §363(f)(2)*.[7] Indeed, Debtors have consulted WestLB in the preparation of this Motion and Debtors will consult with WestLB regarding the sale. To the extent such creditors, other than WestLB, do not consent

---

[7] The Debtors anticipate that WestLB will credit bid, although it is not obligated to do so, on certain Sale Assets in the event no bidders submit bids that are satisfactory to WestLB.

explicitly or implicitly, the Debtors believe that the sale will satisfy one or more of the factors in Bankruptcy Code section 363(f).

### E. The Successful Bidder At The Auction Will Be Entitled To The Protections Afforded To Good Faith Purchasers.

67.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, Bankruptcy Code section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

*11 U.S.C. § 363(m).*  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. 1993) (quoting *In re Abbotts Dairies of Penn, Inc.*, 788 F.2d 143 and 147); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew the pendency of the appeal."); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m). good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

68.     The selection of the Successful Bidder(s) will be the product of arm's-length, good-faith negotiations in an anticipated competitive purchasing process through which the Debtors will seek to maximize the value available for their assets.  The Debtors intend to request

at the Sale Hearing a finding that the Successful Bidder(s) is/are a good-faith purchaser(s) entitled to the protections of section 363(m) of the Bankruptcy Code. The Debtors believe that providing the Successful Bidder(s) with such protection will ensure that the maximum price will be received by the Debtors for the Sale Assets and the Subject Contracts and allow for a prompt closing of the sale.

**F.  Assumption And Assignment Of The Debtors' Execution Contracts And Unexpired Leases In Accordance With The Proposed Assumption Procedures Is Appropriate And In The Best Interests Of The Estates.**

69.  A debtor in possession may assume an executory contract where assumption is a reasonable exercise of its business judgment. *See 11 U.S.C. § 365(a); see e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984); *Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484 (Bankr. S.D. Ohio 1982); *see also In re Extraction Techs.*, 296 B.R. 393, 399 (Bankr. E.D. Va. 2001); *In re Richmond Metal Finishers*, 756 F.2d 1043, 1046-47 (4th Cir. 1985). This requirement is satisfied where a debtor in possession determines in good faith that assumption of an executory contract will benefit the estate. *See In re Gucci*, 193 B.R. 411, 414-15 (S.D.N.Y. 1996); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

70.  Further, a debtor in possession may assume and assign an executory contract only where the trustee has cured all existing defaults under that executory contract. *See 11 U.S.C. § 365(b)(1), (f)(2)*; *see In re Shangra-La. Inc.*, 167 F.3d 843, 849 (4th Cir. 1999). In addition, a debtor in possession must provide adequate assurance of future performance under the assumed executory contract if the debtor has defaulted. *See 11 U.S.C. § 365(b)(1), (f)(2); see e.g., In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that tenant will thrive and pay rent); *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 172 (Bankr. E.D. Va. 1993). The

43

requirements of "adequate assurance" depend on the facts and circumstances of each case. *See*, *e.g., In re Martin Paint Stores*, 199 B.R. 258, 263 (Bankr. S.D.N.Y. 1996).

71.     In the event the Successful Bid(s) include(s) a proposed assumption and assignment of an executory contract or unexpired lease, the Debtors will introduce evidence at the Sale Hearing demonstrating that the Successful Bidder(s) can satisfy the requirements of adequate assurance as contemplated by section 365 of the Bankruptcy Code. The sale price obtained in connection with a party's bid will be sufficient to cure any defaults applicable to assumed executory contracts. The Bid Procedures require each potential assignee to provide assurances to satisfy the standards set forth in the Bankruptcy Code. *See Ames*, 287 B.R. at 115-16. Indeed, in order to qualify as a Qualified Bidder, each bidder must provide financial information regarding the bidder's ability to fulfill its financial obligations. *See In re Bygraph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it a strong likelihood of succeeding.) *See In re CilycoGenesys, Inc.*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) (stating that "it is appropriate to evaluate the financial condition of the assignee and the likelihood that the nondebtors will receive the benefit of its bargain from the assignee."). Upon conclusion of the Auction and selection of the Successful Bidder(s), the Debtors will file a notice identifying the Successful Bidder(s) and serve such notice together with evidence of "adequate assurance" upon all counterparties to executory contracts.

