# EXHIBIT A

## MODIFIED PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT

DATED AS OF SEPTEMBER 23, 2009

BY AND AMONG

NOVA BIOFUELS SENECA, LLC AND NOVA BIOSOURCE TECHNOLOGIES, LLC,
SELLERS

AND

REG SENECA, LLC, PURCHASER

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ...................................................................................................1
    1.1    Definitions. ....................................................................................................1
    1.2    Other Definitions and Interpretative Matters.....................................................9

ARTICLE II BIDDING PROCEDURES ...............................................................................10

    2.1    Bidding Procedures. This Agreement is made subject to, and in accordance with the bidding procedures (the "Bidding Procedures") approved by the Bankruptcy Court pursuant to the Order Establishing Bid and Sale Procedures, Pursuant to Bankruptcy Code Sections 363 and 365 and Bankruptcy Rules 6004 and 6006 and Subject Thereto, for the Sale Free and Clear of Liens, Claims, Encumbrances and Interests of Substantially All of the Debtor's Assets and the Assumption and Assignment of Designated Contracts and Leases (Docket No. 203) ("Bidding Procedures Order"). Purchaser agrees and acknowledges that the Sellers are and may solicit inquiries, proposals or offers for the Purchased Assets in connection with any alternative transaction pursuant to the terms of the Bidding Procedures Order. 10

    2.2    Other Definitions; Conflict. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures. In the event of a contradiction between this Agreement and the Bidding Procedures, the Bidding Procedures shall control. 10

ARTICLE III PURCHASE AND SALE ..................................................................................10

    3.1    Purchase and Sale. This Agreement when signed by Purchaser shall constitute an irrevocable offer by Purchaser to Purchase the Purchase Assets on the terms and conditions set forth in this Agreement until two (2) business days after the Purchased Assets have been sold pursuant to a closing of the sale or sales approved by the Bankruptcy Court, subject to Section 9.1 hereof. Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Purchaser, and Purchaser shall purchase, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of Sellers in, to or under the following (herein collectively called the "Purchased Assets"): (i) all of the properties and assets of Sellers (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use exclusively in or relating exclusively to the Business, as the same shall exist on the Closing Date, and (ii) without limiting the generality of clause (i) of this Section 3.1, all of the following properties and assets of Sellers, whether they relate exclusively to the Business or not (except where so noted in the following list or in any definition used in the following list): ..................................................................................10

    3.2    Excluded Assets. The Purchased Assets shall not include any of the following (collectively, the "Excluded Assets"): ...................................................................12

    3.3    Designation of Assigned Contracts and Leases; Cure Costs. ..........................13

    (a)    Prior to the Designation Deadline, Purchaser shall designate by notice to Seller (such notice to be signed and dated by Purchaser) (the "Assignment Election") whether or not Purchaser elects to have assumed and assigned to it as an Assigned Contract and Lease,

effective as of the Closing Date, the Non-Exclusive Patent License Agreement between Nova Biosource Technologies, LLC and Clinton County Bio-Energy, LLC (the "Technology License"). Upon receipt of the Assignment Election prior to the Designation Deadline, Purchaser and Seller shall cause the Technology License to be assumed and assigned to Purchaser pursuant to an assignment and assumption agreement, in the form attached hereto as **Exhibit D**, duly executed by the Seller and Purchaser. ..............................................................13

(b)      Seller shall be responsible for verification that there are no Cure Costs for the Technology License, including all administrative responsibilities associated therewith, in the Bankruptcy Case and otherwise, and shall use reasonable best efforts to establish that there are no Cure Costs for the Technology License (as soon as practicable and in all events prior to the Designation Deadline), including taking all reasonable actions with respect to the filing and prosecution of any pleadings and Proceedings in the Bankruptcy Court and the service and delivery of any related notices or pleadings. If there are any such Cure Costs with regard to the Technology License or the Assigned Contracts and Leases, Seller shall have no obligation to pay or perform them. ..................................................................................13

3.4      Assignment of Purchased Assets. To the maximum extent permitted by the Bankruptcy Code, the Purchased Assets shall be assumed by and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), would be legally invalid. If with respect to any Purchased Asset such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363 or 365 of the Bankruptcy Code, then such Purchased Asset shall not be transferred hereunder. In the case of licenses, certificates, approvals, authorizations, Leases, Contracts and other commitments included in the Purchased Assets (i) that cannot be transferred or assigned without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, at Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Purchaser in endeavoring to obtain such consent and, if any such consent is not obtained, Sellers shall, following the Closing, at Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, cooperate with Purchaser in all reasonable respects to provide to Purchaser the benefits thereof in some other manner, or (ii) that are otherwise not transferable or assignable (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, following the Closing, at Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Purchaser to provide to Purchaser the benefits thereof in some other manner (including the exercise of the rights of Sellers thereunder); *provided* that nothing in this Section 3.4 shall (x) require Sellers to make any expenditure or incur any obligation on their own or on behalf of Purchaser for which funds in the full amount of such expenditure or obligation are not provided to Sellers by Purchaser in advance in cash or (y) prohibit any Sellers from ceasing operations or winding up its affairs following the Closing. 13

3.5      Further Assurances. .....................................................................................14

3.6    Adequate Assurances. If necessary, Purchaser shall provide adequate assurance of the future performance of each of the Assigned Contracts and Leases without Purchaser incurring any additional expense. Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Purchaser's employees and representatives available to testify before the Bankruptcy Court. .....................14

3.7    Access. Sellers shall afford to Purchaser and its and their Representatives, and to prospective lenders, placement agents and other financing sources and each of their respective representatives, reasonable access, during normal business hours upon reasonable notice throughout the period prior to the Closing, to their respective properties and facilities (including all real property and the buildings, structures, fixtures, appurtenances and improvements erected, attached or located thereon and including for environmental Phase I and Phase II testing), books and records, financial information, Contracts, commitments and records and, during such period, shall furnish promptly such information concerning its businesses, properties and personnel of Sellers as Purchaser shall reasonably request in connection with the transactions contemplated herein; provided, however, such investigation shall not unreasonably disrupt Sellers' operations. Sellers shall afford Purchaser and its Representatives access to, and the opportunity to contact directly, customers of Sellers, including direct or indirect purchasers of biodiesel and by-products of biodiesel production. Purchaser agrees to provide to Sellers reasonable access to its books and records after the Closing to be able to administer the Bankruptcy Case. .................................................................14

3.8    Conduct of the Business Pending the Closing .............................................15

ARTICLE IV PURCHASE PRICE ............................................................................................16

4.1    Purchase Price. In addition to the mutual agreements contained herein, the consideration for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Purchased Assets shall consist of assumption by Purchaser of the Bank Term Debt, on new terms and conditions satisfactory to Purchaser and Bank. Purchaser assumes no other liabilities of Sellers except to the extent Purchaser assumes obligations under the Assigned Contracts and Leases as provided in the Assignment and Assumption Agreement attached as Exhibit E to be executed at Closing. ....................................................................16

4.2    Deposit. Deleted. ...........................................................................................16

ARTICLE V CLOSING .............................................................................................................16

5.1    Closing Date. Upon the terms and subject to the conditions hereof, the closing of the sale of the Purchased Assets contemplated hereby (the "Closing") shall take place at the offices of Blank Rome, LLP, Wilmington, Delaware, or such other place as agreed to by the Parties, no later than three (3) Business Days following the date on which the conditions set forth in Article 8 have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), but no later than October 15, 2009 (the "Target Closing Date"). The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date." Sellers shall cooperate with Purchaser and afford Purchaser the opportunity (without obligation) to employ the Facility Employees as "at will" employees of Purchaser from and after Closing. ....................................................................16