72.     The Debtors respectfully submit that the Assumption and Assignment Notices and Cure Schedules described above are appropriate and reasonably tailored to provide all counterparties to executory contracts with adequate notice of the proposed assumption and

assignment of the applicable contract.  Ample time is provided for contract parties to object to

the Clinton and General Assumption and Assignment Notices and Cure Schedules.  It is

anticipated that any objections that may be filed will be heard at the Sale Hearing.

73.     Accordingly, the Debtors submit that implementation of the proposed procedures

for addressing assumption and assignment of executory contracts and unexpired leases

procedures is appropriate in these Chapter 11 Cases.  As a result, the Bankruptcy Court therefore

should have a sufficient basis to authorize the Debtors to assume and assign executory contracts

and unexpired leases which may form a part of the Successful Bid(s).

## G.     The Automatic Ten Day Stay Under Bankruptcy Rules 6004(g) And 6006(d) Should Be Waived.

74.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all

orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are

automatically stayed for ten days after entry of the order.  Similarly, under Bankruptcy Rule

6006(d), unless the Court orders otherwise, all orders authorizing the assignment of executory

contracts or unexpired leases are automatically stayed for ten days after entry of the order.

75.     Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee

Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day

stay period, Collier on Bankruptcy suggests that the 10-day stay period should be eliminated to

allow a sale or other transaction to close immediately where there has been no objection to the

procedure.  *10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999)*.  Furthermore, *Collier on

Bankruptcy* provides that if an objection is filed and overruled, and the objecting party informs

the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file

such appeal.  *Id*.

131655.01602/21801813v.7

76.     To preserve and maximize the value of their assets for the benefit of all creditors, the Debtors seek to close the Sale immediately after all closing conditions have been met or waived.  Thus, waiver of any applicable stays afforded by the Bankruptcy Rules is appropriate under the facts and circumstances of these cases.

## NOTICE

77.     Notice of this Motion has been provided to:  (a) the OUST; (b) the SEC; (c) the the Internal Revenue Service; (d) counsel to the Committee; (e) counsel to the Indenture Trustee; (f) counsel to WestLB; (g) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (h) all known creditors.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary or required.

## NO PRIOR REQUEST

78.     No prior motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, for the foregoing reasons, the Debtors respectfully request entry of: (A) an order substantially in the form annexed as *Exhibit A* hereto (i) approving the Bid Procedures including the Clinton Break-Up Fee, the Clinton Overbid Amount, and the Clinton Minimum Bid Increment; (ii) approving the form and manner of notice of the sale or sales of the Debtors' assets; (iii) approving the form and manner of notice of the proposed assumption and assignment, including cure amounts, of executory contracts and unexpired leases; (iv) establishing the date for an Auction; (v) establishing the date for the Sale Hearing; and (vi) granting related relief; and (B) the orders substantially in the form annexed hereto as *Exhibits G and H:* (i) approving the sale(s) of all or substantially all of the Debtors' assets free and clear of all Liens (with such Liens attaching to the proceeds of sale as described above); (ii) authorizing the Debtors to assume and assign the Subject Contracts; and (iii) granting related relief.

Dated: July 31, 2009

BLANK ROME LLP

By: */s/ David W. Carickhoff*
     David W. Carickhoff (No. 3715)
     1201 North Market Street, Suite 800
     Wilmington, DE 19801
     Telephone: (302) 425-6400
     Facsimile: (302) 425-6464

          -and-

     Michael B. Schaedle
     Samuel H. Becker
     Josef W. Mintz
     One Logan Square
     130 North 18th Street
     Philadelphia, PA 19103
     Telephone: (215) 569-5500
     Facsimile: (215) 569-5555

Attorneys for Debtors and Debtors in Possession

131655.01602/21801813v.7