5.2  Closing Costs.  In addition to the Purchase Price, Purchaser shall pay the following closing costs (the "Closing Costs"): (i) its own attorneys' fees and expenses, (ii) the entire cost of any title insurance policy (including extended coverage or endorsements) desired by Purchaser, (iii) all recording costs or fees, conveyance fees and any transfer taxes, and (iv) Purchaser's due diligence expenses. .................................................................17

5.3  Payment on the Closing Date.  On the Closing Date Purchaser shall pay the Closing Costs and assume the Bank Debt.................................................................................17

5.4  Deliveries at Closing by Sellers.  At the Closing, Sellers shall deliver to Purchaser:  17

5.5  Deliveries at Closing by Purchaser.  At the Closing, Purchaser shall deliver or cause to be delivered to Sellers:..............................................................................................18

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF SELLERS ..............................18

6.1  Organization and Good Standing.  Each of Sellers is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Sellers in all material respects have the requisite corporate or limited liability company power and authority (i) to own or lease and to operate and use their properties and (ii) to carry on their business as now conducted.  Sellers each are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of their business or the nature of their properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect...................................................................................................18

6.2  Authority; Validity; Consents.  Each of Sellers has, subject to requisite Bankruptcy Court approval, the requisite corporate or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to requisite Bankruptcy Court approval, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller and the consummation by such Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate or limited liability company action.  This Agreement has been duly and validly executed and delivered by Sellers and each other Transaction Document required to be executed and delivered by Sellers at the Closing will be duly and validly executed and delivered by Sellers at the Closing.  Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents constitute, with respect to Sellers that is party thereto, the legal, valid and binding obligations of Sellers, enforceable against Sellers in accordance with their respective terms, except as such enforceability is limited by general principles of equity.  Subject to requisite Bankruptcy Court approval, except (x) for entry of the Sale Order and (y) for notices, filings and consents required in connection with the Bankruptcy Case, Sellers are not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby...19

6.3  Employment Matters. ...................................................................................19

6.4  Sellers' Intellectual Property. .....................................................................19

6.5  Delivery; "AS IS" Transaction. ....................................................................20

131655.01602/21818488v.6

6.6     Consents of Third Parties: Contractual Consents.  To Seller's Knowledge, as of the date hereof, except as set forth on Disclosure Schedule 6.6 all of the Purchased Assets, subject to assignment, can be assigned to Purchaser pursuant to Section 365(c)(1) of the Bankruptcy Code without the consent of the counterparty or relevant Governmental Authority, as applicable.    21

6.7     Title to Purchased Assets.  Except as set forth in Disclosure Schedule 6.7 and the personal property subject to any Leases, Seller owns each of the Purchased Assets, free and clear of all Liens except the Permitted Encumbrances.  Except as set forth in Disclosure Schedule 6.7, with respect to the Owned Real Property, to the Seller's Knowledge, (i) no person or entity has any right of first refusal, option or similar rights to acquire any interest in the Owned Real Property or any part thereof; (ii) Seller has not received any written notice of any proposed special assessment which would affect any of the Owned Real Property; (iii) Seller has received no written notice of any violation of any zoning, subdivision, or platting, Laws, ordinances or regulations related to the Owned Real Property; and (iv) except for the Assigned Contracts and Leases, Seller is not a party to any written contracts or agreements, affecting the Seller's operation of the Owned Real Property (including without limitation management, maintenance, service, or supply) which will survive the Closing and be binding upon the Purchaser thereafter.  Seller is not a party to any lease, sublease or other similar Contract or arrangement affecting the Owned Real Property.................................................21

6.8     Litigation.  There are no Legal Proceedings pending or, to the Knowledge of Seller, threatened against Seller involving the Purchased Assets before any Governmental Authority.    21

6.9     Environmental Matters.  The representations and warranties contained in this Section 6.9 are the sole and exclusive representations and warranties of Seller pertaining or relating to any environmental, health or safety matters, including any arising under any Environmental Laws.  Except as set forth on Disclosure Schedule 6.9 hereto:.........................21

6.10    Brokers, Finders.  Other than Ocean Park Advisors and Prairie Advisors (Brent King), retained by Seller as its brokers in connection with the transactions contemplated by this Agreement, Seller has not retained any broker or finder in connection with the transactions contemplated hereby, and is not obligated and has not agreed to pay any brokerage or finder's commission, fee or similar compensation. .............................................22

ARTICLE VII REPRESENTATIONS AND WARRANTIES OF PURCHASER ......................22

Purchaser represents and warrants to Sellers as follows:.................................................................22

7.1     Organization and Good Standing.  Purchaser is an organization duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  The Purchaser has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted..........................22

7.2     Authority; Validity; Consents.  The Purchaser has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by the Purchaser and the consummation by the Purchaser of the transactions contemplated herein have been duly and validly authorized by all requisite corporate actions in respect thereof.  This Agreement has been duly and validly executed and delivered by Purchaser at the Closing.  This Agreement constitutes the legal, valid and binding

obligation of the Purchaser, enforceable against the Purchaser in accordance with the terms hereof, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Purchaser is or will not be required to give notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, affect Purchaser's ability to perform its obligations under this Agreement or to consummate the transactions contemplated hereby or thereby. 22

7.3     Availability of Funds. As of the Closing, subject to Section 8.1 hereof, Purchaser will have sufficient cash in immediately available funds to pay the Closing Costs and all costs, fees and expenses to be paid by the Purchaser that are necessary to consummate the transactions contemplated by this Agreement. ................................................................23

7.4     Litigation. There are no Proceedings pending or, to the Knowledge of Purchaser, threatened, that would affect Purchaser's ability to perform its obligations under this Agreement or to consummate the transactions contemplated hereby or thereby................23

7.5     Brokers or Finders. Neither Purchaser nor any Person acting on behalf of the Purchaser has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Sellers are or will become liable, and Purchaser shall hold harmless and indemnify Sellers from any claims with respect to any such fees or commissions.23

ARTICLE VIII **CONDITIONS PRECEDENT** ........................................................23

The obligations of the Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Seller or Purchaser in whole or in part to the extent permitted by applicable Law):................................................23

8.1     Accuracy of Representations. The representations and warranties of Seller and Purchaser set forth in this Agreement shall be true and correct in all material respects.....23

8.2     Sale Order. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall become a Final Order. ................................................................23

8.3     Board Approval. This Agreement and the agreements, instruments, and transactions contemplated hereby shall have been approved by the Board of Directors and shareholders of Renewable Energy Group, Inc. and the Boards of Directors of Blackhawk Biofuels, LLC, Central Iowa Energy, LLC and Western Iowa Energy, LLC, which approval may be granted or denied for any reason or no reason. ................................................23

8.4     Compliance with Agreement. Sellers shall have performed and complied with all obligations and agreements required in this Agreement to be performed or complied with by them on or prior to the Closing Date, including delivery of those documents and instruments required by Section 5.4 of this Agreement...............................................23

8.5     Title Insurance. With respect to the Owned Real Property, Purchaser shall have received a binding commitment from a title insurance company of Purchaser's choice, the costs of which will be borne by the Purchaser, to issue a policy of title insurance on the Owned Real Property at Purchaser's expense, which shall show title thereto to be in the

131655.01602/21818488v.6

condition represented by Sellers herein, shall contain exceptions only for Permitted Encumbrances and such other matters as Purchaser shall require or approve..........................23

8.6     No Prohibition Order.  There shall not be in effect any Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby..................................24

8.7     Disclosure Schedules.  The parties shall have agreed to the content of the Exhibits and Schedules to this Agreement, including any Disclosure Schedule referred to in any Section hereof..............................................................................................................24

8.8     Bank Term Debt.  The Bank Term Debt assumed by Purchaser shall have been renegotiated on terms and conditions satisfactory to Purchaser and Bank. .....................24

8.9     Additional Capital.  Purchaser shall have obtained $4.0 million in additional capital on terms and conditions satisfactory to Purchaser. ........................................................24

ARTICLE IX TERMINATION...............................................................................................24

9.1     Termination.  This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing by either Party in the following manner; provided, however, that if the Closing has not occurred because a Bankruptcy Court has not entered the Sale Order, but all other closing conditions under this Agreement that are capable of being met by the Target Closing Date have been fulfilled or waived, then no Party may terminate this Agreement prior to October 6, 2009: ......................24

9.2     Procedure and Effect of Termination.  The Target Closing Date may be extended upon written agreement of Sellers and Purchaser without the further consent of the Bankruptcy Court. Upon termination of this Agreement as provided in Section 9.1, neither Sellers nor Purchaser shall have any further obligation or liability under or by reason of this Agreement except for any liability of a party due to their breach prior to termination of this Agreement.     25

ARTICLE X GENERAL PROVISIONS.....................................................................................25

10.1     Bankruptcy Court Approval. ..........................................................................25

10.2     Notices.  All notices, requests, demands and other communications made in connection with this Agreement shall be in writing and shall be (a) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (b) transmitted by hand delivery, (c) sent by facsimile or electronic mail, or (d) sent by nationally recognized overnight courier for next business day delivery, addressed as follows:.....................................25

10.3     Successors.  This Agreement shall be binding on and inure to the benefit of the Parties and their respective successors and assigns. ...........................................................27

10.4     Counterparts.  This Agreement may be executed in any number of counterparts and all counterparts shall be construed together and shall constitute but one Agreement.  Facsimile transmission (including transmission by email in PDF format) of any executed original document shall be deemed the same as a delivered, executed original.........27

10.5     Applicable Law; Jurisdiction and Venue.  This Agreement shall be construed under federal law and laws of the state of Delaware, and any disputes shall be resolved by the Bankruptcy Court which shall have exclusive jurisdiction at all times that the Bankruptcy Case is pending. Each of the Parties irrevocably consents for all purposes of this Agreement to the jurisdiction of the Bankruptcy Court and agrees that venue is proper in the Bankruptcy Court.27

10.6     Entire Agreement. This Agreement, the Bidding Procedures, and the Schedules and Exhibits hereto represent the Parties' mutual understandings and supersede all prior agreements whether in oral or written form. .................................................................27

10.7     Survival. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.27

10.8     Taxes. Any and all sales, transfer and recording taxes, stamp taxes or similar taxes, if any, relating to the sale, assignment and/or assumption of the Purchased Assets, not precluded by the Sale Order under Section 1146(a) of the Bankruptcy Code, shall be the sole responsibility of Purchaser and shall be paid, if applicable, to the proper governing body by Purchaser.     27

10.9     Severability. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted thereof in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability. ..........................27

10.10    Additional Instruments. The Parties agree to execute such additional instruments as may be reasonably necessary to carry out the provisions of this Agreement. ...28

10.11    No Third-Party Beneficiaries. Nothing in this Agreement shall confer any rights upon any person or entity other than the Parties hereto and their respective successors and permitted assigns. ..........................................................................................................28

10.12    Amendment; Waiver. This Agreement may not be amended or modified except by an instrument in writing signed by all the Parties, and no performance, term or condition can be waived in whole or in part, except by a writing signed by the Party against whom enforcement of the waiver is sought. Any performance, term or condition of this Agreement may be waived in writing at any time by the Party hereto entitled to the benefit thereof. No delay or failure on the part of any Party in exercising any rights hereunder, and no partial or single exercise thereof, will constitute a waiver of such rights or of any other rights hereunder.     28

10.13    Disclosure. Disclosure of any matter, fact or circumstance in any Schedule to this Agreement shall be disclosure thereof for purposes of all other Schedules to this Agreement provided that such disclosure is (i) explicitly cross referenced to such other Schedule or (ii) sufficiently detailed so as to be reasonably recognizable to Purchaser that such disclosure is relevant and responsive to such other Schedule. Certain information set forth in the Schedules is included solely for informational purposes, is not an admission of liability with respect to the matters covered by the information, and may not be required to be disclosed pursuant to this Agreement. The specification of any Dollar amount in the representations and warranties contained in this Agreement or the inclusion of any specific

-viii-

item in the Schedules is not intended to imply that such amounts (or higher or lower amounts) or such items are or are not material, and no Party shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Schedules in any dispute or controversy among the Parties as to whether any obligation, item, or matter not described herein or included in a Schedule is or is not material for purposes of this Agreement. ............28

10.14 <u>Waiver of Jury Trial</u>. PURCHASER AND SELLERS PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. FURTHER, PURCHASER AND SELLERS EACH HEREBY CERTIFY THAT NO REPRESENTATIVE OF THE OTHER, OR COUNSEL TO THE OTHER, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT IT WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION. PURCHASER AND SELLERS EACH ACKNOWLEDGE THAT THE OTHER HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, INTER ALIA, THE PROVISIONS OF THIS <u>SECTION 10.14</u>....28

131655.01602/21818488v.6

## SCHEDULES

| | |
|---|---|
| Schedule 1a | Assigned Contracts and Leases |
| Schedule 2 | List of Individuals for the Purpose of Knowledge |
| Schedule 3.1(d) | Owned Real Property |
| Schedule 3.1(j) | List of Additional Assets |
| Schedule 6.3(b) | Facility Employees |
| Schedule 6.4(a) | Intellectual Property |
| Schedule 6.4(b) | Intellectual Property Rights in Dispute |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Bill of Sale |
| Exhibit B | Form of Deed |
| Exhibit C | Transition Service Agreement |
| Exhibit D | Assignment and Assumption Agreement |
| Exhibit E | Instruments of Assignment of Seller's Patents |

131655.01602/21818488v.6

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), effective as of the 23rd day of September, 2009 (the "Effective Date"), by and between Nova Biofuels Seneca, LLC and Nova Biosource Technologies, LLC, each a Delaware limited liability company (either or both, referred to herein as "Sellers"), and REG Seneca, LLC, an Iowa limited liability company, or its designee ("Purchaser").

### WITNESSETH:

WHEREAS, Sellers are debtors and debtors in possession under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in that certain Case No. 09-11081 (KG) filed on March 30, 2009 (the "Bankruptcy Case") and currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Sellers were in the business of manufacturing ASTM D6751 quality biodiesel and related co-products out of its production facilities in Seneca, Illinois (the "Business") in addition to other locations;

WHEREAS, subject to the approval of the Bankruptcy Court, Sellers desire to sell, transfer, assign, convey and transfer the Purchased Assets (as defined below) and to assign the Assigned Contracts and Leases (each as defined below), and Purchaser desires to purchase, take delivery of and assume the Purchased Assets, the Assigned Contracts and Leases, upon the terms and subject to the conditions set forth herein; and

WHEREAS, the transactions contemplated by this Agreement will be consummated pursuant to the Bidding Procedures (defined below);

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby reciprocally acknowledged, the Parties agree as set follows:

### ARTICLE I
### DEFINITIONS

1.1     Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified and referenced below.

"Accounts Receivable" means, with respect to Sellers, all accounts receivable and other rights to payment from customers of Sellers, including those consisting of all accounts receivable in respect of goods shipped or products sold or services rendered to customers by Sellers, any other miscellaneous accounts receivable of Sellers, and any claim, remedy or other right of Sellers related to any of the foregoing; in all cases, however, only to the extent that such accounts receivable and other payments rights accrued prior to the Closing.

-1-

"Action" means any legal action, suit or arbitration, or any inquiry, Proceeding or investigation, by or before any Governmental Authority.

"Affiliate" has the meaning set forth in 11 U.S.C. § 101(2).

"Agreement" has the meaning set forth in the introductory paragraph.

"Assigned Contracts and Leases" means those executory contracts and unexpired leases: (i) set forth on **Schedule 1A** hereto and (ii) that are designated by Purchaser to be assumed and assigned to Purchaser in accordance with Section 3.3.

"Assignment Election" has the meaning set forth in Section 3.3 hereof.

"Avoidance Actions" means any and all claims for relief of Sellers under chapter 5 of the Bankruptcy Code except those Claims set forth in Section 3.1(n) hereof.

"Bank" means WestLB AG, New York Branch ("WestLB").

"Bank Term Debt" means indebtedness in the aggregate principal amount of $36,250,000. The Bank Term Debt consists of $35,000,000, in the aggregate, of the pre-petition and post-petition obligations owed to WestLB, by Nova Biosource Seneca and affiliated entities pursuant to that certain Credit Agreement dated as of December 26, 2007, among Nova Biofuels Seneca, LLC, as borrower and WestLB as lender (as amended, supplemented or otherwise modified from time to time) (the "Prepetition Credit Agreement") and the DIP Credit Agreement dated as of July 15, 2009 among Nova Biofuels Seneca, LLC, and certain affiliated entities as borrowers and guarantors and WestLB as lender (as amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), plus up to $1,250,000 in certain allowed post-petition expenses related to the acquisition of the assets of Nova Biofuels Seneca, LLC, and Nova Biofuels Technologies, LLC for an aggregate total of $36,250,000 of assumed debt, with such assumed debt subject to renegotiated terms and conditions satisfactory to Purchaser and Bank pursuant to Section 8.8 of this Agreement.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means those rules and regulations promulgated under the Bankruptcy Code.

"Bidding Procedures" has the meaning set forth in Section 2.1 hereof.

"Bidding Procedures Order" has the meaning set forth in Section 2.1 hereof.

"Bill of Sale" refers to the Bill of Sale substantially in the form attached hereto in **Exhibit A**.

"Business" has the meaning set forth in the Recitals.

-2-

"Business Day" means any day of the year on which national institutions in New York, New York are open to the public for conducting business and are not required or authorized to be closed.

"Claims" means any claim, right, demand, actions, cause of action, chose in action, lawsuit, or judgment of any nature whatsoever, in Law, equity or otherwise, of which Seller has received written notice, whether for recovery of money or property, or for consequential or other damages or other relied, and whether arising by way of counterclaim or otherwise.

"Closing" has the meaning set forth in Section 5.1 hereof.

"Closing Costs" has the meaning set forth in Section 5.2 hereof.

"Closing Date" has the meaning set forth in Section 5.1 hereof.

"Code" means the Internal Revenue Code of 1986, as amended.

"Construction Contract Documents" means all construction contracts, subcontracts, plans (including without limitation all as-built marked-up plans), specifications, drawings, site plans, surveys (including without limitation all as-built surveys), environmental assessments and reports, soil condition reports, and all amendments, modifications or restatements of any of the foregoing.

"Contract" means any agreement, contract, obligation, promise or undertaking (in each case whether written or oral), other than a Lease, that is legally binding.

"Copyright" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"Cure Costs" mean all unpaid amounts or unsatisfied obligations that must be paid or satisfied to effectuate, pursuant to all applicable provisions of the Bankruptcy Code, the assumption by and assignment to Purchaser of the Assigned Contracts and Leases.

"Deed" refers to the Deed substantially in the form attached hereto in **Exhibit B**.

"Designation Deadline" means 5:00 p.m., Central Time, on the day that is thirty (30) days after the Closing Date.

"Documents" means all books, records, files, invoices, Inventory records, product specifications, advertising materials, customer lists, cost and pricing information, supplier lists, business plans, catalogs, customer literature, quality control records and manuals, research and development files, records and laboratory books and credit records of customers (including all data and other information stored on discs, tapes or other media), plans, specifications, studies, surveys, maps, plats, drawings, P & ID's, PED's, vessel drawings, analyses, reports, training materials, and ownership and operating manuals; in all cases up to date and to the extent used in or to the extent relating to the assets, properties, business or operations of the Business.

-3-

"Effective Date" has the meaning set forth in the introductory paragraph.

"Encumbrance" means any charge, lien, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, third party interest or other restriction or limitation of any kind.

"Environmental Costs and Liabilities" means, with respect to any Person, all Liabilities and Remedial Actions incurred as a result of any claim or demand by any other Person or in response to any violation of Environmental Law or to the extent based upon, related to, or arising under or pursuant to any Environmental Law, Environmental Permit, order or agreement with any Governmental Authority or other Person, or which relates to any environmental, health or safety condition, violation of Environmental Law or a Release or threatened Release of Hazardous Materials, whether known or unknown, accrued or contingent, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute.

"Environmental Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other legal requirement or obligation in any way relating to pollution, odors, noise, or the protection of human health and safety, the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as each has been amended and the regulations promulgated pursuant thereto.

"Environmental Permit" means any Permit required by Environmental Laws for the operation of the Business.

"Equipment" means all furniture, trade fixtures, equipment, computers, machinery, apparatus, appliances, implements, signage, supplies, spare parts and all other tangible personal property of every kind and description owned by Sellers and used or held for use exclusively in the Business.

"Excluded Assets" has the meaning set forth in Section 3.2 hereof.

"Excluded Deposits" means all deposits (including customer deposits and security deposits for rent and electricity) and prepaid charges and expenses of Sellers, other than Pre-Paid Expenses and Security Deposits.

"Facilities" or "Facility" means the production facilities or facility listed on **Schedule 3.1(d)**.

"Facility Employee" means any of the individuals listed on **Schedule 6.3(b)**, as updated pursuant to Section 6.3(b).

"Final Order" means an action taken or order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or order is pending, no such stay is in effect, and,

-4-

if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental authority or regulatory or administrative authority or any court, tribunal or judicial body having jurisdiction.

"Hazardous Substance" means any "pollutant," "contaminant," "hazardous waste," "hazardous material" or "hazardous substance" under any Legal Requirement concerning environmental, health or safety matters.

"Intellectual Property" means all intellectual property, including all Copyrights, Patents, Trademarks, domain names, software, source codes, technology, enforcement rights and Trade Secrets, owned by Sellers or licensed from third parties by Sellers, and used or held for use in the Business, as set forth in **Schedule 6.4(a)**.

"Inventory" means the property listed on Schedule 3.1(j).

"Knowledge" means, with respect to any matter in question, in the case of Sellers, the actual knowledge of any of the individuals listed on **Schedule 2** with respect to such matter.

"Law" means any federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other legal requirement or obligation.

"Leased Real Property" means the real property subject to the unexpired leases set forth in **Schedule 1A**.

"Lease" means the unexpired leases set forth in **Schedule 1A**.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, mediations, investigations, inquiries, proceedings or claims (including counterclaims) by or before a Governmental Authority.

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"Material Adverse Effect" means any change, event or occurrence that individually or in the aggregate (taking into account all other such changes, events or occurrences) has had, or would be reasonably likely to have, (x) a material adverse change in or material adverse effect on the

-5-

Purchased Assets or the Business (excluding the Excluded Assets), in each case taken as a whole, or (y) a material adverse change in or the ability of Sellers to consummate the transactions contemplated by this Agreement, but excluding, in either case, (a) any change or effect to the extent that it results from or arises out of (i) the Bankruptcy Case; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the transactions contemplated hereby; (iii) changes in (or proposals to change) Legal Requirements or accounting regulations or principles; or (iv) any action contemplated by this Agreement or taken at the request of Purchaser; and (b) any change or effect generally applicable to (i) the industries and markets in which Sellers operate or (ii) economic or political conditions or the securities or financial markets in any country or region, in the case of each of clauses (b)(i) and (b)(ii), to the extent that such change or effect does not affect the Business, taken as a whole, in a disproportionate manner relative to other participants of a similar size in the industries and markets in which the Business operates.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"Ordinary Course" or "Ordinary Course of Business" means the conduct of the business of Sellers in accordance with their normal day-to-day customs, practices and procedures as conducted from time to time prior to the date of this Agreement and shall include the activities of Sellers undertaken in connection with their respective obligations under this Agreement.

"Owned Real Property" means the assets listed on **Schedule 3.1(d)**.

"Party" or "Parties" means, individually or collectively, Purchaser and Sellers.

"Patent" means patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"Permits" means all franchise, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances and Orders that are necessary for Sellers to own, lease and operate their properties and assets or to carry on the Business as it is now being conducted.

"Permitted Encumbrance" means: (i) easements, leases, reservations, or other rights of others in, or minor defects and irregularities in title that do not materially impair the use of, the encumbered property or assets for the purposes for which they are held; (ii) any Encumbrance or privilege vested in any lessor, licensor or permittor for rent or other obligations solely related to the period after the Closing; (iii) licenses of or other grants of rights to use Intellectual Property entered into in the ordinary course of business that do not materially impair the conduct of the Business; (iv) Encumbrances, title exceptions or other imperfections of title caused by or resulting from the acts of Purchaser or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees; and (v) liens for Taxes not yet due and payable, which includes the real property taxes with respect to the Owned Real Property for fiscal year 2009 that are due

-6-

and payable in fiscal year 2010 in the approximate amount of $200,000; and (vi) the Encumbrances securing the obligations under the Bank Term Debt.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Pre-Closing Tax Period" means all liability for any real or personal property Taxes with respect to the Purchased Assets for a Tax period or year, or portion thereof, that ends on or before the Closing Date.

"Pre-Paid Expenses" means all (i) prepaid charges and expenses of Sellers solely to the extent that such prepaid charges and expenses (A) relate to natural gas, denaturant, chemicals, utilities and rail, (B) were deposited or paid pursuant to the Assigned Contracts and Leases and (C) relate to goods to be provided or services to be performed to or for the benefit of Purchaser or any of its Affiliates at any time after Closing, and (ii) cash deposits paid by Sellers under any of the Assigned Contracts and Leases, which deposits will be transferred to Purchaser or its designated Affiliates at Closing.

"Proceeding" means any action, arbitration, availability, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Purchased Assets" has the meaning set forth in Section 3.1 hereof.

"Purchaser" has the meaning set forth in the introductory paragraph.

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Substance).

"Remedial Action" means all actions including any capital expenditures undertaken to (i) clean up, remove, treat or in any other way address any Hazardous Material; (ii) prevent the Release or threat of Release, or minimize the further Release of any Hazardous Material so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) correct a condition of noncompliance with Environmental Laws.

"Representatives" means with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, attorneys, advisors, and other representatives.

"Sale Order" means an order of the Bankruptcy Court, pursuant to all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, in the Bankruptcy Case that approves this Agreement and the transactions contemplated hereby, which order shall contain findings of fact, conclusions of law and other provisions acceptable to each of the Parties.

-7-

"Security Deposits" means (A) all security deposits and other deposits (including interest, if any, accrued thereon in accordance with the terms of the Lease) relating to space within the leased premises paid by Sellers and in the possession or control of the lessor under the Lease, and (B) all deposits (including interest, if any, accrued thereon) to secure services provided to or goods used for the Owned Real Property, the Leased Real Property or the Business, including, deposits with utility service providers.

"Sellers" has the meaning set forth in the introductory paragraph.

"Subsidiaries" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"Target Closing Date" has the meaning set forth in Section 5.1 hereof.

"Taxes" means (and with/correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any transferee liability in respect of any items described in clause (i) above.

"Third Party Agreement" has the meaning set forth in Section 9.1(c) hereof.

"Trade Secrets" means trade secrets and other confidential and proprietary information and know-how.

"Trademarks" means trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"Transaction Document" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transition Services Agreement" means a Transition Services Agreement substantially in the form attached hereto as **Exhibit D**.

"Treasury Regulation" means the regulations promulgated by the U.S. Treasury Department pursuant to the Code.

-8-

## 1.2 Other Definitions and Interpretative Matters.

(a)  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

"Calculation of Time Period" When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

"Dollars" Any reference in this Agreement to $ means U.S. dollars.

"Exhibits/Schedules" All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

"Gender and Number" Any reference in this Agreement to gender includes all genders, and words imparting the singular number only include the plural and vice versa.

"Headings" The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

"Herein" Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

"Including" The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)  No Strict Construction.  Purchaser and Sellers participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Purchaser and Sellers and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

131655.01602/21818488v.6

## ARTICLE II
## BIDDING PROCEDURES

2.1    Bidding Procedures.  This Agreement is made subject to, and in accordance with the bidding procedures (the "Bidding Procedures") approved by the Bankruptcy Court pursuant to the Order Establishing Bid and Sale Procedures, Pursuant to Bankruptcy Code Sections 363 and 365 and Bankruptcy Rules 6004 and 6006 and Subject Thereto, for the Sale Free and Clear of Liens, Claims, Encumbrances and Interests of Substantially All of the Debtor's Assets and the Assumption and Assignment of Designated Contracts and Leases (Docket No. 203) ("Bidding Procedures Order").  Purchaser agrees and acknowledges that the Sellers are and may solicit inquiries, proposals or offers for the Purchased Assets in connection with any alternative transaction pursuant to the terms of the Bidding Procedures Order.

2.2    Other Definitions; Conflict.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures.  In the event of a contradiction between this Agreement and the Bidding Procedures, the Bidding Procedures shall control.

## ARTICLE III
## PURCHASE AND SALE

3.1    Purchase and Sale.  This Agreement when signed by Purchaser shall constitute an irrevocable offer by Purchaser to Purchase the Purchase Assets on the terms and conditions set forth in this Agreement until two (2) business days after the Purchased Assets have been sold pursuant to a closing of the sale or sales approved by the Bankruptcy Court, subject to Section 9.1 hereof. Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Purchaser, and Purchaser shall purchase, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of Sellers in, to or under the following (herein collectively called the "Purchased Assets"): (i) all of the properties and assets of Sellers (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use exclusively in or relating exclusively to the Business, as the same shall exist on the Closing Date, and (ii) without limiting the generality of clause (i) of this Section 3.1, all of the following properties and assets of Sellers, whether they relate exclusively to the Business or not (except where so noted in the following list or in any definition used in the following list):

(a)    all Inventory;

(b)    all Equipment;

(c)    the Assigned Contracts and Leases;

(d)    the Owned Real Property listed or described on **Schedule 3.1(d)**;

-10-

(e)     all Permits and pending applications therefor, in each case to the extent assignable, used exclusively in connection with the Business;

(f)     all Intellectual Property;

(g)     Pre-Paid Expenses and Security Deposits, specifically excluding retainer and expense deposit payments to attorneys, financial advisors and all other professionals for services related to the Bankruptcy Case;

(h)     all goodwill associated with the Business or the Purchased Assets;

(i)     to the extent available and permitted by applicable law, all Documents that relate to any Purchased Assets, provided that Sellers may retain copies of such Documents;

(j)     all assets set forth in **Schedule 3.1(j)**;

(k)     all Documents and Construction Contract Documents and all rights under or pursuant to all Documents and Construction Contract Documents, warranties, representations and guarantees made by suppliers, manufacturers, contractors or others to the extent relating to the operation of the Business or affecting the Owned Real Property, Leased Real Property, Equipment, Inventory or other tangible Purchased Assets, not including any such Documents or Construction Contract Documents relating exclusively to the biodiesel refinery operated by Nova Biofuels Clinton County, LLC, or its successors and assigns;

(l)     to the extent reasonably practicable, all telephone, telex and telephone facsimile numbers and other directory listings relating exclusively to the Facilities;

(m)     Tax refunds and Tax abatements (including agreements for Tax abatements) for ad valorem real property Taxes paid with respect to the Owned Real Property, except as provided in Section 3.2(i);

(n)     all Claims and demands of whatever nature against Purchaser and any Affiliate, including Claims under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code;

(o)     any and all of Sellers' rights, title and interest in and to any Claims against any architect, contractor, subcontractor or other person for defective work, defective products or negligence to the extent such claims are assignable under applicable nonbankruptcy law;

(p)     all other or additional privileges, rights and interests associated with the Purchased Assets of every kind and description and wherever located to the extent that they are used or intended for use exclusively in connection with the Business and;

(q)     Insurance proceeds payable with respect to a casualty to any of the Purchased Assets provided that such casualty occurs after August 31, 2009. For the avoidance of doubt, insurance proceeds under this subsection 3.1(q) shall not include proceeds from (i) any insurance policy of Sellers or their Affiliates which indemnifies harm arising from misconduct by the directors or officers of any of Sellers or their Affiliates, or (ii) any insurance policy of

-11-

Sellers or their Affiliates which indemnifies losses occurring on or prior to August 31, 2009 for interruptions of the business of Sellers or their Affiliates.

3.2     Excluded Assets.  The Purchased Assets shall not include any of the following (collectively, the "Excluded Assets"):

(a)     the consideration delivered to Sellers pursuant to this Agreement;

(b)     all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits as of the Closing Date, in each case excluding any item described in Section 3.1(g), (m) and (p) and excluding any deposit amounts included in Pre-Paid Expenses;

(c)     all Owned Real Property not listed or described on **Schedule 3.1(d)** and not otherwise comprising any portion of the Facilities;

(d)     Deleted.

(e)     all capitalized leases;

(f)     any shares of capital stock or other equity interest of any Sellers or any of Sellers's Subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Sellers or any of Sellers's Subsidiaries;

(g)     all minute books, stock ledgers, corporate seals and stock certificates of Sellers;

(h)     any Contracts or Leases that are not Assigned Contracts and Leases;

(i)     any refunds of Taxes paid by Sellers with respect to a Pre-Closing Tax Period and not otherwise reimbursed by Purchaser hereunder;

(j)     all Accounts Receivable;

(k)     all insurance policies and rights to proceeds thereof, including insurance policies and rights to proceeds thereof for claims (i) against directors and officers of the Sellers and their affiliates and (ii) relating to interruption of the Sellers' business prior to August 31, 2009, provided, however, insurance proceeds paid with respect to a casualty to any of the Purchased Assets shall be considered as part of the Purchased Assets;

(l)     all telephone, telex and telephone facsimile numbers and other directory listings, other than telephone, telex and facsimile numbers specific exclusively to the Facilities and included in Purchased Assets pursuant to Section 3.1(n);

(m)     all Permits and pending applications therefor other than those specified in Section 3.1 (e);

-12-

(n)     all Excluded Deposits;

(o)     any payments pursuant to the USDA Section 9005 Program Reserve for Advanced Biofuels;

(p)     the Avoidance Actions; and

(q)     any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document.

3.3     Designation of Assigned Contracts and Leases; Cure Costs.

(a)     Prior to the Designation Deadline, Purchaser shall designate by notice to Seller (such notice to be signed and dated by Purchaser) (the "Assignment Election") whether or not Purchaser elects to have assumed and assigned to it as an Assigned Contract and Lease, effective as of the Closing Date, the Non-Exclusive Patent License Agreement between Nova Biosource Technologies, LLC and Clinton County Bio-Energy, LLC (the "Technology License"). Upon receipt of the Assignment Election prior to the Designation Deadline, Purchaser and Seller shall cause the Technology License to be assumed and assigned to Purchaser pursuant to an assignment and assumption agreement, in the form attached hereto as **Exhibit D**, duly executed by the Seller and Purchaser.

(b)     Seller shall be responsible for verification that there are no Cure Costs for the Technology License, including all administrative responsibilities associated therewith, in the Bankruptcy Case and otherwise, and shall use reasonable best efforts to establish that there are no Cure Costs for the Technology License (as soon as practicable and in all events prior to the Designation Deadline), including taking all reasonable actions with respect to the filing and prosecution of any pleadings and Proceedings in the Bankruptcy Court and the service and delivery of any related notices or pleadings. If there are any such Cure Costs with regard to the Technology License or the Assigned Contracts and Leases, Seller shall have no obligation to pay or perform them.

3.4     Assignment of Purchased Assets.    To the maximum extent permitted by the Bankruptcy Code, the Purchased Assets shall be assumed by and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), would be legally invalid. If with respect to any Purchased Asset such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363 or 365 of the Bankruptcy Code, then such Purchased Asset shall not be transferred hereunder. In the case of licenses, certificates, approvals, authorizations, Leases, Contracts and other commitments included in the Purchased Assets (i) that cannot be transferred or assigned without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, at Purchaser's sole expense and subject to

-13-

any approval of the Bankruptcy Court that may be required, reasonably cooperate with Purchaser in endeavoring to obtain such consent and, if any such consent is not obtained, Sellers shall, following the Closing, at Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, cooperate with Purchaser in all reasonable respects to provide to Purchaser the benefits thereof in some other manner, or (ii) that are otherwise not transferable or assignable (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, following the Closing, at Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Purchaser to provide to Purchaser the benefits thereof in some other manner (including the exercise of the rights of Sellers thereunder); *provided* that nothing in this Section 3.4 shall (x) require Sellers to make any expenditure or incur any obligation on their own or on behalf of Purchaser for which funds in the full amount of such expenditure or obligation are not provided to Sellers by Purchaser in advance in cash or (y) prohibit any Sellers from ceasing operations or winding up its affairs following the Closing.

3.5     Further Assurances.

(a)     At the Closing, and at all times thereafter as may be necessary, for a reasonable period of time following the Closing, Sellers shall execute and deliver to Purchaser such other instruments of transfer as shall be reasonably necessary or appropriate to vest in Purchaser good and indefeasible title to the Purchased Assets free and clear of all Encumbrances other than Permitted Encumbrances and to comply with the purposes and intent of this Agreement and such other instruments as shall be reasonably necessary or appropriate to evidence the assignment by Sellers and assumption by Purchaser of the Assigned Contracts and Leases, and each of Sellers and Purchaser shall use its reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable law, and execute and deliver such documents and other papers, as may be required to consummate the transactions contemplated by this Agreement and to carry out the intent and give effect to such transactions; *provided* that nothing in this Section 3.5 shall prohibit any Sellers from ceasing operations or winding up its affairs following the Closing.

(b)     Sellers at their expense prior to Closing shall have moved the storm water separation vault to the Owned Real Property in compliance with applicable Law and as reasonably acceptable to Purchaser.

3.6     Adequate Assurances.  If necessary, Purchaser shall provide adequate assurance of the future performance of each of the Assigned Contracts and Leases without Purchaser incurring any additional expense.  Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Purchaser's employees and representatives available to testify before the Bankruptcy Court.

3.7     Access.  Sellers shall afford to Purchaser and its and their Representatives, and to prospective lenders, placement agents and other financing sources and each of their respective representatives, reasonable access, during normal business hours upon reasonable notice throughout the period prior to the Closing, to their respective properties and facilities (including

-14-

all real property and the buildings, structures, fixtures, appurtenances and improvements erected, attached or located thereon and including for environmental Phase I and Phase II testing), books and records, financial information, Contracts, commitments and records and, during such period, shall furnish promptly such information concerning its businesses, properties and personnel of Sellers as Purchaser shall reasonably request in connection with the transactions contemplated herein; provided, however, such investigation shall not unreasonably disrupt Sellers' operations. Sellers shall afford Purchaser and its Representatives access to, and the opportunity to contact directly, customers of Sellers, including direct or indirect purchasers of biodiesel and by-products of biodiesel production. Purchaser agrees to provide to Sellers reasonable access to its books and records after the Closing to be able to administer the Bankruptcy Case.

3.8     Conduct of the Business Pending the Closing.

(a)     Except as otherwise expressly provided by this Agreement or with the prior written consent of Purchaser, between the date hereof and the Closing, Sellers shall:

i.      conduct the Business only in the Ordinary Course of Business, which for these purposes, may include not operating the Facilities;

ii.     maintain (A) all of the assets and properties of, or used by, Sellers consistent with past practice, which for these purposes, may include not operating the Facilities and (B) insurance upon all of the assets and properties of Sellers in such amounts and of such kinds comparable to that in effect on the date of this Agreement;

iii.    comply in all material respects with all applicable Laws;

iv.     take steps to renew all Permits in a timely manner prior to their lapse;

v.      pay all maintenance and similar fees and take all other appropriate actions as necessary to prevent the abandonment, loss or impairment of all Intellectual Property of the Company; and

vi.     Sellers shall use reasonable efforts to maintain the current workforce level at the Seneca facility, including assisting Purchaser to retain current Seneca employees on a permanent basis following the Closing.

(b)     Without limiting the generality of the foregoing, except as otherwise expressly provided by this Agreement or with the prior written consent of Purchaser, Sellers shall not:

i.      subject to any Encumbrances or otherwise encumber or, except for Permitted Encumbrances, permit, allow or suffer to be subjected to any Encumbrances or otherwise encumbered, any of the Purchased Assets;

ii.     sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets;

-15-

iii.        enter into any transaction or enter into, modify or renew any Assigned Contract or Lease which by reason of its size or otherwise is not in the Ordinary Course of Business;

iv.        enter into any contract, understanding or commitment that restrains, restricts, limits or impedes the ability of the Business, or the ability of Purchaser, to compete with or conduct any business or line of business in any geographic area or solicit the employment of any persons;

v.        terminate, amend, restate, supplement or waive any rights under any (A) Assigned Contract or Lease other than in the Ordinary Course of Business or (B) Permit;

vi.        take any action which would adversely affect the ability of the parties to consummate the transactions contemplated by this Agreement;

vii.        agree to do anything (A) prohibited by this Section 3.8, (B) that would make any of the representations and warranties of Sellers in this Agreement or any of the Transaction Documents untrue or incorrect in any material respect or could result in any of the conditions to the Closing not being satisfied or (C) that could be reasonably expected to have a Material Adverse Effect with respect to Purchased Assets.

## ARTICLE IV
## PURCHASE PRICE

4.1    <u>Purchase Price</u>.  In addition to the mutual agreements contained herein, the consideration for the purchase, sale, assignment and conveyance of Sellers's right, title and interest in, to and under the Purchased Assets shall consist of assumption by Purchaser of the Bank Term Debt, on new terms and conditions satisfactory to Purchaser and Bank. Purchaser assumes no other liabilities of Sellers except to the extent Purchaser assumes obligations under the Assigned Contracts and Leases as provided in the Assignment and Assumption Agreement attached as Exhibit E to be executed at Closing.

4.2    <u>Deposit</u>. Deleted.

## ARTICLE V
## CLOSING

5.1    <u>Closing Date</u>.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Purchased Assets contemplated hereby (the "Closing") shall take place at the offices of Blank Rome, LLP, Wilmington, Delaware, or such other place as agreed to by the Parties, no later than three (3) Business Days following the date on which the conditions set forth in Article 8 have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), but no later than October 15, 2009 (the "Target Closing Date"). The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date." Sellers shall cooperate with Purchaser and afford Purchaser the opportunity (without

-16-

obligation) to employ the Facility Employees as "at will" employees of Purchaser from and after Closing.

5.2 Closing Costs. In addition to the Purchase Price, Purchaser shall pay the following closing costs (the "Closing Costs"): (i) its own attorneys' fees and expenses, (ii) the entire cost of any title insurance policy (including extended coverage or endorsements) desired by Purchaser, (iii) all recording costs or fees, conveyance fees and any transfer taxes, and (iv) Purchaser's due diligence expenses.

5.3 Payment on the Closing Date. On the Closing Date Purchaser shall pay the Closing Costs and assume the Bank Debt.

5.4 Deliveries at Closing by Sellers. At the Closing, Sellers shall deliver to Purchaser:

(a) the Bills of Sale, the Deeds and each other Transaction Document to which any Seller is a party, duly executed by the applicable Seller;

(b) the Transition Services Agreement, duly executed by the applicable Sellers;

(c) instruments of assignment of the Patents and Trademarks that are owned by Sellers and included in the Purchased Assets, if any, duly executed by the applicable Sellers, in form for recordation with the appropriate Governmental Authorities, substantially in the form of **Exhibits F-1 and F-2** , respectively;

(d) executed counterparts of the contract and lease assignment and assumption agreement(s) referenced in Section 5.5(a)(i);

(e) with respect to the Owned Real Property and Leased Real Property, possession of the Owned Real Property and Leased Real Property, together with any and all keys, access cards, security passcodes and combinations, any existing surveys, legal descriptions and title policies concerning the Owned Real Property and Leased Real Property that are in the possession of Sellers;

(f) a certified copy of the Sale Order having been entered by the Bankruptcy Court and docketed, in form and content reasonably acceptable to Purchaser and its legal counsel;

(g) certificates executed by Sellers, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Sellers are not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(h) such ordinary and customary documents (including any factually accurate affidavits) as may be required by any title company or title insurance underwriter to enable Purchaser to acquire, at Purchaser's sole election and Purchaser's sole cost and expense, one or

-17-

more owner policies of title insurance covering any or all of the Facilities in form and substance reasonably acceptable to Sellers;

>    (i)    all Permits, in accordance with Section 3.1(e):

>    (j)    original counterparts of each Assigned Contract and Lease that is in Seller's possession, custody or control;

>    (k)    all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser and Seller, as may be necessary to convey the Purchased Assets to Purchaser, subject to the Permitted Encumbrances;

>    (l)    such other documents, instruments and certificates as reasonably requested by the Purchaser or agreed to by the parties in order to consummate the contemplated transactions hereunder.

>    5.5    Deliveries at Closing by Purchaser.    At the Closing, Purchaser shall deliver or cause to be delivered to Sellers:

>    (a)    At the Closing, Purchaser shall deliver or cause to be delivered to Sellers:

>    (i)    executed counterparts of one or more contract and lease assignment and assumption agreement(s) with respect to each of the Assigned Contracts and Leases, in the form attached hereto as **Exhibit E**, assigning to Purchaser or an Affiliate of Purchaser all of Sellers's right, title and interest in and to such Assigned Contracts and Leases;

>    (ii)    the Transition Services Agreement, duly executed by Purchaser; and

>    (iii)each    other Transaction Document to which Purchaser is a party, duly executed by Purchaser.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers, jointly and severally, represent and warrant to Purchaser as follows, except as disclosed in the schedules attached hereto:

>    6.1    Organization and Good Standing.    Each of Sellers is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Sellers in all material respects have the requisite corporate or limited liability company power and authority (i) to own or lease and to operate and use their properties and (ii) to carry on their business as now conducted.    Sellers each are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of their business or the nature of their properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

-18-

6.2    <u>Authority; Validity; Consents</u>.    Each of Sellers has, subject to requisite Bankruptcy Court approval, the requisite corporate or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to requisite Bankruptcy Court approval, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller and the consummation by such Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate or limited liability company action. This Agreement has been duly and validly executed and delivered by Sellers and each other Transaction Document required to be executed and delivered by Sellers at the Closing will be duly and validly executed and delivered by Sellers at the Closing. Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents constitute, with respect to Sellers that is party thereto, the legal, valid and binding obligations of Sellers, enforceable against Sellers in accordance with their respective terms, except as such enforceability is limited by general principles of equity. Subject to requisite Bankruptcy Court approval, except (x) for entry of the Sale Order and (y) for notices, filings and consents required in connection with the Bankruptcy Case, Sellers are not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby.

6.3    <u>Employment Matters</u>.

(a)    There are no collective bargaining agreements to which Sellers or its Affiliates are a party relating to any Facility Employee. There is no pending or, to Sellers's Knowledge, threatened, strike, slowdown, picketing, work stoppage, and there is no pending application for certification of a collective bargaining agent involving Sellers and any Facility Employee.

(b)    There are no persons employed by Sellers or any of its Affiliates (whether full-time or part-time) as of the Effective Date who primarily work at the Facilities or whose jobs relate primarily to the Facilities other than the Facility Employees. **<u>Schedule 6.3(b)</u>** is a complete list of all Facility Employees as of the Effective Date, specifying their position, status and date of hire. None of the Facility Employees is subject to any sort of employment agreement or restrictive covenant, whether written or oral, except for the restrictive covenants with the Seller. Any restrictive covenant covering any Facility Employee with Sellers that might prevent Purchaser from employing such Facility Employee shall be irrevocably waived in writing by Sellers prior to Closing, unless otherwise agreed by Purchaser. By the Closing Date, Sellers shall provide to Purchaser copies of such restrictive covenant and written waiver for each Facility Employee, to the extent necessary or requested by Purchaser.

6.4    <u>Sellers' Intellectual Property</u>.

(a)    **<u>Schedule 6.4(a)</u>** sets forth a true and complete list of all U.S. (and in the case of Trademarks, U.S. state) and foreign (i) Patents; (ii) Trademarks; and (iii) Copyrights, in

-19-

each case which are owned by Seller as of the Effective Date and which are material to the Purchased Assets. Except as set forth on **Schedule 6.4(a)**, Seller is the sole owner of all of the applications and registrations set forth on **Schedule 6.4(a)**, and all such applications and registrations are in effect and subsisting.

(b)     Except as disclosed on **Schedule 6.4(b)**, and except as would not, individually or in the aggregate, have a Material Adverse Effect, to Seller's Knowledge, (i) the conduct of the Business by Seller as currently conducted (including the products and services currently sold or provided by Seller) does not infringe or otherwise violate any Person's intellectual property rights, and no such claims are pending or threatened against Seller, and (ii) no Person is infringing or otherwise violating any Intellectual Property owned by Seller, and no such claims are pending or threatened against any Person by Seller.

(c)     To Seller's Knowledge, the Purchased Assets and any rights provided to Purchaser pursuant to the Transaction Documents include all third party intellectual property rights required to operate the Facility in the manner in which they were operated and to otherwise conduct the Business as it is presently being conducted by Seller.

6.5     Delivery; "AS IS" Transaction.

(a)     Purchaser acknowledges that it has fully inspected the Purchased Assets or waived the right to inspect the Purchased Assets prior to the execution of this Agreement, and does hereby assume all of the risks, including, but not limited to, latent and other defects in the Purchased Assets. Sellers shall not be obligated to do any pre-occupancy work or make any repairs in or to the Purchased Assets. Any work (including demolition) which may be necessary to adapt the Purchased Assets for Purchaser's occupancy or for the operation of Purchaser's business shall be the sole responsibility of Purchaser and shall be performed by Purchaser at its sole cost and expense.

(b)     PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT EXCEPT AS PROVIDED IN THIS AGREEMENT SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATED TO THE PURCHASED ASSETS OR THE BUSINESS (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS OR THE BUSINESS; THE PHYSICAL CONDITION OF THE PURCHASED ASSETS; THE PRESENCE, RELEASE OR ABSENCE OF ANY HAZARDOUS SUBSTANCE IN, ON OR ABOUT THE PURCHASED ASSETS OR ANY OTHER MATTER RELATED TO THE ENVIRONMENTAL CONDITION OF THE PURCHASED ASSETS; THE ZONING OF THE PURCHASED ASSETS; THE POSSIBILITY OF DEVELOPING OR USING THE PURCHASED ASSETS IN THE MANNER CONTEMPLATED BY PURCHASER OR OBTAINING ANY CONSENTS, APPROVALS, PERMITS, AUTHORIZATIONS OR ENTITLEMENTS IN CONNECTION THEREWITH; THE VALUE OF THE PURCHASED ASSETS; THE FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR USE; THE ACCURACY, COMPLETENESS, OWNERSHIP OR TRANSFERABILITY OF THE PURCHASED ASSETS OR ANY DOCUMENTS OR OTHER